# Exhibit – 21

Filing # 133961523 E-Filed 09/02/2021 03:49:20 PM

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA
CIVIL DIVISION

ALLISON SCOTT, individually and on behalf of W.S., a minor; LESLEY A B R A V A N E L   a n d   M A G N U S ANDERSSON, individually and on behalf of S.A. and A.A, minors; KRISTEN THOMPSON, individually and on behalf of P.T., a minor; AMY NELL, individually and on behalf of O.S., a minor; DAMARIS ALLEN, individually and on behalf E.A., a minor; PATIENCE BURKE, individually and on behalf of C.B., a minor; and PEYTON   DONALD   and   TRACY DONALD, individually and on behalf of A.D., M.D., J.D., and L.D., minors,

Case No.: 2021-CA-001382

     Plaintiffs,

v.

GOVERNOR RON DESANTIS, in his official capacity as Governor of the State of Florida; RICHARD CORCORAN, in his official capacity as Florida Commissioner of Education; FLORIDA DEPARTMENT OF EDUCATION; and FLORIDA BOARD OF EDUCATION,

     Defendants.

_____/

**FINAL JUDGMENT**

E-Filed and E-Served
by SB on   SEP 0 2 2021

This case came before this Court for a non-jury trial from August 23 -26, 2021.  A verbal ruling was announced on August 27, 2021.

"Under the American System of laws and government every one is required to so use and enjoy his own rights as not to injure others in their rights or to violate any law in force for the preservation of the general welfare." State ex rel. Hosack v. Yocum, 186 So. 448,451(Fla. 1939)(citing from Dutton Phosphate Co. v. Priest, 65 So. 282, 284-85 (Fla. 1914)(emphasis supplied). "The wisdom and necessity, as well as the policy, of a statute are authoritatively determined by the Legislature.  Courts may inquire only into the **power** of the Legislature to lawfully enact a particular statue." Id.

These two quotes from the Florida Supreme Court over 100 years ago describe the balancing of ones own rights with the rights of others, and that, when considering separation of powers, courts may properly consider whether a law (and as a logical extension of this quote an executive action) was lawfully enacted or exercised.  A governor's executive order and an agency's actions must be based on authority granted to them by the Constitution or the Legislature.  Executive power  exercised without authority is illegal, null and void, and unenforceable.

### Incorporation of Verbal Order

2

This Court's findings and conclusions of law are listed verbatim in the attached transcript of the Court's verbal ruling on August 27, 2021, as Exhibit "A", which is incorporated by reference in this Final Judgment.[1]

### Issues and Background

The issues in this case are formed by the pleadings, the evidence presented, the statements and contentions of the parties in the pleadings and at trial.

Before this Court, is a dispute between the Governor, the Florida Commissioner of Education, the Florida Department of Education, and the Florida Board of Education (the Defendants) and parents and students in the Florida public school system (the Plaintiffs).[2] The dispute is whether state law permits local school districts in Florida to adopt and enforce a face mask mandate for students, teachers, and staff.   This dispute arises out of the

---

[1] As indicated at the hearing on August 27, 2021, this Court's verbal order would be close to a final order that could be used by the parties preparing the order as a guideline.  This Court has received a proposed Final Judgment from the Plaintiffs and comments by the Defendants.  After reviewing these, this Court will write its own order and will take into account any portions of the proposal/comments that are applicable.  The verbal order was lengthy.  Because of the pressing need to reduce the verbal ruling to a written order, this Court will do its best to include all the rulings.  However, the complete transcript attached hereto is a more complete recitation of the ruling.

[2] The trial transcript will list the Plaintiffs dismissed by the Court who failed to put on any evidence to support their standing.  As to the Plaintiffs not dismissed during the trial, this Court found that they had standing and reaffirms that finding here.

opening of public schools for the new school year and the increasing COVID crisis in Florida. This has resulted from the less than complete vaccination of the population in Florida and the dominance of a COVID virus variant referred to as the Delta variant. The Delta variant has a higher viral load and is more contagious than the form of COVID present in Florida in 2020. Also, the Delta variant presents a higher risk of infection to children than did the previous form of COVID. The combination of lack of vaccination, decreasing social distancing, and the Delta variant has resulted in dramatically increased COVID infections in Florida over the past several months. Although vaccinated persons have significant protection against the Delta variant, they can still become infected with it. As a result, the CDC (Centers for Disease Control), the American Academy of Pediatrics, and the wide majority of the medical and scientific community in this country recommend universal indoor masking for all school students, staff, teachers, and visitors to K-12 schools regardless of vaccination status and social distancing.

On April 14, 2021, Commissioner Corcoran sent a memorandum (Defendants' Exhibit 45) to School Superintendents requesting that they not implement a mandated mask policy. He said, "we ask that districts, which currently are implementing a mandated face covering policy, revise their

policy to be voluntary for the 2021-2022 school year." Based on this memorandum, this Court concludes that the issue of voluntary versus mandated face mask policies was being considered at least as early as April of 2021. At that time, the Delta variant of COVID had not hit in Florida with full force. It seems that the policy mentioned in the April 14, 2021, memorandum was focusing on the former less infectious form of COVID.

In late June 2021, the Governor declared there was no longer a state of emergency in Florida. He did this by allowing the time-limited declaration of state of emergency order to lapse without renewal. Consequently, his emergency powers under Chapter 252, Florida Statutes expired at that time.

On July 27, 2021, the Governor held a Round Table Meeting on face mask policy in schools. The video of that meeting was introduced into evidence and published at the trial. It was noted at the August 27, 2021, verbal ruling according to this Court's notes and memory, that the participants at this meeting were the Governor, two charter school representatives, a high school student, and some doctors. One of the doctors present was Jayanta Bhattacharya, M.D., Ph.D., who also testified at trial. No Round Table participant proposed a face mask mandate with no parental opt-out. All participants present proposed or suggested a parental opt-out policy. No one

5

advocated for any CDC recommended policy or guideline. In its verbal ruling, this Court provided additional detail of statements and positions taken at the Round Table meeting.

On July 30, 2021, the Governor issued Executive Order 21-175, which continued the formulation of a policy and the enforcement of that policy by the Defendants that local school districts in Florida could not adopt a face mask mandate unless it allowed a parental opt-out.[3] The Parents' Bill of Rights was the keystone of this policy and its enforcement.

The Executive Order went on to direct certain actions (which were premised on enforcing the Parents' Bill of Rights) which would result in a blanket banning - in advance of all school board mask mandates with no parental opt-out. The apparent way to accomplish this was to institute a policy that would likely result in a violation of the Parents' Bill of Rights.[4]

---

[3]This is reflected in the Defendants' Seventh Affirmative Defense which said, "the Parents' Bill of Rights precludes school boards from implementing categorical mask mandates that do not allow parents to opt their children out of the requirement."

[4]The Defendants contended that "[t]he Executive Order requires that any rules adopted by either agency be in accordance with the Parents' Bill of Rights and tasks the Commissioner of Education with ensuring school districts adhere to Florida law." Defendants' Motion to Dismiss, p. 8. In their Motion to Dismiss, p.14, the Defendants contended that "the State Board can *** enforce the Rule and the Parents' Bill of Rights through its discretionary application of its statutory enforcement powers under Section 1008.32, Florida Statutes." Finally, the Defendants contended in their Motion to Dismiss, p. 31, that under the Bill of Rights "parents - not school - boards have the discretion to choose whether their children will wear masks in school."

The Executive Order specifically directed the Florida Department of Health and the Florida Department of Education to work together to immediately adopt rules and take any additional agency action necessary to ensure safety protocols for controlling the spread of COVID. This direction was interpreted by the agencies as a direction to pass a rule to put into effect Executive Order 21-175, which they did. The Florida Department of Health, after consultation with the Florida Department of Education, passed an emergency rule (64DER21-12) which said that "[t]his emergency rule conforms to Executive Order Number 21-175", and incorporated the Executive Order by reference. The Department of Health rule directs "that any COVID-19 mitigation actions taken by school districts comply with the Parents' Bill of Rights, and 'protect parents' right to make decisions regarding masking of their children in relation to Covid-19." The record in this case demonstrates that the Executive Order had two functions : (1) prohibit mask mandates by public schools that do not have a parent opt-out, and (2) enforce this policy by using the Parents' Bill of Rights.

Among its general protocols for controlling COVID spread, the emergency rule states that "the school must allow for a parent or legal guardian of the student to opt-out the student from wearing a face covering

or mask."[5] This accurately reflects the Defendants' position and actions, and is the direct result of the Executive Order.

In addition, the Defendants have acted to threaten and impose sanctions on school districts if they do not comply with the Defendants' directions.[6] "The Executive Order tasks agencies to draft rules and the State Board to enforce the laws and rules." (Defendants' Motion to Dismiss, p. 31).

