IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:21-cv-22863-KMM

JUDITH ANNE HAYES, individually and on behalf
of W.H., a minor, et. al.,

       Plaintiffs,

v.

GOVERNOR RONALD DION DESANTIS, in his official
Capacity as Governor of the State of Florida; et.al.,

       Defendants.

_____/

## PLAINTIFF'S RESPONSE TO THE STATE DEFENDANT'S MOTION TO DISMISS

**COMES NOW**, Plaintiffs, JUDITH ANNE HAYES, individually and on behalf of W.H., a minor., et al., by and through the undersigned counsel, and hereby files response to the Motion to Dismiss filed by GOVERNOR RONALD DION DESANTIS DESANTIS; FLORIDA DEPARTMENT OF EDUCATION; COMMISSIONER RICHARD CORCORAN (hereinafter "State Defendants") [DE-69], and states as follows:

**I.**    **Introduction and Background:**

In the Motion to Dismiss, which was further explained at the hearing for the Motion for Preliminary Injunction on September 8th, it is clear that the Defendants are attempting to reframe the complaint to allege that Plaintiffs are complaining about the lack of educational opportunities after they were excluded from the schoolhouse – instead of the act of being excluded from the schoolhouse. This demonstrates a fundamental misunderstanding of the effects of segregation and exclusion and how such effect encompass every aspect of an equal educational experience. Separate is even more unequal for children with disabilities, as not only are they deprived of an

integrated, social environment (from classes to busses), but also due to the state's policy, they are also being systemically deprived of the specialized instruction that each has crafted through their individualized program. Furthermore, the contention that safety requirements for a child with a disability need to be exhausted through the IDEA administrative process runs contrary to both Fry, and that exhaustion in this case is both futile and inadequate. Moreover, the ironic fact that the State Defendants enacted a provision that allows students without a mask to have a cause of action without any preconditions for the same type of segregation or exclusion that they suggest for children with disabilities demonstrates the paucity of their arguments.

Lastly, the State Defendants go far beyond the four corners of the complaint and seek to relitigate the case which they lost in Scott v. DeSantis, [DE 80-21]. In reiterating their arguments to the preliminary injunction, they seek to assume facts, not established, that post-date the complaint.

On **August 6, 2021**, the Plaintiffs filed their complaint against the State Defendants. The Plaintiffs are parents of fifteen children with disabilities recognized by their school districts as such. [DE 1, p. 2-4]. Pursuant to the Complaint, the Governor had recently passed an Executive Order on **July 30, 2021**, in response to several Florida school boards considering or implementing mask mandates in their school districts. In such Executive Order, Florida's Governor DeSantis contended that wearing a mask is a limitation on a parent's fundamental right to make health and educational decisions for their children. DE 1, p. 9. As many school districts were scheduled to begin classes on **August 10, 2021**, thousands of families were placed in limbo as to what they needed to do to prepare. Id. In addition, in such Executive Order, Governor DeSantis directed the Commissioner of Education, to penalize non-compliant school boards that fail to follow his Order.

*Disability Independence Group, Inc. * 2990 SW 35th Avenue* Miami, FL 33133*

All fifteen children in this Complaint have increased risks of severe illness or death if they become infected with COVID-19. Id. at p. 10. Pursuant to the ADA and Section 504 of the Rehabilitation Act, these children have the right to equal access the programs and services of the education system in an integrated environment. Id. at 10. By placing these children at increased injury or death by issuing an Executive Order that prevents districts the ability make such decisions, "he is violating the Americans with Disabilities Act and Rehabilitation Act by using criteria and methods of administration (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [and] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3)" Id. at 10.

All three claims made by the Plaintiffs arise from the implementation of the Governor's executive order which denies the Plaintiffs the right to be safe in their own, brick and mortar schools. (DE 1 ¶ 50 -55).  The injury suffered by the plaintiffs is that they either need to risk becoming ill or try to find an alternative to being in their schools. ¶ 54-55. The alternatives that they have to choose from do not provide them with equal access to their educational and non-educational benefits of being a child in school.  See DE 1, 84- 89. Some of these important factors for children with disabilities is the ability to interact with their peers and receive necessary supports and services within the school. DE 1 ¶ 99, 111, 114, 121, 126, 131, 134, 142, 159.  The claims made are specific to the claims under the operative provisions of the ADA and Section 504, including the exclusion and discrimination based on being subject to an unsafe environment.