Thus, the Governor, the Commissioner, the Florida Department of Education, and the Florida Board of Education (by seeking to threaten enforcement of the Executive Order) have directed that school boards may not under any circumstances enact a face mask mandate unless it includes an opt-out provision for the parents pursuant, they say, to the Parents' Bill of Rights.[7]  The Executive Order was issued  for the purpose of using the Parents' Bill of Rights to block all no parent opt-out face mask mandates, and

---

[5]The Defendants' Motion to Dismiss, at p. 33, said, "[n]either the Executive Order nor the Rule require that unvaccinated or non-masked students attend school. Rather, they seek to ensure that school boards are complying with the Parents' Bill of Rights - leaving the decision of masking of children to the children's parents."

[6]The Defendants confirmed by stating at p. 31 of their Motion to Dismiss, "school boards still have the option - albeit with consequences - to categorically mandate masking without exception."

[7]The Department of Health issued its rule after consulting with the Department of Education.  The rule confirms this consultation and the Defendant accept this by stating in their Motion to Dismiss, at p.9, "[i]n accordance with the Executive Order, the Department of Health, after consultation with the Department of Education, promulgated the Rule."

to put into effect the policies raised in the April 14, 2021, memorandum and the July 27, 2021, Round Table meeting.

The Plaintiffs contend, for various reasons set forth in the pleadings, the evidence, the attorneys' presentations in the motion to dismiss hearing, and at trial, that the Executive Order, which directed and became incorporated into the expressed per se no exceptions anti-mask mandate with no parental-opt out, is unconstitutional, illegal, without authority, and unenforceable. The enforcement action of the Defendants (per the August 20, 2021, press release from the Department of Education) noted both the executive order and the Department of Health rule it directed. It said each order (Executive Order and Department of Health rule) requires school districts to document compliance with the Parents' Bill of Rights and the Department of Health rule. Even after the Department of Health rule was adopted, the Department of Education and the State Board of Education are using the Executive Order and the Parents' Bill of Rights to enforce the no mask mandate without a parent opt-out policy.

The parties have called on this Court for a resolution to their dispute.

### Count I - Safe Schools

This Court does not grant relief pursuant to Count I because the proof does not rise to the level required by the decision in <u>DeSantis v. FEA</u>, 306

9

So.3d 1202 (Fla. 1st DCA 2020), and other cases discussing the burden of proof for claims in such cases. There is at least some dispute in the medical community on the issue of masking, therefore, the decision in <u>DeSantis v. FEA</u> mandates a finding by this Court that the burden of proof has not been met for relief.[8]

## Count II - Home Rule

## School Board Control And The Constitution

There has been discussion for many years in many cases regarding the sometimes competing roles of the local school board and the State of Florida in operating public schools.

For example, Article IX, Section 4(b) of the Florida Constitution says in pertinent part: "The school board shall operate, control and supervise all free public schools within the school district."

Yet the Florida Supreme Court in <u>Citizens for Strong Schools v. Florida State Board of Education</u>, 262 So.3d 127, 137 (Fla. 2019) quoted from an earlier decision in <u>Coaltion v. Chiles</u>, 680 So.2d 400, 408 (Fla. 1996), "[w]e

---

[8]In this case, the evidence clearly demonstrated that the recommendation of the CDC for universal masking of students, teachers, and staff represents the overwhelming consensus of scientists, medical doctors, and medical organizations. However, the Plaintiffs failed to disprove that there is at least some dispute within the medical community on the issue of masking.

hold that the legislature has been vested with enormous discretion by the Florida Constitution to determine what provision to make for an adequate and uniform system of free public schools."  In <u>Coaltion</u> and <u>Citizens,</u> the Court dealt with a claim that the Legislature had failed to sufficiently fund the public schools.  In general, funding decisions by the Legislature have been granted substantial deference by the appellate courts of Florida.  However, the issue here is not whether the State has adequately funded the school system.

Last year the First District Court of Appeal said: "whatever the outcome of Appellees' lawsuit, the choice of how to deliver education to students remains with Florida's school boards".  <u>DeSantis v. FEA</u>, 306 So.3d 1202, 1214 (Fla. 1st DCA 2020).  Although the State retains responsibility for establishing a system of public education through laws, standards, and rules to assure efficient operation of a system of public education, the state constitution states that each county constitutes a school district. Responsibility for the actual operation and administration of all schools within the districts are delegated by law to the school boards of the respective districts.  In this regard, all public schools conducted within the district are under the direction and control of the district school board.  46 Fla. Jur. 2d Schools, Universities, and Colleges §19.  Although subject to the Parents' Bill

11

of Rights, the setting of local policies for health and safety of students substantially remains a local function. Florida is a large state including small rural counties to large densely populated counties. What is appropriate in one county may not be appropriate in another county. Thus, a one-size-fits-all policy for student health and safety as dictated by Tallahassee seems to run contrary to Article IX, Section 4(b) of the Florida Constitution. However, the passing of the Parents' Bill of Rights and other case law in Florida does not make it sufficiently clear that the issue presented in this case is not clearly, strictly, and soley a local issue with no right of the State to intervene. There exist cases which seem to validate State imposed laws regulating teachers and imposing certain obligations on local school boards regarding charter schools.

Therefore, I cannot find that the law of Florida clearly sets forth the issues in this case as solely local. Thus, this Court finds and **DENIES** relief to the Plaintiffs on Count II of the Complaint.

## Counts III and IV

This Court grants relief with respect to Counts III and IV for the reasons announced at the August 27, 2021, hearing and this Final Judgment.

## Separation of Powers

12

The Defendants argue that the Plaintiffs seek relief that would violate the doctrine of separation of powers.  This doctrine is set forth at Article II, Section 3 of the Florida Constitution.   It provides that the powers of government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided.  As it relates to the powers of the judiciary, the separation of powers concept stands for the proposition that the judicial branch must not interfere with the **authorized** discretionary functions of the legislative or executive branches of government **absent** **violation** **of constitutional or** **statutory rights**.   10 Fla. Jur. 2d Constitutional Law §158; and <u>Florida Department of Children and Families v. J.B.</u>, 154 So.3d 479, 481 (Fla. 3d DCA 2015)(finding that "the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional <u>or</u> statutory rights"); <u>see also</u> <u>Forney v. Crews</u>, 112 So.3d 741, 743 (Fla. 1st DCA 2013) (finding that the court cannot dictate the operation of the state prison system "so long as no statute or constitutional requirement is violated.").  The courts will not substitute their judgment with reference to matters properly within the domain of the legislative and executive branches of government.

Likewise, neither the Governor nor the executive agencies are permitted to substitute their judgment for the legislature nor can they perform the function of the legislature. By the assertion of separation of powers as an affirmative defense in this case, the Defendants must show that the actions challenged (here, the Executive Order, the blanket prohibition of mask mandates that do not include a parental opt-out, and related enforcement actions) are within the powers of the Defendants as provided by the Constitution or by the Legislature.

Here, the Defendants argue that they are entitled to deference provided by the separation of powers doctrine because they were exercising their authority to act. This is something they must prove. If their actions are not authorized by the Constitution or the Legislature, then they have no authority to take that action, they are not protected by the separation of powers doctrine, and their actions are invalid as being taken without authority. In DeSantis v. FEA, 306 So.3d 1202 (Fla. 1st DCA 2020), the First District Court of Appeal held that the Governor was acting in accordance with his emergency powers pursuant to Fla. Stat. §252.36(1)(b) because he declared a state of emergency to address the COVID pandemic. Thus, the

Governor had authority under the declared state of emergency to "issue executive orders to address a pandemic in accordance with the Act."

In this case, however, the state of emergency lapsed in June 2021, before Executive Order 21-175 was issued. Thus, the Governor did not have emergency powers pursuant to Chapter 252, Florida Statutes. Because the Governor had no emergency powers, he and the other Defendants must look to some other authorization in statute or the Constitution to provide them authority to enforce a blanket ban of mask mandates without a parental opt-out. The Defendants have not shown any convincing authority in the Constitution or any statute. However, they cite the Parents' Bill of Rights as their authority. If Defendants do not show that they had authority to issue the Executive Order, take the actions it called for, and all the things that it led to, the Defendants do not have a separation of powers defense. Thus, the Executive Order and the actions taken as a result are without authority and are null and void.

### Political Question

The political question affirmative defense is a form of separation of powers, therefore, the above analysis applies here. As the First District noted in DeSantis, 306 So.3d at 1214, "the nonjusticiability of a political

15

question is primarily a function of the separation of powers." The political question doctrine must be cautiously invoked, and the mere fact that a case touches on the political process does not necessarily create a political question beyond the Court's jurisdiction. 10 Fla. Jur. 2d Constitutional Law §157. If the Defendants' Executive Order and related actions are ultra vires (i.e., without authority in law) they are without legal basis and therefore null and void. Thus, the defenses of separation of powers or political question are not available. As will be further discussed in this Final Judgment and noted herein, I find that the Defendants have not proven sufficient authority for the Executive Order, their anti-mask mandate policy, and the enforcement actions for them to be entitled to the defenses of Separation of Powers and Political Question.