Each of these children would like their education, as crafted in their IEPs and 504 plans, implemented their schools, in-person, and in an integrated-non segregated environment. DE 1, at p. 11. All children, whether disabled or able-bodied should have the opportunity to have academic

and social learning integrated in a school. For example, children with developmental or intellectual disabilities are educated on a modified curriculum also known as "Access Points" curriculum. "An Access Point curriculum reflects the core intent of the grade level standards but allows the material to be taught at reduced levels of complexity. The intent is to expose students to grade level material and promote inclusion with nondisabled students." Id. 17. For children on an Access Point curriculum, all of which have intellectual or developmental disabilities, do not have any alternative but to go back to their brick-and-mortar schools and expose themselves to danger. Id. at 18. Each of the Plaintiff children demonstrated detailed facts on how they are at risk by the failure to follow masking and other basic CDC protocol, and because of their disabilities, they will be at risk of serious injury or death if they go back to school, and their other options do not provide them equal access to the programs and services of similarly situated able bodied kids in the school district. Id. at p 19-29.

## II.      Standard of Review

The Plaintiffs' complaint pleads sufficient facts and the law to withstand a motion to dismiss.  A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted if the allegations in the complaint fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion tests the formal sufficiency of the allegations of claims for relief. The dismissal of a complaint is warranted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Glover v. Liggett Group, Inc*., 459 F.3d 1304, 1308 (11th Cir. 2006).

When ruling on a motion to dismiss under Rule 12(b)(6) a court "accepts that allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." Hill v.

<u>White,</u> 321 F.3d 1334, 1335 (11th Cir. 2003). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009). Those "[f]actual allegations must be enough to raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Iqbal</u>, 556 U.S. at 679 (citing <u>Twombly</u>, 550 U.S. at 570). In short, the complaint cannot merely allege misconduct, but must demonstrate that it is plausible that the pleader is entitled to relief. <u>Id.</u>

### III.   Gravamen of the Claim and exhaustion of Administrative Preconditions – A Safe Environment is not an element of FAPE

The arguments of the State Defendants assert that the exhaustion requirements of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(i), applies to all claims in this case and the plaintiffs are required to exhaust administrative remedies prior to seeking relief under the IDEA. The IDEA focuses on the appropriateness of the public education afforded special needs students whereas both the Rehabilitation Act and the ADA focus on disability-based discrimination against students with disabilities and are intended to reach "grosser kinds of misconduct" than the IDEA. <u>Timms v. Metrop. Schl. Dist. of Wabash Cty., Indiana</u>, 722 F.2d 1310, 1318 (7th Cir.1983). If relief sought by a plaintiff can be provided by the IDEA or relates to the provision of a FAPE or development of an IEP under the IDEA, the plaintiff's ADA or Section 504 claims will fail absent the plaintiff's exhaustion of administrative remedies. <u>Alboniga v. Sch. Bd. of Broward Cty. Fla.</u>, 87 F. Supp. 3d 1319, 1328 (S.D. Fla. 2015).

In Oral Argument, counsel for the Defendant emphasized that just because the Plaintiffs intoned the acronym "FAPE" they were automatically relegated to the administrative process, without looking into the gravamen of the cause of action of the complaint. This is incorrect. The

IDEA, which is not directly at issue in this case, is a comprehensive educational scheme, conferring

on disabled students a substantive right to public education. Honig v. Doe, 484 U.S. 305, 310, 108

S.Ct. 592, 98 L.Ed.2d 686 (1988)). In Honig, the Court stated:

> Envisioning the IEP as the centerpiece of the statute's education delivery system
> for disabled children, and aware that schools had all too often denied such children
> appropriate educations without in any way consulting their parents, Congress
> repeatedly emphasized throughout the Act the importance and indeed the necessity
> of parental participation in both the development of the IEP and any subsequent
> **assessments of its effectiveness**. See §§ 1400(c), 1401(19), 1412(7),
> 1415(b)(1)(A), (C), (D), (E), and 1415(b)(2). Accordingly, the Act establishes
> various procedural safeguards that guarantee parents both an opportunity for
> meaningful input into all decisions affecting their child's education and the right to
> seek review of any decisions they think inappropriate. These safeguards include the
> right to examine all relevant records pertaining to the identification, evaluation, and
> educational placement of their child; prior written notice whenever the responsible
> educational agency proposes (or refuses) to change the child's placement or
> program; an opportunity to present complaints concerning any aspect of the local
> agency's provision of a free appropriate public education; and an opportunity for
> "an impartial due process hearing" with respect to any such complaints. §§
> 1415(b)(1), (2).