## Parents' Bill of Rights And Additional Rulings

As the case has proceeded, the Parents' Bill of Rights and its use to effect the Defendants' anti-mask mandate has become a focal point.

The Parents' Bill of Rights (Fla. Stat. §§ 1014.01-06) (2021) was passed by the Legislature and signed by the Governor. It took effect July 1, 2021. No party has challenged the constitutionality of this statute. This Court has found no appellate opinion that discusses this new law.

The provision of the law that is most relevant to this case is: Fl. St. §1014.03, which says in pertinent part, no "governmental entity ... may... infringe on the fundamental rights of a parent to direct the upbringing, education, health care, and mental health of his or her minor child <u>without demonstrating that such action is reasonable and necessary to achieve a compelling state interest and that such action is narrowly tailored and is not otherwise served by a less restrictive means.</u>" (emphasis supplied).

It seems that the Defendants are relying only on the first portion of Fla. Stat. §1014.03 that prohibits infringement on parents rights, but ignoring the remaining portion of the section which provides that infringement may occur if the action is reasonable and necessary to achieve a compelling state interest and that the action is narrowly tailored and is not otherwise served by a less restrictive means. In plain English, this law says that the government cannot interfere with parental rights regarding education and health care <u>unless</u> there is a reasonable basis to do so and that the remaining elements of Fla. Stat. §1014.03 are met.

This law does not make invalid various laws in Florida that do affect parents rights to direct health care of children. Examples are Fl. Stat. §1003.22(3) which mandates vaccines for specific diseases prior to school

17

admittance, and Chapter 39 of the Florida Statutes which sets forth procedures in Child Dependency cases to provide for the care, safety, and protection of children.

The Parents' Bill of Rights expressly gives governmental entities, such as school boards, the right to adopt policies regarding health care and education of children in school, even if the policies affect a parents' rights to make decisions in these areas.   However, the statute requires the governmental agency to show that the policy is reasonable and necessary to achieve a compelling state interest, and that the policy is narrowly tailored and not otherwise served by a less restrictive means.

There is no prohibition in the Parents' Bill of Rights against schools adopting mandatory face mask policies without a parental opt-out so long as the policy is reasonable and otherwise complies with the provisions of the law. The Defendants do not have authority under this law to enforce a before the fact of policy adoption blanket mandate against a mandatory face mask policy by a local school board. This statute does not support a state-wide order or action interfering with the constitutionally provided authority of local school districts to provide for the safety and health of the children based on the unique facts on the ground in a particular county.   As stated in this Final

18

Judgment the Parents' Bill of Rights statute does allow a challenge of a policy and a requirement that the school demonstrate the reasonableness requirements of the statute.

The law of Florida does not permit the Defendants to punish school boards, its members, or officials for adopting face mask mandates with no parental opt-outs if the school boards have been denied their due process rights under the Parents' Bill of Rights to show that this policy is reasonable and meets the requirements of the statute. If the Defendants act to deny the school districts their due process rights provided by the statute, as is the case if the Defendants strictly enforce the Executive Order, the Department of Health rule, or any other policy prohibiting mask mandates without a parental opt-out, then they are acting without authority and are refusing to comply with all provisions of the law.

Therefore, the Parents' Bill of Rights permits local school boards to enact policies relating to health care and education, including mask mandates. The school boards are not required to secure permission in advance to adopt a policy. To do otherwise would submit local schools to endless court suits and/or administrative hearings on inumerable local policy decisions. If there is an objection to a school board adopted policy by a

parent or the Department of Education, those objecting must initiate an authorized proceeding at which it may be demonstrated that the policy is reasonable and necessary to achieve a compelling state interest, that it is narrowly tailored, and is not otherwise served by a less restrictive means.

By passing the Parents' Bill of Rights, the Florida Legislature necesarily recognized the importance of parental rights. But it also recognized that parents' rights are not immune to some reasonable limitation depending upon safety and reasonableness and compelling state need regarding health care or condition of the child.

The standard of proof a school board must meet is reasonableness. The school board is not required to establish that its policy is the best or only policy available or that the policy might be disagreed with by others.

A school district which adopts a policy (such as a mask mandate) is acting within the discretion given to it by the Legislature in the Parents' Bill of Rights. So long as the requirements provided for in the Parents' Bill of Rights are met, the doctrine of separation of powers requires that the discretionary power exercised by the school board cannot be interfered with by the judiciary or executive branch of government, and neither the judiciary nor the executive can substitute their judgment for that of the school board.

20

The purpose of the Executive Order and the actions it set in motion were to prohibit local school boards from adopting face mask mandates that did not include a parental opt-out provision. The Defendants have contended by their actions and positions in this case that the Parents' Bill of Rights authorizes them to enforce a blanket prohibition against mask mandates. The Defendants have additionally used threats of enforcement and have engaged in enforcement actions generated as a result of the Executive Order to enforce this blanket prohibition. The Defendants contend that the Parents' Bill of Rights as referenced in the Executive Order authorized the enforcement actions against school boards that adoped face mask mandates with no parent opt-out provision.

The Defendants' assertion in this regard is incorrect because the Parents' Bill of Rights does not ban school board face mask mandates. The statute expressly permits school boards to adopt policies regarding the healthcare of students (such as a face mask mandate) even if a parent disagrees with the policy. The statute requires only that the policy be reasonable, is necessary to achieve a compelling state interest, and be narrowly tailored  and not otherwise served by a less restrictive means. The actions of the Defendants do not pass constitutional muster because they

seek to deprive the school boards in advance and without their right to show reasonableness of such a policy. The statue does not require that the school board secure permission for adopting a policy in advance. It only requires in the instance of a policy challenge, that the school board, has a burden to prove it policy's validity under the guidelines of the statute.

Therefore, an executive order and/or action or agency action which bans under all circumstances a face mask mandate for school children does not meet constitutional muster because such action exceeds the authority given to the Governor and the other Defendants under the Parents' Bill of Rights. Seeking to enforce a policy through the Executive Order and through actions that violate the provisions of the Parents Bill of Rights is arbitrary and capricious because there is no reasonable or rational justification for a violation of this statute. A policy or action which violates the Parents' Bill of Rights cannot be lawfully enforced by the Defendants.

Further, an Executive Order and/or agency action, such as a blanket ban of a face mask policy, denies school boards their right to show reasonableness, which violates the Parents' Bill of Rights, exceeds any authority to issue the order or take the action to the extent it sets in motion or causes a violation of the Parents' Bill of Rights and exceeds the authority of

the Defendants granted to them by the Parents' Bill of Rights. Such action is arbitrary, unreasonable, and violates the separation of powers doctrine because it would exceed the powers granted by the Legislature in the Parents' Bill of Rights as discussed in this Final Judgment.

## Count V - Department of Health Rule

The Defendants' Motion for Involuntary Dismissal as to Count V is granted because the Plaintiffs did not sue the Department of Health and it is an indispensable party to that count. The Court cannot take any action that affects the Department of Health because it is not a party to this suit. Therefore, this Court cannot issue an order to the Department of Health ordering it to strike its rule. However, this ruling does not limit the Court from enjoining or otherwise prohibiting the Defendants from engaging in actions that violate the Parents' Bill of Rights.

## Count VI - Injunctive Relief

As stated at the August 27th hearing, this Court declines to grant an injunction against the Governor. This Court is not granting an injunction against the Governor because the other Defendants are primarily involved in the enforcement actions on a day-to-day basis against local school boards However, this Court does issue a permanent injunction and enjoins the

remaining Defendants ("Enjoined Defendants") from violating the Parent's Bill of Rights.

The "Enjoined Defendants" are ordered not to violate the Parents' Bill of Rights by taking action to effect a blanket ban on face mask mandates by local school boards and by denying the school boards their due process rights granted by the statute which permits them to demonstrate the reasonableness of the mandate and the other factors stated in the law.  I also enjoin the "Enjoined Defendants" from enforcing or attempting to enforce the Executive Order and the policies it caused to be generated and any resulting policy or action which violates the Parents' Bill of Rights as outlined in this Final Judgment. In granting this injunction I find that the act or conduct to be enjoined (violation of the Parents' Bill of Rights) is a clear legal right, there is no adequate remedy at law, and  relief is necessary to prevent an irreparable injury.  In this case irreparable injury is demonstrated by the increased risk of Delta variant infection (as demonstrated by CDC guidance and medical evidence in the record) if universal face mask mandates are blocked in violation of the Parents' Bill of Rights.   A continuing constitutional violation is in and of itself irreparable harm. Board of County Commissioners v. Home

<u>Builders Association of West Florida</u>, 2021 WL 3177293, at *3 (Fla. 1st DCA July 28, 2021).