Honig, 484 U.S. at 311–12 (emphasis ours). As is relevant to this action, the IDEA provides
as follows:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures,
> and remedies available under the Constitution, the Americans with Disabilities Act
> of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29
> U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with
> disabilities, except that before the filing of a civil action under such laws seeking
> relief that is also available under this subchapter, the procedures under subsections
> (f) and (g) shall be exhausted to the same extent as would be required had the action
> been brought under this subchapter.

20 U.S.C. § 1415(l). In Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 756, 197 L. Ed. 2d 46 (2017),

by looking at the gravamen of the claims, the Supreme Court had adopted a "relief-centered"

approach to IDEA exhaustion, rather than an "injury-centered" approach. "[T]he IDEA's

exhaustion provision applies only in cases where the relief sought by a plaintiff in the pleadings is

available under the IDEA"; in contrast, "[n]on—IDEA claims that do not seek relief available

under the IDEA are not subject to the exhaustion requirement, even if they allege injuries that could conceivably have been redressed by the IDEA." Payne v. Peninsula Sch. Dist., 653 F.3d 863, 871 (9th Cir.2011). Similarly, when a person brings a case where a plaintiff is seeking to enforce rights under section 504 or 42 U.S.C. § 1983, that *arise as a result of* a denial of a free appropriate public education, whether pled as an IDEA claim or any other claim that relies on the denial of a FAPE to provide the basis for the cause of action, the case must go through exhaustion. N.B. by D.G. v. Alachua Cty. Sch. Bd., 84 F.3d 1376, 1379 (11th Cir. 1996). The main questions are whether the relief was primarily due to the adequacy of the educational program that the school district offered to the child. Durbrow v. Cobb Cty. Sch. Dist., 887 F.3d 1182, 1190 (11th Cir. 2018).

In this matter, the claim and injury suffered by Plaintiffs is a regular disability claim of exclusion from the school environment due to conditions that were not safe for them to enter into the schools as a result of exclusion or segregation from their school environment, the damages suffered are the denial of everything from peer interaction to instructional study. There is no difference in this matter from the denial of a ramp to the school for a child in a wheelchair, or the denial of being permitted to enter school with a service animal. Each of those denials will result in a deprivation of both access and the educational and social experiences arising from those denials.

As such, the Plaintiffs do not need to exhaust administrative remedies under IDEA because the relief sought here under the ADA, Section 504, and its implementing regulations – namely, the permission to follow CDC requirements and ensure a safe educational environment - is not available under the IDEA. The district- and school-wide implementation of safe school environments requested is not available under the IDEA, which is inherently individualized. See, e.g., L.J. by N.N.J. v. Sch. Bd. of Broward Cty., 927 F.3d 1203, 1210 (11th Cir. 2019)(finding that

the IDEA created an array of procedures allowing parents and schools to work together to provide

"special education and related services designed to meet" disabled children's "unique needs."). In

fact, when such relief is systemic, it is considered to be outside of the IDEA as inadequate or futile.

Systemic violations are not a unique and individualized issue involving a child's educational

program. "Administrative remedies are generally inadequate or futile where plaintiffs allege

structural or systemic failure and seek systemwide reforms." <u>Association for Community Living</u>

<u>in Colorado v. Romer</u>, 992 F.2d 1040 (10th Cir.1993)

> Relatedly, the systemic exception is not met every time a plaintiff challenges centralized, uniform policies that affect all students within a school or school district. … Instead, to satisfy the systemic exception, a plaintiff must challenge policies that are "truly systemic ... in the sense that the IDEA's basic goals are threatened on a system-wide basis" and must not "focus[ ] on the shortcomings of a particular component of ... special education."

<u>T.R. v. Sch. Dist. of Philadelphia</u>, 4 F.4th 179, 192 (3d Cir. 2021) (internal quotation omitted).