This Court notes that it is not enjoining the enforcement of the Parents' Bill of Rights, so long as the complete statute is enforced without omitting portions of it. Defendants can enforce the Parents' Bill of Rights but must do so in accordance with the terms of the law and allow a due process proceeding to permit the local school boards to meet their burden under the statute.

Local school boards can adopt policies dealing with the health and education of school children, and to the extent that those policies may affect parents' rights to control their children's education or health, then, it is incumbent on the school board, if challenged to demonstrate its policy's reasonableness along with the other factors required by the Parents' Bill of Rights.

**Done and Ordered** in Tallahassee, Leon County, Florida this 2nd day of September 2021.

John C. Cooper
Circuit Judge

25

Copies to:

All Counsel of Record

```
 1        IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
            OF THE STATE OF FLORIDA, IN AND FOR LEON COUNTY
 2                          CIVIL DIVISION
                       Case No.: 2021-CA-001382
 3

     ROBIN MCCARTHY and JOHN MCCARTHY,
 4   individually and on behalf of L.M., a minor;
     ALLISON SCOTT, individually and on behalf of
 5   W.S., a minor; LESLEY ABRAVANEL and
     MAGNUS ANDERSSON, individually and on
 6   behalf of S.A. and A.A., minors; KRISTEN
     THOMPSON, individually and on behalf of P.T.,
 7   a minor; AMY NELL, individually and on behalf
     of O.S., a minor; EREN DOOLEY, individually
 8   and on behalf of G.D., D.D., and F.D., minors;
     DAMARIS ALLEN, individually and on behalf of
 9   E.A., a minor; PATIENCE BURKE, individually
     and on behalf of C.B., a minor; and PEYTON
10   DONALD and TRACY DONALD, individually
     and on behalf of A.D., M.D., J.D., and L.D.,
11   minors,
12                   Plaintiffs,
     vs.
13
     GOVERNOR RON DESANTIS, in his official
14   capacity as Governor of the State of Florida;
     RICHARD CORCORAN, in his official capacity
15   as Florida Commissioner of Education; FLORIDA
     DEPARTMENT OF EDUCATION; and
16   FLORIDA BOARD OF EDUCATION,
17                   Defendants.
     _____/
18
                     E   X   C   E   R   P   T
19
           TRIAL BEFORE THE HONORABLE JOHN C. COOPER
20              (Conducted via Videoconference)
21       DATE:              August 27, 2021
22       TIME:              10:22 a.m. to 12:34 p.m.
23       REPORTED BY:       Deborah W. Gonyea, RMR, CRR
                            Notary Public, State of
24                          Florida at Large
25                          Pages 1 to 86
```

<div style="display:flex">
<div>

**Page 2**

1 APPEARANCES:
2   CHARLES R. GALLAGHER III, ESQUIRE
    ERIKA T. MARIZ, ESQUIRE
3   Gallagher & Associates Law Firm, P.A.
    5720 Central Avenue
4   St. Petersburg, Florida 33707
        - and -
5   JOSHUA G. SHERIDAN, ESQUIRE
    Dusciglio Sheridan Schoeb, P.A.
6   3302 North Tampa Street
    Tampa, Florida 33603
7       - and -
    CRAIG A. WHISENHUNT, ESQUIRE
8   Ripley Whisenhunt, PLLC
    8130 66th Street North, Suite 3
9   Pinellas Park, Florida 33781
        - and -
10  MARIA G. PITELIS, ESQUIRE
    Wagstaff & Pitelis, P.A.
11  161 14th Street Northwest
    Largo, Florida 33770
12      - and -
    ERIN K. BARNETT, ESQUIRE
13  ERIN E. WOOLUMS, ESQUIRE
    Barnett Woolums, P.A.
14  6501 1st Avenue South
    St. Petersburg, Florida 33707
15      - and -
    TRACEY L. STICCO, ESQUIRE
16  4202 East Fowler Avenue, SOC 107
    Tampa, Florida 33620
17      - and -
    NATALIE L. PASKIEWICZ, ESQUIRE
18  Paz Mediation
    Post Office Box 7233
19  St. Petersburg, Florida 33734
        - and -
20  CHARLES W. DODSON, ESQUIRE
    270 Rosehill Drive North
21  Tallahassee, Florida 32312
        Attorneys for Plaintiffs
22
23
24
25

**Page 3**

1 APPEARANCES CONTINUED:
2   MICHAEL A. ABEL, ESQUIRE
    JARED J. BURNS, ESQUIRE
3   Abel Bean Law, P.A.
    100 North Laura Street
4   Suite 501
    Jacksonville, Florida 32202
5       Attorneys for Defendants
6
7
8
9           INDEX
10 Description                Page
11 PROCEEDINGS                  4
12 REPORTER'S CERTIFICATE      86
13
14
15
16
17
18
19
20
21
22
23
24
25

</div>
<div>

**Page 4**

1       (The following is an excerpted portion of the
2 trial proceedings.)
3       P R O C E E D I N G S
4       THE COURT:  Okay.  Good morning.
5       Okay.  I'm late because I just finished
6 putting in my notes from my last night's writings
7 on this case, and then for some reason I was
8 unable to get on Zoom.  But I managed to negotiate
9 that.
10      So give me one more minute and I'll be right
11 back.
12      (Brief recess taken.)
13      THE COURT:  All right.  This is actually the
14 ruling I just pulled out of the printer.  So these
15 are my notes.
16      So, again, good morning everyone.  These
17 are -- these are my notes.  This is not something
18 that I could send and sign, but this is pretty
19 close to what could be a final written order.  And
20 I would expect the parties writing the order to
21 take this as their guideline.
22      It may be that there will need to be
23 grammatical changes or rearranging of various
24 sections to make them flow better in a written
25 order.  But I would expect to be able to receive a

**Page 5**

1 proposed order by Monday.  And I would give the
2 other side another day after that to make a
3 copy -- I'm sorry -- to make comments.  And then I
4 would like to -- I would like to enter the written
5 order Tuesday, if at all possible.
6       Excuse me if I take a little while to get
7 started, but I was up at 2:00 a.m. this morning
8 ruling, working, rereading, making notes, et
9 cetera.  So this is where I am.
10      Before I forget, I'm officially finding that
11 the plaintiffs who I left in the case, who we
12 identified at the motion for -- I'm calling it a
13 motion for directed verdict; I know there's a more
14 correct name for it.  Motion for order of judgment
15 of dismissal, I think.  They have -- I'm finding
16 that they have standing.  So I didn't want to
17 forget that before I get into the order.
18      All right.  I'm going to read this order and
19 probably from time to time make comments that are
20 not scripted or in my notes.  And we'll see how
21 that goes.  I will try to be articulate and
22 relatively slow for the purposes of our court
23 reporter.
24      And as in a written order you have various
25 citations and things of that nature, I'm going to

</div>
</div>

Page 6

1  read those.  So it may not sound very flowing when
2  I read it, but in part it's because I'm
3  referencing citations and grammatical marks, et
4  cetera.  Also, some of the citations into the
5  record and to other parts of the case might be
6  more appropriately included in footnotes.  But I
7  wasn't sure that reading a proposed order and then
8  identifying footnotes would be all that helpful.
9  So, again, that would be left up to the drafters'
10  discretion.
11     Even -- who's some great writer, which I'm
12  not.  Even Ernest Hemingway had an editor.  So --
13  Maxwell Perkins was his editor, by the way.  So I
14  have no problem with edits, so long as the essence
15  of the order and most of the details are in the
16  order.
17     Let me start with you a quote which I think
18  we should all think about, including those of us
19  who are on the Zoom, those of us who are online,
20  on YouTube, those who may read about this case in
21  the news media.  I find that in any intense public
22  debate there are often emotions and concepts which
23  show a failure to completely understand the
24  complete scenario of what we're dealing with.
25     In particular, I find in the last 50, 60

Page 7

1  years or so, our country has felt that every
2  problem could be served -- could be solved in a
3  courtroom.  Every problem cannot be solved in a
4  courtroom.  Some problems are solved at the ballot
5  box.  Some are solved in the courtroom.  Some are
6  solved by individual action.  But before people
7  start deciding how they believe about something or
8  how it's going to affect them, let me tell you --
9  give you an idea of one of the foundations of our
10  law as I think it relates to this situation.
11     So here's the quote:  Quote, Under the
12  American system of laws and government, everyone
13  is required to use and enjoy his own rights as not
14  to injure others in their rights or to violate any
15  law in force for the preservation of the general
16  welfare.
17     That quote comes from a 1914 Florida Supreme
18  Court opinion called Dutton, D-u-t-t-o-n,
19  Phosphate Company vs. Priest, 65 So. 282, Florida
20  1914.
21     It was again restated in a 1939 Florida
22  Supreme Court, State ex rel. Hosack, H-o-s-a-c-k,
23  v. Yocum, just like the country singer, Y-o-c-u-m,
24  136 Fla. 246, Florida 1939.
25     The second quote, coming from the same