This court has found that exhaustion is futile when there is a policy or practice that even violates

a provision of the IDEA – such as the uniform policy of denying ABA therapy to autistic children:

> Taking the allegations in the complaint as true, it would be futile for potential class members to utilize the administrative remedial scheme in order to challenge the School Board's uniform policy of denying requests for ABA. If the parents of the children have no actual input in the IEP determination for children with ASD, and the School Board automatically determines their placement, little could be gained from requiring each family to exhaust administrative remedies. A general determination as to whether this uniform policy procedurally violates the IDEA can best be handled by a district court without the unnecessary resort to countless administrative hearings all considering the same policy and the same evidence. To do so would expose the School Board to potentially inconsistent rulings on their standard policy, ultimately requiring an eventual resolution of the issue by a federal district court. Under the facts alleged here, exhaustion by class members would be needless and futile.

<u>L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cty., Fla.</u>, 516 F. Supp. 2d 1294, 1305 (S.D. Fla. 2007).

Similarly, by systemically denying a safe environment, thesechildren are automatically

disqualified from being integrated into the schools because of their disabilities and are relegated to segregated or out-of-school options. The structure of IDEA administrative compliance does not focus on these more generalized needs, as they  do not involve the unique issues involved with each student. In <u>L.J.</u> the Eleventh Circuit established how there are *content* cases which argue about the scope of an IEP, and an *implementation* case which examines how the unique IEP is implemented in practice:

> The IDEA allows parents to challenge "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education." Id. § 1415(b)(6)(A). Disagreements over a disabled child's education can take different forms. Sometimes the child's parent will argue that the school's proposed IEP is inadequate and thus fails to offer a free appropriate public education. In those content cases, the Supreme Court recently made clear that to "meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Endrew F</u>., 137 S. Ct. at 999. Other times, in what are more fairly called implementation cases, the parent will argue that while their child's IEP clears the IDEA's substantive threshold as written, the school has nonetheless failed to properly put the plan into practice.

<u>L.J. by N.N.J. v. Sch. Bd. of Broward Cty</u>., 927 F.3d 1203, 1207 (11th Cir. 2019). The Supreme Court in <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley</u>, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) narrowly defined the role the federal courts take in reviewing the due process requirements which are limited to items in the IEP. In analyzing the appropriate interpretation, the Court specified that: "a court's inquiry in suits brought under § 1415(e)(2) is twofold": (1) "has the State complied with the procedures set forth in the Act"; and (2), "is the individualized educational program ('IEP') developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits." <u>Id</u>. at 206–07, 102 S.Ct. 3034. The Court further concluded that Congress' intention was not that the IDEA displace the primacy of States in the field of educational methods, and, "once a court determines that the

requirements of the Act have been met, questions of methodology are for resolution by the States." Id. at 208, 102 S.Ct. 3034. Accordingly, as the items are outside of both the content and implementation of the IEP or 504 plan, an administrative law judge could not order the school districts to do any action, and such judges do not have the authority to violate the regulations promulgated pursuant to the executive order.

In this matter, we are not arguing educational methods or educational benefits, the Plaintiffs maintain that educational and non-educational benefits of the public school system are being denied based on exclusion. As a "safe environment" is not an element of FAPE, exhaustion is not required. P.P . v. Compton Unified School District, 135 F. Supp. 3d 1126 (C.D. Cal. 2015)(district- and school-wide implementation of trauma-sensitive systems requested was not available under the IDEA, which is inherently individualized); Dorsey v. Pueblo School District 60, 140 F. Supp. 3d 1102 (D. Colo. 2015)(relief for bullying from school employees not available under the IDEA).

Whether or not a claim is subject to the exhaustion requirement includes an examination of the gravamen or essence of the claims to determine whether the complaint seeks to determine if a "complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination." Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 756, 197 L. Ed. 2d 46 (2017). As should be apparent, the IDEA and Title II differ in both ends and means." K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088, 1097 (9th Cir. 2013). "Substantively, the IDEA sets only a floor of access to education for children … but requires school districts to provide the individualized services necessary to get a child to that floor, regardless of the costs, administrative burdens, or program alterations required. Title II and its implementing regulations, taken together, require public entities to take steps towards making existing services not just accessible, but

equally accessible to people with … disabilities, but only insofar as doing so does not pose an undue burden or require a fundamental alteration of their programs." Id.

To determine whether a complaint seeks relief under the specific provisions of FAPE and the IDEA and when it seeks general discrimination claims, the Supreme Court offered a test of two hypothetical questions:

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

Fry, 137 S. Ct. at 756.