Page 8

1  decisions, 1914 decision originally and repeated
2  in 1939:  The wisdom and necessity, as well as the
3  policy, of a statute are authoritatively
4  determined by the legislature.  Courts may inquire
5  only into the power of the legislature to lawfully
6  enact a particular statute.
7     These two quotes from the Florida Supreme
8  Court over 100 years ago describe two things: the
9  balancing of one's own rights with the rights of
10  others and that, when considering the separation
11  of powers, court may properly consider whether a
12  law and, as a logical extension of this quote, an
13  executive action, was lawfully enacted or
14  exercised.
15     A governor's executive order and an agency's
16  actions must be based on authority granted to them
17  by the constitution or the legislature.  Executive
18  power is exercised -- if executive power -- fifth
19  edit; I still missed words.  If executive power is
20  exercised without authority, the executive action
21  is illegal, null and void, and unenforceable.
22     So let me go back and comment this concept of
23  personal rights.  We all have personal rights.  We
24  all enjoy our personal rights.  We all zealously
25  protect our personal rights.

Page 9

1     We have a personal right, if we so choose --
2  not my choice, but many do -- to drink alcoholic
3  beverages in their home if they're over 21 years
4  of age.  We can drink until we're intoxicated.
5  But we can't get in a -- it's our right to drink
6  alcoholic beverages if we're over 21, but we
7  cannot get in our car and start driving around
8  while we've had alcoholic beverages that impair
9  our ability to drive.  And the reason is not
10  because of whether the driver's going to hurt him
11  or herself or not.  The reason is the driver
12  exercising his or her rights to drink is now
13  putting at risk other people.
14     So that driver's right to drive intoxicated
15  is limited by the government in various criminal
16  laws that prohibit driving while under the
17  influence of alcohol.
18     We all have a right to speak our mind, First
19  Amendment rights.  You've all heard this quote.
20  We don't have a right to tell lies about people.
21  If we do, then we'll have to respond to that in
22  some sort of court action.  We don't have the
23  right to harass and intimidate people verbally
24  because that violates the law.  That limits our
25  rights.  And we don't have a right, to the extent

3 (Pages 6 - 9)

Page 10

1   there are crowded theaters anymore -- this in a
2   few years may be an anecdote that younger people
3   won't even understand what I'm saying.  We don't
4   have a right to go into a crowded theater and yell
5   "fire" because we've decided it's our right to do
6   that.  We don't have that right because exercising
7   the right in that way is harmful or potentially
8   harmful to other people.
9       Our law and our history as a country going
10  back 200-plus years is full of examples of rights
11  that are remedied by the good of others that would
12  be adversely affected by those rights.
13      So when we talk about absolute and
14  fundamental rights, there's always a footnote that
15  is something like, well, let's see if exercising
16  these rights harms other people.  If it does, then
17  we have to have a discussion.
18      That's what we're having here this week, a
19  discussion, in part, as to whether people's rights
20  to not want their children to wear a face mask for
21  30 or 60 days -- which is what most of these
22  policies we've been talking about are for --
23  whether those rights outweigh the risk not wearing
24  a mask places other children in to catching a
25  highly contagious and sometimes deadly disease,

Page 11

1   even for children.
2       So this is not something that I made up.
3   This has been the law of Florida I know since
4   1914.  It's been the law of Florida for probably a
5   hundred years before that.  These concepts are
6   contained in the fundamental writings that support
7   our country.  They are contained in the -- all the
8   founding documents in the country are these
9   concepts, including separation of powers and use
10  of rights in such a way as not to harm others.
11      So I say that to the lawyers, to the parties,
12  and to whoever may be listening to this case.  We
13  will not solve any issue if we can't sit down and
14  work together and take positions recognizing that
15  what's going on is not some recent imposition on
16  someone or some attack on the country.  It's what
17  has gone on at least during my lifetime on many
18  occasions about many issues.  So that's all the
19  preaching you'll hear from me.
20      So let's go on to the issues before the
21  Court.  The issues in this case are formed by the
22  pleadings, the evidence presented, contentions of
23  the parties in the pleadings, and statements and
24  contentions made by the parties and witnesses and
25  evidence at trial.  Those all come together at the

Page 12

1   end of a trial and formulate essentially the
2   issues for the finder of fact -- which is in this
3   case me; in a jury trial, it's the jury -- to try
4   to determine.
5       This is not an easy task because I constantly
6   have to remind myself what my role is.  My role is
7   to primarily try to figure out what the law says
8   and then enforce it.  My role is rarely to decide
9   what policy should be.  However, in our system,
10  sometimes when a judge has to enforce a rule or a
11  regulation or a statute for the constitution,
12  there are policy implications.  So they're not as
13  separate and as cleanly different as one might
14  think.
15      Before this Court is a dispute between the
16  governor of Florida, the Florida commissioner of
17  education, the Florida Department of Education,
18  and the Florida Board of Education.  And I'll call
19  those the defendants.  When I say defendants, I'm
20  referring to all of those people.
21      Also are involved parents and students in the
22  Florida public school system, which I'll call the
23  plaintiffs.
24      The dispute is whether state law permits
25  local school districts in Florida to adopt and

Page 13

1   enforce a face mask mandate for students and
2   staff, staff being teachers and other employees in
3   the school system.
4       There have been a lot of descriptions for
5   this.  What I think we're talking about is
6   essentially the contention of the plaintiffs that
7   the school system should be free to pass a face
8   mask mandate -- generally this has been considered
9   in this trial a face mask mandate -- with a
10  medical opt-out only.
11      The governor and the defendants believe the
12  correct policy is face mask mandate if you want
13  to; but if you pass that, there must be a parental
14  opt-out.
15      So those of you who are drafting this order,
16  that's what I mean.  I might not be that specific
17  as to each one, but that's where I am.
18      One sidenote that's not in my notes, many of
19  the witnesses -- there were many very fine -- in
20  fact, all the witnesses seemed like fine people
21  and serious.  Many of the witnesses who are
22  parents who testified on behalf of the defendants
23  had, you know, serious concerns for their
24  children, children with serious medical issues,
25  and they were scared about the mask mandate.  Most

4 (Pages 10 - 13)

Veritext Legal Solutions
800-726-7007                                          305-376-8800

Page 14

1  of what I heard, those children would not be
2  required to wear a mask in school under any
3  version of the mandate we've been talking about.
4      Doctors have a responsibility for patients.
5  If, in fact, they have a patient with a legitimate
6  medical reason not to wear a mask, they should
7  step up and sign the opt-out paper for those
8  patients. That's the role -- one of the many
9  roles our medical community has. You can't just
10 say, no, I don't want to get involved.
11     Doctors, if you have a patient such as those
12 I heard described here, you need to do the correct
13 thing and sign a medical opt-out if that is what
14 is necessary. Some of these people -- I'm not a
15 doctor. But they seem to me to be clear medical
16 opt-out circumstances.
17     But let me now go back on to my notes.
18 Picking up, the dispute is whether state law
19 permits local school districts in Florida to adopt
20 and enforce a face mask mandate for students and
21 staff. This dispute arises out of the opening of
22 public schools for the new year and increasing --
23 and increasing COVID crisis in Florida.
24     This is -- by the way, for those of you, I'm
25 drawing on my legal rulings and my findings from

Page 15

1  the facts. I am a factfinder. I am required and
2  permitted to take the evidence I've heard, draw
3  inferences from that evidence, and make findings
4  based upon what I think is the more persuasive and
5  most credible evidence. So when I give these
6  statements such as I am, these aren't things I
7  just dreamed up either. These are things that --
8  findings I'm making based on the evidence I've
9  heard, the legal discussions based upon the law as
10 I interpret it.
11     So the increasing COVID crisis in Florida has
12 resulted from less than complete vaccination of
13 the population of Florida and the dominance of a
14 COVID virus variant referred to as the Delta
15 variant.
16     The Delta variant has a much higher viral
17 load and is more contagious than the form of COVID
18 present in Florida from 2020 until about May or so
19 of this year. COVID variant became increasingly
20 dominant in Florida starting around May or so, and
21 to the present time it is the dominant -- by far
22 the dominant virus that's being spread in the
23 state of Florida.
24     Also, the Delta variant presents a higher
25 risk of infection to children than did the