Before analyzing the two claims, it is essential to consider that in the implementation of the regulation relating to the requirement of a parental opt-out, the drafters prohibited and provided a direct cause of action under the parents' bill of rights, § 1014.01, Fla. Stat., et seq. relating to the prohibitions of rule 64DER21-12(6), which provides as follows:

> (6) NON-DISCRIMINATION. Students whose parents or legal guardian have opted them out of a mask or face covering requirement shall not be subject to any harassment or discriminatory treatment, including but not limited to:
>
> (a) Relegation to certain physical locations;
> (b) Isolation during school activities; or
> (c) Exclusion from any school-sponsored events or activities.

Ironically, *all* of the solutions argued by the State defendants would be considered discrimination against children who choose to opt-out of the mask requirements under their own regulations.

*Disability Independence Group, Inc. * 2990 SW 35th Avenue* Miami, FL 33133*

These options argued by the State Defendants include having no option to be an in-person school, being relegated to hospital-homebound program or virtual school, or requesting the development of a segregated class without persons that are non-masked (as well as segregated hallways, segregated lunchrooms, segregated physical education classes, segregated transportation, and all other programs, services, and activities of the school system). Such segregation would be a per se violation of the integration mandate of the ADA. Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999). The fact that persons who choose not be masked would be able to have a direct cause of action without administrative preconditions, and persons with disabilities would need to exhaust for the same violations is plainly inequitable.

Because the questions and claims in this case arise from the safe environment due to the lack of precautions that caused the exclusion or denial of programs, benefits or services, the first question – "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library?" – the answer is yes, as there is a plethora cases across the country related to the legitimacy of mask limitations for both public and private entities under the Americans with Disabilities Act and other laws. See e.g. Pletcher v. Giant Eagle Inc., 2020 WL 6263916, at *1 (W.D. Pa. Oct. 23, 2020)(ADA claim that no exception to face mask requirement in grocery store violated rights of person with multiple disabilities); Giles v. Sprouts Farmers Mkt., Inc., 2021 WL 2072379, at *1 (S.D. Cal. May 24, 2021)(Plaintiff filed claim that she was denied entry into a market when she refused to wear either a face covering or a face shield); Emanuel v. The Walt Disney Co., 2021 WL 2454462, at *2 (E.D. Pa. June 16, 2021)(Person who lives with Autism that prevented him from wearing a mask denied entry into a Disney Store); Blandino v. Eighth Judicial Dist. Court in & for County of Clark, 478 P.3d 936 (Nev. App. 2021)(petitioner filed mandamus action to challenge COVID-19

administrative orders wearing masks); Chew v. Legislature of Idaho, 512 F. Supp. 3d 1124, 1126 (D. Idaho 2021)(Ohio legislature mask wearing).  Also, claims have been made for safety protections from COVID in prisons,  Ahlman v. Barnes, 445 F. Supp. 3d 671, 688 (C.D. Cal. 2020) (Granting preliminary injunctions requiring protections to incarcerated people to prevent infection under the ADA), and psychiatric facilities, Costa v. Bazron, 464 F. Supp. 3d 132 (D.D.C. 2020)

For the second question – "could an adult at the school—say, an employee or visitor— have pressed essentially the same grievance?" – Again, of course.  As shown above, any member of the public who has standing can challenge a policy that prohibits (or requires) masks. School districts in Florida, and across the country, have implemented requirements for employees and members of the public relating to wearing masks and other protections in schools. In addition, the EEOC has established detailed guidance on reasonable accommodations for employees during the COVID-19 Pandemic. See Coronavirus and COVID-19, found at https://www.eeoc.gov/coronavirus.  As such, there should be no question that the use of a mask or other prophylactic device to prevent the transmission of COVID-19 is not an educational issue, but a disability discrimination issue that is mainly covered by the discrimination provisions of ADA and 504.