Page 16

1  previous form of COVID. This fact places at issue
2  all medical studies and anecdotal evidence that
3  says, well, we had no problems last year; we
4  should have no problems this year. There's a
5  difference. We had a different, less infectious,
6  less dangerous form of virus last year than we
7  have this year.
8      And as the facts change on the ground, the
9  need, or failure to need, for various measures
10 will also change. I'm talking about facts on the
11 ground now as I understand it from the evidence.
12     The combination of lack of vaccination,
13 decreasing social distancing, and the Delta
14 variant has resulted in dramatically increased
15 COVID infections in Florida over the past several
16 months. Although vaccinated persons do have
17 significant protection against the COVID variant,
18 they can still become infected by the COVID
19 variant. They can also transmit that infection to
20 children and other people.
21     As a result, the CDC, Centers for Disease
22 Control, the American Academy of Pediatrics, and
23 the wide majority of the medical and scientific
24 community in this country recommend universal
25 indoor masking for all school students, staff,

Page 17

1  teachers, and visitors to K through 12 schools
2  regardless of vaccination status and social
3  distancing.
4      On April 20 -- April 14, 2021, Commissioner
5  Corcoran, who's the commissioner of the Florida
6  Department of Education and, in his official
7  capacity, the defendant -- and for those who
8  aren't lawyers, when you sue someone from an
9  agency in official capacity, that's just another
10 way of suing the agency.
11     But Commissioner Corcoran on April 14, 2021,
12 sent a memorandum to all school district
13 superintendents. The superintendent of a school
14 district is sort of like the principal of the high
15 school. They're the in-charge executive officer
16 of that district. Many are appointed; some are
17 elected.
18     In that order or memorandum, Defendants'
19 Exhibit 45, as I read it, he's requesting that the
20 school superintendents do not implement a mandated
21 masking policy. He said, With this return -- I'll
22 read it -- we ask that districts, which currently
23 are implementing a mandated face covering policy,
24 revise their policy to be voluntary for the
25 '21-'22 school year.

5 (Pages 14 - 17)

Page 18

1    It's clear to this Court that the issue of
2    voluntary versus mandated, opt-out versus no
3    opt-out, masking policies in Florida school --
4    schools was being considered and studied at least
5    as early as April of 2021. Remember, at the time
6    of that memorandum, COVID virus or variant had not
7    really hit the scene hard. So this was a policy
8    perhaps dealing primarily with what was viewed as
9    the former form of the virus. In any event, the
10   policy consideration was ongoing by that time. I
11   can't tell you if it started then or not, but it
12   was ongoing.
13       In late June 2021, the governor of Florida
14   declared that there was no longer a state of
15   emergency based on COVID in Florida. You may
16   recall we had been in that state of emergency from
17   about March or so 2020 until end of June 2021.
18   That date was agreed to earlier in this case by
19   all parties. The governor did this by allowing
20   the time-limited declaration of emergency order to
21   lapse without renewal.
22       Under Florida law -- again, I'm speaking off
23   memory; I stand to be corrected -- the ability to
24   declare a state of emergency usually lasts for 60
25   days and then it has to be re-upped in a

Page 19

1    supplemental order. If you don't re-up it, it
2    will expire, which is -- my understanding that's
3    what happened here. Therefore, the governor's
4    emergency powers under Florida Statute 252 expired
5    at that point, by the end of June.
6        On July 27th, the governor held a roundtable
7    meeting on face mask policy. That meeting -- the
8    video of that meeting was admitted into evidence.
9        At that meeting -- this is my recollection
10   and notes -- no participant in the meeting --
11   there were some doctors there. The governor was
12   there. There was a charter school -- I think he
13   was a principal, but a higher-up charter school
14   official from a local charter school. There was
15   another mother and also charter school employee
16   there. And there was a high school student who
17   indicated he and his friends preferred to hang
18   around without wearing face masks. There may have
19   been others, but that's my member -- memory of who
20   was there.
21       No participant at that meeting, this
22   factfinding meeting, proposed a mandate -- a
23   mandated face mask policy with no parental
24   opt-out, such as that being proposed by a
25   number -- or being implemented by a number of

Page 20

1    school districts in Florida. No one proposed
2    that. All proposed a parental opt-out policy. No
3    one advocated for any CDC recommended policy.
4        In fact, the governor stated, gave his
5    opinion, that his confidence -- hold on a
6    second -- that his confidence in some medical
7    leadership had been shattered. He said they
8    appear to be, quote, delighted to impose
9    unspeakable burdens on children. Other than the
10   fact that it was said in that conference, no
11   evidence has been produced to support that
12   statement.
13       Also in the governor's executive order that
14   was issued a few days later, the governor
15   expressed doubt about the validity of the CDC
16   guidance.
17       Remember, the CDC by the overwhelming weight
18   of evidence is considered the preeminent medical
19   authority in this country about infectious
20   diseases. It's the gold standard.
21       The State of Florida has in the past on many
22   occasions adopted and incorporated CDC guidelines
23   and recommendations into the state statutes. Here
24   is an example of just a few. It's not exhaustive.
25   Florida Statute 465.189, topic is administration

Page 21

1    of vaccines and epinephrine autoinjection; Florida
2    Statute 384.23, regarding sexually transmitted
3    diseases; Florida Statute 381.0031, regarding
4    epidemiological research, report of diseases of
5    public health significance to department; Florida
6    Statute 1002.23, a statute that's been mentioned
7    quite a bit in this case dealing with student and
8    parental rights and educational choices. They say
9    there, that statute, a recommended immunization
10   schedule in accordance with the United States
11   Center for Disease Control and recommendations
12   is -- is referenced and apparently assumed to be
13   worth including in the statute. Florida Statute
14   381.005, primary and preventive health services;
15   Florida Statute 381.0056, school health services:
16   Each school health advisory committee must, at a
17   minimum, include members who represent the
18   right -- the eight component areas of the
19   Coordinated School Health model as defined by the
20   Centers for Disease Control; Florida Statute
21   381.985, screening program, a requirement that
22   there be adoptive rules to follow established
23   national guidelines or recommendations such as
24   those used by the Council of State and Territorial
25   Epidemiologists and the Centers for Disease

Page 22

1  Control; Florida Statute 400.141, administration
2  and management of nursing home facilities,
3  requiring providing for immunizations against flu
4  viruses in accordance with the recommendations of
5  the Centers for Disease Control; Florida Statute
6  112.181, firefighters, paramedics, EMTs, law
7  enforcement officers, et cetera, reference to the
8  Centers for Disease Control; 381.9315, gynecologic
9  and ovarian cancer education and awareness: State
10  Surgeon General shall make publicly available, by
11  posting on the Internet website of the Department
12  of Health, resources and an Internet website link
13  to the federal Centers for Disease Control for
14  gynecologic cancer information; and, finally --
15  but this is not an exhaustive list; this is just
16  some of what I found -- Florida Statute 951.27,
17  blood tests of inmates, requiring a procedure
18  consistent with the guidelines of the Centers for
19  Disease Control.
20  So not only do the doctors who testified here
21  recognize the Centers for Disease Control as the
22  legitimate reputable source of information, it
23  appears that over many years so has the Florida
24  legislature.
25  So let's go back.  At that July 27th

Page 23

1  meeting -- I made some notes -- there was one
2  presenter there, I believe his name was Meissner,
3  who stated that masks were not worn to protect
4  wearers of the mask.  This is clearly contrary to
5  evidence presented at the trial here.  He said
6  that harm is done to children with masks.
7  A psychiatrist, I think his last name was
8  McDonald, said masking is child abuse.  He said
9  there is no evidence that masking protects against
10  COVID.
11  There's a lot of evidence that was presented
12  here, including CDC studies, including the April
13  21st, two thousand -- April -- the May 21st, 2021,
14  CDC study that's Exhibit 48.  I'll get back to
15  that in a minute.
16  Dr. McDonald also said not a single child has
17  benefited from wearing a mask.  All children have
18  been hurt.  He is appalled, he said.  Every
19  thoughtful, rational adult knows children
20  shouldn't be masked.  He said children cannot
21  transfer COVID to adults.  Again, another fact
22  that's disputed by the science.  Masks do nothing
23  to help medically, and they destroy the country.
24  So that's not everything that was said there.
25  I thought the governor's remarks were much more

Page 24

1  temperate than some of the other participants',
2  but that's what was said there.
3  One study -- I'm not going through every
4  piece of evidence.  I'm highlighting some issues.
5  One study, Exhibit -- Defendants' Exhibit 48,
6  which was a study in -- I think it was a CDC study
7  involving Georgia.  What was read to a couple of
8  the plaintiffs' witnesses and they were asked for
9  this comment, I think it was this sentence:
10  quote, The 21 percent lower incidence in schools
11  that recommend mask use among students was not
12  statistically significant compared to the schools
13  where mask use was optional.  And the witnesses
14  recall -- comment on that.
15  The clear implication made in that
16  cross-examination was, here's a CDC study that
17  doesn't even recognize that masks work.  What was
18  not read was the rest of the study.
19  Directly following that sentence -- it's a
20  little bit lengthy, but I'm going to read it.  It
21  says, This finding might be attributed to higher
22  effectiveness of masks among adults, who are at a
23  higher risk for SARS-CoV-2 infection, but might
24  also result from differences in mask-wearing
25  behavior among students in schools with optional