Examples of items that would be required under to exhaust administrative preconditions include denial of a paraprofessional (Moragas v. Sch. Bd. of Miami-Dade County, 2019 WL 3252229, at *4 (S.D. Fla. 2019)), failure to allow a parent to attend an IEP meeting (Prunty v. Desoto County Sch. Bd. & Dist., 738 Fed. Appx. 648, 651 (11th Cir. 2018)), failure of the adequacy of the educational program for a student with ADHD (Durbrow v. Cobb Cty. Sch. Dist., 887 F.3d 1182, 1190 (11th Cir. 2018)). On the other hand, issues that are discriminatory at any place of public accommodation or governmental entity would be actionable, such as bullying,

singling out, or targeting a student with a disability (S.V.S by & through Varner v. Broward County Pub. Sch., 2019 WL 10092978, at *5 (S.D. Fla. 2019)), segregation of students into different classrooms (Georgia Advoc. Off. v. Georgia, 447 F. Supp. 3d 1311, 1315 (N.D. Ga. 2020); physical abuse or isolation of a disabled student (N.R. by Ragan v. Sch. Bd. of Okaloosa County, Florida, 418 F. Supp. 3d 957, 993–94 (N.D. Fla. 2019), J.S., III by & through J.S. Jr. v. Houston County Bd. of Educ., 877 F.3d 979, 986 (11th Cir. 2017)) Another example of the exemption is when care is needed for a medical condition:

> Significantly, AP has not brought any claims under the IDEA. ... AP's parents asked District 11 to accommodate AP's diabetes so that he would be safe and healthy at Adventures Plus; this is more like asking District 11 to accommodate a wheelchair-bound student by installing a ramp or widening doors than it is like asking for specific educational services.

AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11, 538 F. Supp. 2d 1125, 1146–47 (D. Minn. 2008). See also B.M. v. Bd. of Educ. of Scott Cnty., Ky., 2008 WL 4073855, at *6 (E.D.Ky. Aug. 29, 2008) (exhaustion not required where allegations arising from "concerns about how blood sugar monitoring would be conducted and insulin administered" at school, were "not related to the way that Defendants provided an education" and were "independent" of the IDEA); Sullivan by & through Sullivan v. Vallejo City Unified Sch. Dist., 731 F.Supp. 947, 951 (E.D.Cal.1990) (no exhaustion for relief under Rehabilitation Act where disabled student sought to be accompanied by service dog at school but did not dispute the adequacy of educational program or aver that service dog was educationally necessary).

**In any event, any exhaustion would be futile and/or inadequate under the IDEA.**

In Oral Argument, the State Defendants stated, in essence, that the parental mask opt out was not to be affected by any of the remedies that could be provided to a child, and that children with disabilities could have remote learning or segregated learning if other safety factors were not

adequate. The exhaustion of administrative remedies is not required under the IDEA where resort to administrative remedies would be 1) futile or 2) inadequate. <u>Durbrow v. Cobb Cty. Sch. Dist.,</u> 887 F.3d 1182, 1191 (11th Cir. 2018). Exhaustion is not required where exhaustion is futile or inadequate, where the question presented is purely legal, where the administrative process cannot grant relief, or where exhaustion would work a severe or irreparable harm upon a litigant. <u>D.M. v. New Jersey Dept. of Educ.</u>, 801 F.3d 205 (3d Cir. 2015).

Initially, the mere fact that remedies are not available, even after the due process hearing occurs, would make the process, by definition futile and inadequate. In this matter, the need for a safe environment is beyond the scope of the due process hearing.  See Weber v. Cranston Sch. Comm., 212 F.3d 41, 52 (1st Cir.2000) (observing that a state's implementation of the IDEA may render exhaustion futile where a plaintiff's complaint lies beyond "the scope of the due process hearing"); <u>McGraw v. Prudential Ins. Co. of Am</u>., 137 F.3d 1253, 1264 (10th Cir.1998) (noting that futility exception is limited to those situations where resort to administrative remedies would be "clearly useless").  The contention by counsel for the Defendant that administrative preconditions need to be exhausted when the process cannot garner the necessary relief or preconditions for such relief (i.e. finding a violation of section 504 to have a trial for damages) is false.

While systemic violations, such as a widespread legal violation or a practice, are an example of such inadequate or futile events which would not require exhaustion, exhaustion is similarly deemed to be inadequate and not necessary when "an emergency situation exists (e.g., the failure to take immediate action will adversely affect a child's mental or physical health)." <u>Komninos by Komninos v. Upper Saddle River Bd. of Educ.</u>, 13 F.3d 775, 778–79 (3d Cir. 1994)(quoting H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)). In this case, the regulation, in

and of itself, is an emergency regulation.  The mere fact that the due process timeline under Florida Administrative Code 6A06.03311(9) provides at least 75 days for a decision makes relief futile. This is not including the court delays that have also been systemic due to the pandemic.