Page 25

1  requirements.  Mask use requirements were limited
2  in this sample; 65.1 percent of schools required
3  teacher and staff member mask use and
4  approximately one-half, 51.5 percent, required
5  student mask use.  Because universal and correct
6  use of masks can reduce COVID -- I'm substituting
7  "COVID" for the technical science term "SARS."
8  Let me repeat this.  Because universal and correct
9  use of masks can reduce COVID transmission and is
10  a relatively low-cost and easily implemented
11  strategy, findings in this report suggest
12  universal and correct mask use is an important
13  COVID-19 prevention strategy in schools as part of
14  the multicomponent approach.
15  This is not a plaintiffs' exhibit.  This is a
16  defendants' exhibit.
17  Also, one last thing this report said in its
18  summary, they noted that COVID infection was 37
19  percent lower in schools that required teachers
20  and staff members to use masks.
21  So this study, which was presented by the
22  defendants to me, wasn't presented to the governor
23  at that meeting in which they were stating they
24  were trying to decide what to do.  But the
25  governor was told that use of masks is child abuse

7 (Pages 22 - 25)

**Page 26**

1   and bringing harm to every child in the country.
2       I've seen no scientific evidence of that to
3   support that statement in this case.
4       So after the meeting, the governor three days
5   later issued Executive Order 21-175. This order
6   began the formulation of a policy, and enforcement
7   by the defendants, that local school districts in
8   Florida could not adopt a face mask mandate unless
9   it provided for a parental opt-out.
10      This is also reflected in the defendants'
11  seventh affirmative defense filed in this case
12  which says, quote, The Parents' Bill of Rights
13  precludes school boards from implementing
14  categorical mask mandates that do not allow
15  parents to opt their children out of the
16  requirement, end quote. We're going to get to the
17  Parents' Bill of Rights. But this seventh
18  affirmative defense does a good job of stating
19  exactly one of the big disputed issues in this
20  case. I'll get to that later.
21      Continuing, the executive order, based on the
22  evidence and inferences from the evidence
23  presented to me, was a continuation into a policy
24  disfavoring the no opt-out mask mandates and the
25  means to accomplish this was going to be through

**Page 27**

1   the Parents' Bill of Rights, which is clearly
2   evident from the executive order and confirmed by
3   the affirmative defense.
4       Under other provisions of the executive
5   order, it cited to a study which it said found no
6   correlation with face masks. This study is known
7   and called in the order the Brown University
8   study. It was not peer-reviewed and its own --
9   its own authors have expressed doubts as to its
10  use. That study's in evidence. All I have to do
11  is find it. It's Exhibit -- I believe it is
12  Exhibit 19 and -- yes. Exhibit 19.
13      Here's a quote from the people that wrote the
14  study: Quote, We caution that our analysis
15  focuses only on correlations, and it is
16  challenging to make causal statements. In the
17  case of masking in particular, we focus on
18  mandates and not on actual behavior. Masking is
19  likely correlated with mask mandates, but it is
20  also likely that some individuals mask even in the
21  absence of a mandate and that there is imperfect
22  compliance even with a mandate. In addition,
23  while we control for community rates, we do not
24  control for community mitigation practices, which
25  would also impact behavior and rates in schools.

**Page 28**

1       This paper adds to our understanding of the
2   relationship between COVID mitigation and school
3   safety in the U.S., and they cite about four
4   different studies. We would emphasize that in
5   general this literature suggests in-person school
6   can be operated safely with appropriate
7   mitigation, which typically includes universal
8   masking. It would be premature to draw any
9   alternative conclusions about this question based
10  on this preliminary data.
11      This study doesn't say masking is not
12  effective. In fact, it recommends universal
13  masking. And it says that it's premature to state
14  anything otherwise.
15      Also, they say in the study right above the
16  section called discussion, It is important to note
17  that this -- this is the long discussion in the
18  paper -- does not imply masks are ineffective, as
19  these results focus only on masking in schools and
20  do not take community behavior into consideration.
21  Additionally, as noted above, we focus only on
22  mask mandates and not actual masking behavior.
23      So the Brown report said that it had analyzed
24  COVID data and found no correlation with mask
25  mandates. If that's true, why did the Brown

**Page 29**

1   report recommend that universal masking was still
2   the way to go?
3       Now, I don't say that the governor has time
4   enough to read a report that's that thick. But
5   his advisors do. So the statement in the
6   executive order is just incorrect. That study
7   does not find no correlation with mask mandates.
8       What I read to you is a defense exhibit, not
9   a plaintiffs' exhibit.
10      So, going back to the executive order, the
11  order showed lack of support for CDC guidance on
12  face masks -- I don't think there's any dispute
13  about that -- and stated that face masks may have
14  negative health and societal ramifications. Most
15  importantly, the order noted the applicability of
16  a new statute called the Parents' Bill of Rights.
17  The order -- we'll talk about that more in detail.
18      The order directed certain actions which were
19  premised on enforcing the Parents' Bill of Rights,
20  which would result in a blanket banning in advance
21  of all school board mask mandates if there was no
22  parental opt-out. The most likely way to
23  accomplish this was to institute a policy that
24  would likely result in a violation of the Parents'
25  Bill of Rights. Parents' Bill of Rights is a law

8 (Pages 26 - 29)

[solved - system]                                                                Page 106

solved  7:2,3,4,5,6
somebody  48:5
soon  82:3
sophisticated  37:10
sorry  5:3 33:6
  44:14 49:20 63:15
  71:7 80:1
sort  9:22 17:14
  55:11 63:12 68:14
  75:23 79:17
sorts  48:12 62:12
  79:24
sought  37:21
sound  6:1 30:21
source  22:22
south  2:14
speak  9:18
speaking  18:22
specific  13:16
speed  60:1
spending  79:14
spent  79:15
spread  15:22 32:5
st  2:4,14,19
staff  13:2,2 14:21
  16:25 25:3,20
  64:12
stand  18:23
standard  20:20
  63:8,18,22,22,23
  63:24 64:5,7
standards  47:3
standing  5:16
  48:18,20
standpoint  49:7
stands  38:22
start  6:17 7:7 9:7
  76:2
started  5:7 18:11
starting  15:20

state  1:1,14,23 7:22
  12:24 14:18 15:23
  18:14,16,24 20:21
  20:23 21:24 22:9
  28:13 30:23,24
  31:2 37:20 38:11
  39:25 41:18,21
  42:4,7,10,20,21
  45:19 46:2,19 47:1
  47:5,22 48:3 51:9
  52:13 53:1,10,23
  54:9,14 57:6,12,24
  58:16 59:22 62:7
  62:20,25 68:7
  70:19 74:23 86:3
stated  20:4 23:3
  29:13 30:3,4 32:23
  34:1 38:3 43:23
  51:18 63:21 70:24
  73:9,10 75:10
statement  20:12
  26:3 29:5 30:11
  31:22 35:10
statements  11:23
  15:6 27:16
states  21:10 38:11
  47:5 56:16
statewide  58:18
stating  25:23 26:18
  35:17 37:14
statistically  24:12
status  17:2
statute  8:3,6 12:11
  19:4 20:25 21:2,3,6
  21:6,9,13,13,15,20
  22:1,5,16 29:16
  31:24 40:22 41:17
  43:4,8 49:24 50:1
  52:2,3,11 54:24
  56:15 57:21 58:18
  69:1 70:11 75:8,13

76:16 77:9,11,14
  78:12,15
statutes  20:23 31:9
  45:11 78:11
statutory  31:8 39:2
  39:14 45:3 50:1
staying  42:8
stenographic  86:8
stenographically
  86:7
step  14:7
sticco  2:15
sticking  55:18
stopped  52:21
strategy  25:11,13
street  2:6,8,11 3:3
strictly  59:9 61:17
strike  73:19
stroke  45:9
structure  84:9
structured  65:7
student  19:16 21:7
  25:5 33:13,14 42:5
  48:1
students  12:21 13:1
  14:20 16:25 24:11
  24:25 33:19 42:8
  46:23 47:18 54:2
  61:4,18,19 64:11
  68:4
studied  18:4
studies  16:2 23:12
  28:4
study  23:14 24:3,5
  24:6,6,16,18 25:21
  27:5,6,8,14 28:11
  28:15 29:6
study's  27:10
subdivision  52:14
subject  47:16

submit  60:23
submitted  64:14
subset  43:18
substantial  46:15
  46:16
substantially  47:18
substitute  40:3,9
  66:11 71:18
substituting  25:6
sue  17:8 73:12
sufficiently  46:13
suggest  25:11
suggests  28:5
suing  17:10
suit  48:18 74:5
suite  2:8 3:4
suits  60:24
summary  25:18
superintendent
  17:13
superintendents
  17:13,20 31:19
supervise  45:24
supervision  56:19
supervisory  30:25
  31:4
supplemental  19:1
support  11:6 20:11
  26:3 29:11 54:14
  58:16,18 64:4
supreme  7:17,22
  8:7 38:14 46:1
sure  6:7 49:14 81:2
  81:10
surgeon  22:10
surprise  31:17
surprised  55:11
system  7:12 12:9
  12:22 13:3,7 39:25
  46:9,19 47:2,4 60:9
  68:16