One of the protections that is usually provided to a student is the IDEA's stay put provision. Section 1415(j) establishes a student's right to a stable learning environment during what may be a lengthy administrative and judicial review. <u>Tenn. Dep't of Mental Health & Mental Retardation v. Paul B.</u>, 88 F.3d 1466, 1472 (6th Cir.1996). If the child is ejected from his or her current educational placement while the administrative process sorts out where the proper interim placement should be, then the deprivation of education is complete. And, when such deprivation cannot be satisfied by the stay put provision, then again, immediate relief is essential to vindicate a child's right. See <u>Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.</u>, 297 F.3d 195, 199–200 (2d Cir. 2002); <u>L.A. v. New York City Dep't of Educ.,</u> 2020 WL 5202108, at *3 (S.D.N.Y. Sept. 1, 2020). In this matter, there is no protections afforded to a child in the delay, as the stay-put option places more harm to the child's education and health.  Furthermore, the situation with surges of COVID are so fluid, that the complying with such conditions each time an arbitrary rule placing children with disabilities in danger would make relief always impossible. See <u>Roman Cath. Diocese of Brooklyn v. Cuomo</u>, 141 S. Ct. 63, 208 L. Ed. 2d 206 (2020)

**Collateral Estoppel and Redressability and Traceability.**

In this motion to dismiss, the State Defendants go far beyond the four corners of the complaint and are seeking to collaterally attack the State Court judgment for which they had an opportunity to fully try. While the arguments were in the Motion for Preliminary Injunction, with an up-to-the minute rendition of what the State Defendants have done since the filing of the complaint,  the motion should be decided on the four corners of the complaint.  However, the court

should understand that this is being used as a collateral attack. "[C]ollateral estoppel precludes the relitigating of an issue that has already been litigated and resolved in a prior proceeding." Pleming v. Universal–Rundle Corp., 142 F.3d 1354, 1359 (11th Cir.1998). "Collateral estoppel applies when: (1) "the issue at stake is identical to the one involved in the prior proceeding," (2) "the issue was actually litigated in the prior proceeding," (3) the determination of the issue in the prior litigation was a "critical and necessary part" of the judgment in the first action, and (4) the party against whom collateral estoppel is asserted had a "full and fair opportunity" to litigate the issue in the prior proceeding. Id.; Parris v. Taft, 630 F. App'x 895, 900 (11th Cir. 2015). In Scott v. DeSantis, Case No. 2021-CA-001382 [attached as DE 80-21], the same State Defendants were sued as to whether the promulgation of the Executive Order was a valid exercise of the State Defendant's power under Florida Law, and asserted many of the same arguments, which were rejected by the state court judge when the ruling on the issues incorporated in the motion to dismiss were decided after trial:

1. The State Court found that the actions were traceable to the governor and his executive order, and rules promulgated through his order by his executive agencies:

   - A third point of distinction is the DeSantis case said that the order in that case did not require the school districts to do anything. In this case, the order and the consequences it set up and directed resulted in ordering the school districts to not pass a mandate with no parental opt-out. If you do that, as was stated, there will be consequences. And we've already seen that that's happening now [DE 66-1, p. 52]

   - The purpose of the Executive Order and the actions it set in motion were to prohibit local school boards from adopting face mask mandates that did not include a parental opt-out provision. The Defendants have contended by their actions and positions in this case that the Parents' Bill of Rights authorizes them to enforce a blanket prohibition against mask mandates. The Defendants have additionally used threats of enforcement and have engaged in enforcement actions generated as a result of the Executive Order to enforce this blanket prohibition. The Defendants contend that the Parents' Bill of Rights as referenced in the Executive Order

authorized the enforcement actions against school boards that adopted face mask mandates with no parent opt-out provision. [DE 80-21 p. 22]

2. The State Court found that the rule was not promulgated during a declared emergency, and did not rely on the complete text of the Parents Bill of Rights, which allows reasonable restrictions for health and safety:

- The provision of the law that is most relevant to this case is: Fl. St.§1014.03, which says in pertinent part, no "governmental entity ... may ... infringe on the fundamental rights of a parent to direct the upbringing, education, health care, and mental health of his or her minor child without demonstrating that such action is reasonable and necessary to achieve a compelling state interest and that such action is narrowly tailored and is not otherwise served by a less restrictive means." (emphasis supplied).