**system's** 64:22

**t**

**t** 1:18 2:2 7:18,18
44:16
**tailor** 53:10
**tailored** 53:2,24
54:3 57:24 58:16
68:8 70:20
**take** 4:21 5:6 11:14
15:2 28:20 32:3
41:4 43:13 55:4,6
59:24 62:25 71:11
75:3 78:20 80:13
**taken** 4:12 32:24
34:2 41:7 43:16
**takes** 80:13
**talk** 10:13 29:17
43:10 48:7
**talked** 38:7,8
**talking** 10:22 13:5
14:3 16:10 37:6
41:13
**tallahassee** 2:21
48:2 81:19
**tampa** 2:6,6,16
**task** 12:5 30:7
**tasked** 34:11
**teacher** 25:3
**teachers** 13:2 17:1
25:19 48:11 64:11
**technical** 25:7
**tell** 7:8 9:20 18:11
30:12,20 46:16
54:18 55:23 59:19
67:2 80:19
**telling** 49:16
**temperate** 24:1
**temporarily** 56:20
**ten** 79:1
**term** 25:7 44:16

**terms** 75:20
**territorial** 21:24
**testified** 13:22
22:20
**tests** 22:17
**thank** 81:14 83:15
84:14,24 85:1,2
**thanks** 84:25
**theater** 10:4
**theaters** 10:1
**theme** 33:9
**theory** 64:19
**thick** 29:4
**thing** 14:13 25:17
42:17 58:17 78:23
78:24
**things** 5:25 8:8
15:6,7 32:12 39:10
43:14 48:12 55:13
61:14 62:5,8,9,13
66:25 76:2 79:24
80:24
**think** 5:15 6:17,18
7:10 12:14 13:5
15:4 19:12 23:7
24:6,9 29:12 30:13
31:3,17,17 38:5
47:19,19 49:1
51:23 60:2,3 62:11
64:8,15 67:3 71:21
72:8,17,22 76:3
77:7 78:13 79:23
80:12,14,17,19
83:4 84:3,9,11,15
**third** 39:9 51:12
**thompson** 1:6
**thought** 23:25
**thoughtful** 23:19
**thousand** 23:13
**threaten** 34:5,19

**threatened** 34:16
**threats** 67:14
**three** 26:4 40:7
54:4 59:25 79:18
79:18 80:11 81:11
**tied** 63:5
**till** 78:25
**time** 1:22 5:19,19
15:21 18:5,10,20
29:3 40:8 62:10
65:2,5 78:25 80:13
**timeframe** 82:6
**times** 78:7 81:11
**title** 52:12
**today** 80:11 82:20
**told** 25:25 80:16
**topic** 20:25 80:24
**totally** 72:20
**touches** 44:5
**tracey** 2:15
**tracy** 1:10
**trait** 81:3
**transcript** 86:7
**transfer** 23:21
**transmission** 25:9
**transmit** 16:19
**transmitted** 21:2
**treatments** 56:22
**trial** 1:19 4:2 11:25
12:1,3 13:9 23:5
36:7 65:8,9
**tried** 79:8
**trouble** 61:11,19,21
**true** 28:25 48:5
86:8
**try** 5:21 12:3,7 52:5
**trying** 25:24 30:11
63:25 79:3
**tuesday** 5:5
**twice** 81:1,6,8

**two** 8:7,8 23:13
33:5 46:16 48:14
52:6 79:18 81:11
84:21
**typically** 28:7
**typing** 79:1

**u**

**u** 7:18,23 44:16
**u.s.** 28:3
**ultra** 44:15,17,20
**unable** 4:8
**unbridled** 71:6
**unconstitutional**
36:10 59:17 62:24
73:17
**underlined** 38:24
**underpinning** 57:3
60:8
**understand** 6:23
10:3 16:11 55:9
78:18,20 80:25
**understanding**
19:2 28:1
**undoing** 55:22
**unenforceable** 8:21
36:11
**uniform** 46:9
**unique** 58:22 65:21
**unit** 52:14,16
**united** 21:10 38:11
**universal** 16:24
25:5,8,12 28:7,12
29:1 64:11 76:24
**universities** 47:14
**university** 27:7
**unlawful** 76:16
**unreasonable**
70:12
**unspeakable** 20:9
**unvaccinated**
33:18

upbringing 52:18
upped 18:25
use 7:13 11:9 24:11
  24:13 25:1,3,5,6,9
  25:12,20,25 27:10
  49:21
uses 66:20
usually 18:24 57:12
  83:7

**v**

v 7:23 39:19 44:16
  46:1 73:11,16 74:7
  84:7
vaccinated 16:16
vaccination 15:12
  16:12 17:2 55:25
  56:2
vaccine 55:19
vaccines 21:1 54:22
  54:24 55:5,6,22
valid 52:7
validity 20:15
  68:25
value 72:9
variant 15:14,15,16
  15:19,24 16:14,17
  16:19 18:6 76:22
various 4:23 5:24
  9:15 16:9 36:4
  48:10 56:23
verbal 79:17 81:20
  83:5
verbally 9:23
verdict 5:13
version 14:3
versus 18:2,2
vested 46:7
vi 84:7,8
video 19:8
videoconference
  1:20

viewed 18:8
violate 7:14 37:24
  48:13,16 54:20
  69:11 73:4 74:10
violated 40:1
violates 9:24 57:1
  69:19,24 70:12
  76:9
violating 74:2 75:2
  75:15 76:11 77:11
violation 29:24
  39:1,14,18 70:1,7
  70:11 73:1 76:25
  76:25 77:1
viral 15:16
vires 44:15,18,20
virus 15:14,22 16:6
  18:6,9
viruses 22:4
visitors 17:1
void 8:21 43:17
  44:21
voluntary 17:24
  18:2
vs 1:12 7:19 39:8
  41:9 46:4,21 51:5
  72:3 73:6 76:18
  77:3,23

**w**

w 1:23 2:20 86:6,18
w.s. 1:5
wagstaff 2:10
want 5:16 10:20
  13:12 14:10 34:14
  42:11 49:4 59:11
  66:17 71:9,22
  74:14 77:8 78:5
  79:19,21 82:18
  83:4 84:1,20
wanted 81:2,10

wants 61:23
way 6:13 10:7
  11:10 14:24 17:10
  29:2,22 33:23 40:7
  46:11 72:10,21
  80:3 81:11,19 84:9
ways 40:8
we've 9:8 10:5,22
  14:3 33:9 41:13
  51:19
wear 10:20 14:2,6
  31:16
wearers 23:4
wearing 10:23
  19:18 23:17 24:24
  33:14
website 22:11,12
week 10:18 80:10
  80:12,12
weekend 82:1
weeks 50:16
weigh 56:4
weight 20:17
welfare 7:16
west 77:4
westlaw 77:5
whisenhunt 2:7,8
wide 16:23
wisdom 8:2
witness 50:23
witnesses 11:24
  13:19,20,21 24:8
  24:13
wl 77:4
woolums 2:13,13
word 38:24
words 8:19 40:2
  48:2 70:9 76:13
work 11:14 24:17
  32:2 78:25 82:7

worked 78:24
working 5:8 81:16
  81:23,25
works 84:10
world 79:5
worn 23:3
worth 21:13
writer 6:11 38:5
writing 4:20 80:20
  81:9
writings 4:6 11:6
written 4:19,24 5:4
  5:24 52:6 78:12,13
  78:13 83:3,5,11
wrong 79:23
wrote 27:13 38:4
  81:12

**x**

x 1:18 76:18

**y**

y 7:23 39:19
y'all 83:18
year 14:22 15:19
  16:3,4,6,7 17:25
  30:1 41:14 43:1
  46:20 48:14 50:6
years 7:1 8:8 9:3
  10:2,10 11:5 22:23
  44:24 45:17 46:5
  54:4
yell 10:4
yocum 7:23
younger 10:2
youtube 6:20

**z**

zealously 8:24
zoom 4:8 6:19 86:7