  It seems that the Defendants are relying only on the first portion of Fla. Stat. §1014.03 that prohibits infringement on parents' rights, but ignoring the remaining portion of the section which provides that infringement may occur if the action is reasonable and necessary to achieve a compelling state interest and that the action is narrowly tailored and is not otherwise served by a less restrictive means. In plain English, this law says that the government cannot interfere with parental rights regarding education and health care unless there is a reasonable basis to do so and that the remaining elements of Fla. Stat. §1014.03 are met. [DE 80-21, p. 18].

3. The Court found that the immense danger posed to all children was an irreparable injury:

- In this case irreparable injury is demonstrated by the increased risk of Delta variant infection (as demonstrated by CDC guidance and medical evidence in the record) if universal face mask mandates are blocked in violation of the Parents' Bill of Rights. A continuing constitutional violation is in and of itself irreparable harm. Board of County Commissioners v. Home Builders Association of West Florida, 2021 WL 3177293, at *3 (Fla. 1st DCA July 28, 2021). [DE 80-21, p. 26].

4. As a result of finding the actions traceable to the state defendant's conduct, it enjoined the defendants from continuing the conduct (other than the Governor):

- The "Enjoined Defendants" are ordered not to violate the Parents' Bill of Rights by taking action to effect a blanket ban on face mask mandates by local school boards and by denying the school boards their due process rights granted by the statute which permits them to demonstrate the reasonableness of the mandate and the other factors stated in the law. I also enjoin the "Enjoined Defendants" from enforcing or

attempting to enforce the Executive Order and the policies it caused to be generated and any resulting policy or action which violates the Parents' Bill of Rights as outlined in this Final Judgment. [DE 80-21, p. 25]

**Plaintiffs State Law Claims**

The Florida Educational Equity Act ("FEEA") prohibits discrimination based on national origin against a student in the state system of public K–20 education. Fla. Stat. § 1000.05(2)(a). "No person in this state shall, on the basis of ... disability ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any public K–20 educational program or activity, ... conduct by a public educational institution that receives or benefits from federal or state financial assistance." Id. The FEEA confers a private right of action for injunctive relief. See Fla. Stat. 1000.05(7).

As this statute specifically authorizes discrimination suits against public entities that discriminates based on disability in public educational institutions, claims against the state and state entities are permitted. Fla. Stat. § 1000.05(2)(a); see, e.g. Methelus v. Sch. Bd. of Collier Cty., Fla., 243 F. Supp. 3d 1266, 1281 (M.D. Fla. 2017)("And pre-suit notice is not required here because the FEEA authorizes discrimination suits against "public educational institution[s]." This statute is patterned after Title VII, and claims are analyzed identically to Title VII claims. Ren v. Univ. of Cent. Fla. Bd. of Trustees, 390 F. Supp. 2d 1223, 1235 (M.D. Fla. 2005), aff'd sub nom. Ren v. Univserity of Cent. Fla. Bd. of Trustees, 179 F. App'x 680 (11th Cir. 2006) The Eleventh Amendment (or sovereign) immunity bars an unconsented action against a state for damages, but does not bar a suit for nonmonetary relief, such as an injunction. This point was made in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866

(2001), where Eleventh Amendment immunity barred plaintiff's action for damages under Title I of the ADA but did not bar injunctive relief. <u>Garrett</u>, 531 U.S. at 374 n. 9, 121 S.Ct. 955.

**WHEREFORE,** Plaintiffs, JUDITH ANNE HAYES, individually and on behalf of W.H., a minor., et al., respectfully requests that this Court DENY the Defendant's motion to dismiss and grant any further relief as this court deems just and equitable.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 9, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties and counsel of record, or in some other authorized manner for those counsel or parties who are not authorized to receive notices electronically.

By: /s/*Matthew W. Dietz*_____
Matthew W. Dietz, Esq.
Florida Bar No. 84905
Stephanie Langer, Esq.
Florida Bar No. 149720
2990 Southwest 35th Avenue
Miami, Florida 33133
T: (305) 669-2822 / F: (305) 442-4181
slanger@justDIGit.org
mdietz@justdigit.org
aa@justdigit.org