IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| | * | |
| THE ARC OF IOWA; CHARMAINE ALEXANDER, Individually and on Behalf of C.B.; JOHNATHAN CRAIG, Individually and on Behalf of E.C. and J.C.; MICHELLE CROFT, Individually and on Behalf of J.J.B.; AMANDA DEVEREAUX, Individually and on Behalf of P.D.; CARISSA FROYUM ROISE, Individually and on Behalf of H.J.F.R.; LIDIJA GEEST, Individually and on Behalf of K.G.; MELISSA HADDEN, Individually and on Behalf of V.M.H.; HEATHER LYNN PRESTON, Individually and on Behalf of M.P. and S.P.; LISA HARDISTY SITHONNORATH, Individually and on Behalf of A.S.; REBEKAH STEWART, Individually on Behalf of E.M.S.; ERIN VERCANDE, Individually and on Behalf of S.V.; | * * * * * * * * * * * * * * * * * * | 4:21-cv-00264 |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| KIM REYNOLDS, In her Official Capacity as Governor of Iowa; ANN LEBO, In her Official Capacity as Director of the Iowa Department of Education; ANKENY COMMUNITY SCHOOL DISTRICT; COUNCIL BLUFFS COMMUNITY SCHOOL DISTRICT; DAVENPORT COMMUNITY SCHOOL DISTRICT; DECORAH COMMUNITY SCHOOL DISTRICT; DENVER COMMUNITY SCHOOL DISTRICT; DES MOINES PUBLIC SCHOOLS; IOWA CITY COMMUNITY SCHOOL DISTRICT; JOHNSTON COMMUNITY SCHOOL DISTRICT; LINN MAR COMMUNITY SCHOOL DISTRICT; WATERLOO COMMUNITY SCHOOL DISTRICT; | * * * * * * * * * * * * * * * * * | ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER |
| | * | |
| Defendants | * | |
| | * | |

**Exhibit - A**

Before the Court is Plaintiffs' Complaint for Declaratory and Injunctive Relief against All Defendants, and Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (TRO Motion), both filed on September 3, 2021. ECF Nos. 1, 3. Defendants Kim Reynolds and Ann Lebo filed a Response to Plaintiffs' TRO Motion on September 9, 2021. ECF No. 21. On September 10, 2021, the Court held a hearing on the TRO Motion. *See* ECF No. 27. Following the hearing, Plaintiffs filed a Supplement to their TRO Motion. ECF No. 28. The matter is fully submitted.

## I. INTRODUCTION

It has been almost forty years since the U.S. Supreme Court recognized that, regardless of citizenship status, denying school-aged children a free public education violates the U.S. Constitution. *Plyler v. Doe*, 457 U.S. 202, 230–31 (1982). In *Plyler*, Justice Brennan described the importance of protecting the most vulnerable class of society—innocent children—who "can affect neither their parents' conduct nor their own status." *Id.* at 220 (quoting *Trimble v. Gordon*, 430 U.S. 762, 770 (1977)). Forcing children to bear the brunt of societal discord "is illogical and unjust." *Id.* (quoting *Weber v. Aetna Cas. & Surety Co.*, 406 U.S. 164, 175 (1972)). Equal access to "education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Id.* at 221. Denying a group of children "the means to absorb the values and skills upon which our social order rests" is a "significant social cost[] borne by our Nation." *Id.* As Justice Brennan indicated, we can look to *Brown v. Board of Education*, 347 U.S. 483, 493 (1954), for the proposition that "education is perhaps the most important function of state and local governments. . . . [I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity . . . is a right which must be made available to all on equal terms." *Id.* at 222–23.

**Exhibit - A**

## II. FACTUAL AND PROCEDURAL BACKGROUND

In their TRO Motion, Plaintiffs seek to immediately enjoin Defendants from enforcing Iowa's mask mandate ban that prohibits Iowa school districts from adopting, implementing, and enforcing a universal mask mandate. Plaintiffs want Iowa school districts to have the opportunity to comply with federal law and ensure that each child receives an education in the least-restrictive and the most-integrated environment—without jeopardizing their lives or safety. The Iowa mask mandate ban provides that school districts "shall not adopt, enforce, or implement a policy that requires its employees, students, or members of the public to wear a facial covering for any purpose while on the school district's . . . property." Iowa Code § 280.31. The provision bans universal mask mandates indoors unless school district authorities determine masks must be worn for "specific extracurricular or instructional purpose[s]" or a mask is otherwise required by law. *Id.* Plaintiffs thus claim that section 280.31 violates the civil rights of disabled or immunocompromised children under Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act of 1973, § 794(a). Plaintiffs further claim section 280.31 is preempted by the ADA, the Rehabilitation Act, and the American Rescue Plan Act of 2021 (ARPA), Pub. L. No. 117-2, 135 Stat. 4 (2021). Because Plaintiffs cannot access reasonable protection from the threat of exposure to SARS-CoV-2—the virus that causes COVID-19—they allege that only immediate restraint of the mask mandate ban will eliminate this violation of the children's civil rights.

### A. Ongoing COVID-19 Risks

Despite the introduction of vaccines earlier this year, COVID-19 continues to spread. Since August 2021, the State of Iowa has seen a dramatic increase in COVID-19 cases, particularly among the unvaccinated, driven by the spread of the highly contagious Delta variant.

**Exhibit - A**

ECF No. 1 at 9–10.  In the first week of September 2021 alone, over 8,100 new cases were reported in Iowa.  *Iowa COVID-19 Summary*, COVID-19 in Iowa (Sept. 7, 2021), https://coronavirus.iowa.gov.  This is an increase from a month ago in August when there were just "over 7,000 new cases" in one week.  ECF No. 1 at 9.  Iowa is quickly reaching pre-vaccination levels in daily positive tests and hospitalization rates because the "Delta variant is at least twice as transmissible as previous variants."  ECF No. 3-1 ¶ 11.[1]  And despite what some may think, children of all ages can and do contract and transmit SARS-CoV-2.  ECF No. 3-2 ¶¶ 19, 21.  "According to the American Academy of Pediatrics (AAP), 'the Delta variant has created a new and pressing risk to children and adolescents across this country' and pediatric cases of COVID-19 have been 'skyrocketing.'"  ECF No. 17 at 2 (quoting Letter from American Academy of Pediatrics to Acting FDA Commissioner Janet Woodcock (Aug. 5, 2021), https://downloads.aap.org/DOFA/AAP%20Letter%20to%20FDA%20on%20Timeline%20for%20Authorization%20of%20COVID-19%20Vaccine%20for%20Children_08_05_21.pdf).

Since July, the AAP has recorded around 3,500 new COVID-19 cases among Iowa school-aged children.  ECF No. 1 at 10; *see also* ECF No. 3-2 ¶ 14 ("Data released August 31 shows 22% of new cases in Iowa last week, after one week of school for many, are in school-age children.").  "[I]t is becoming increasingly apparent that the Delta variant of COVID-19 is very contagious and causing more symptomatic illness in children."  ECF No. 11 at 41.  The current level of the Delta variant in Iowa has increased the infection rate and severity of infection.  ECF Nos. 11 at 16; 17 at 3–4.  Some public schools in Iowa are experiencing COVID-19 infection rates at upwards of sixty percent that of last year's total for the entire school year.  ECF No. 28 at 2–4.  Defendant Des Moines Public Schools report a positive infection rate already at twenty-

---

[1] For purposes of this TRO, the Court accepts as true the statements contained within the Declarations submitted by Plaintiffs.

**Exhibit - A**

five percent of all positive cases last year. *Id.* at 2–3. Defendant Linn-Mar Community School District similarly reports it has already reached thirty percent of the total infection rate of last year. *Id.* at 4. Defendant Waterloo Community School District reports a positive infection rate at more than sixty percent of last year's total. *Id.* Defendant Iowa City Community School District reports positive cases have more than doubled in one week in September. *Id.* at 3. And this school year has only been in session for a few weeks. The number of children hospitalized due to COVID-19 is also on the rise. ECF No. 3-1 ¶ 12.

Children are susceptible to post-infection complications of COVID-19, namely Multisystem Inflammatory Syndrome in Children (MIS-C) and "Long COVID." ECF No. 3-1 ¶¶ 20, 21. Children who suffer from MIS-C "often require continuous infusions of medications that help their heart beat strong enough to maintain life." *Id.* ¶ 20. Long COVID entails "symptoms remain[ing] months after an initial COVID diagnosis," *id.* ¶ 21, such as "chronically disabling fatigue, headache, difficulty concentrating, insomnia and other multisystemic symptoms," ECF No. 3-2 ¶ 22. Long COVID can occur even in children who had a mild illness. ECF No. 3-2 ¶ 22.

Some children, like Plaintiffs, are at greater risk of severe illness than others. The Centers for Disease Control and Prevention (CDC) has listed several factors that identify people at higher risk of severe illness or death from COVID-19. *See* ECF No. 1 at 11. The CDC's research "suggests that children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease might be at increased risk for severe illness from COVID-19." ECF No. 17 at 3; *Information for Pediatric Healthcare Providers*, Ctrs. for Disease Control (Dec. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pediatric-hcp.html. As are children with obesity, diabetes, asthma, chronic lung disease, sickle cell

**Exhibit - A**

disease, and immunosuppression. *Information for Pediatric Healthcare Providers*, *supra*.

Similarly, studies show that individuals with intellectual disabilities are at an increased risk of

contracting COVID-19 and dying from COVID-19 compared to their non-disabled peers. ECF

No. 3-1 ¶ 19. Experts, including Plaintiffs' Expert Dr. Joel Waddell, agree the Delta variant

makes it increasingly dangerous for disabled children and their siblings to attend in-person

learning without vaccination or universal masking. *See* ECF No. 3-1 ¶¶ 7, 32.

### B. COVID-19 Mitigation Strategies

The Delta variant has impacted school-aged children in part because the U.S. Federal

Drug Administration (FDA) has not yet approved vaccination for children under age twelve.

ECF Nos. 1 at 10; 3-1 at 5, 17. An approved pediatric vaccine will be the answer for some

children. *COVID-19 Vaccines Work*, Ctrs. for Disease Control & Prevention (Aug. 16, 2021),

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html. But for others,

their medical conditions or prescribed medications make it impossible for their immune systems

to fight off COVID-19, thus a vaccine will provide little protection for them. ECF No. 3-1 ¶¶ 15,

20. Unvaccinated adults and children are more likely to contract, transmit, and suffer from

severe symptomatic illness than those who are vaccinated. *Id.* ¶ 16.

To mitigate spread of the virus, "[t]he CDC recommends 'universal indoor masking for

all teachers, staff, students, and visitors to K-12 schools, regardless of vaccination status.'" ECF

No. 3-1 ¶ 22 (quoting *Guidance for Covid-19 Prevention in K-12 Schools*, Ctrs. for Disease

Control & Prevention (Aug. 5, 2021), https://www.cdc.gov/coronavirus/2019-

ncov/community/schools-childcare/k-12-guidance.html); *see also American Academy of*

*Pediatrics Updates Recommendations for Opening Schools in Fall 2021*, Am. Acad. Pediatrics

(July 19, 2021), https://www.aap.org/en/news-room/news-releases/aap/2021/american-academy-

**Exhibit - A**

of-pediatrics-updates-recommendations-for-opening-schools-in-fall-2021 (recommending "that everyone older than age [two] wear masks, regardless of vaccination status . . . because a significant portion of the student population is not yet eligible for vaccines, and masking is proven to reduce transmission of the virus and to protect those who are not vaccinated"). Further, the World Health Organization's (WHO) public health experts suggest children with underlying health conditions that put them at greater risk of serious illness wear a mask. *Coronavirus Disease (COVID-19): Children and Masks*, World Health Org. (Aug. 21, 2020), https://www.who.int/news-room/q-a-detail/q-a-children-and-masks-related-to-covid-19. A mask provides protection to a child with an underlying health condition and "prevents transmission to others." *Id.* According to WHO, mask wearing is important for teachers and adults working closely with children. *Id.* For the 2020–2021 academic year, numerous school districts in Iowa had a mask mandate during the pandemic. ECF No. 1 at 3.

### C. Iowa Code section 280.31

On May 20, 2021—with less than two weeks left of school in Iowa—Governor Reynolds signed House File 847, which included a provision banning local school districts from implementing universal mask policies on school property. Act of May 20, 2021 (H.F. 847), ch. 139, 2021 Iowa Act § 28 (to be codified at Iowa Code § 280.31). The ban went into effect immediately. Defendant Lebo, Director of the Iowa Department of Education, recently made it clear that violators of section 280.31 will "be referred to the State Board of Education" and risk loss of funding. ECF No. 17 at 7–8. Likewise, Governor Reynolds has indicated she intends to "hold strong" and vigorously enforce section 280.31 this fall. *See* ECF No. 1 at 16. On August 6, 2021, the Iowa Department of Public Health (IDPH) issued guidance that school districts are

7

**Exhibit - A**

prohibited from implementing a mask-wearing policy on school property because of section 280.31.  ECF No. 1 at 3.

Since section 280.31 was enacted, the first two weeks of the academic year have coincided with a dramatic ten-percent increase in the cumulative number of children contracting COVID-19 since the start of the pandemic.  *Children and COVID-19: State-Level Data Report*, Am. Acad. Pediatrics, (Sept. 7, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report.  Importantly, Plaintiffs' TRO Motion comes on the heels of the U.S. Department of Education's Office for Civil Rights announcing its investigation into whether Iowa's mask mandate ban violates Title II of the ADA and section 504 of the Rehabilitation Act by discriminating against school-aged children with disabilities.  ECF No. 1 at 15 (citing Letter from Suzanne B. Goldberg, Acting Asst. Sec'y for C.R., U.S. Dep't Educ. to Ann Lebo, Iowa Dep't of Educ. (Aug. 30, 2021)).

### D.  Plaintiffs' Lawsuit

The named Plaintiffs in the Complaint and TRO Motion include eleven parents who individually, and on behalf of their minor children with disabilities, challenge section 280.31 as a violation of federal disability rights, namely Title II of the ADA and section 504 of the Rehabilitation Act.  Plaintiffs allege these "federal disability rights laws prohibit outright exclusion, denial of equal access, or unnecessary segregation of students with disabilities in public education."  ECF No. 1 at 3.

Each child attends a public school district in Iowa and has an underlying health condition that increases their risk of serious complications or even death from COVID-19.  *See generally* ECF No. 1.  These underlying health conditions include asthma, Down Syndrome (Trisomy 21), cerebral palsy, heart and lung conditions, hypertension, sickle cell anemia, and weakened

8

**Exhibit - A**

immune systems—many conditions identified by the CDC as risk factors for severe illness if infected with COVID-19.  ECF No. 1 at 3.

The ARC of Iowa is a "nonprofit organization devoted to advocating for people with intellectual and developmental disabilities . . . and their families."  ECF No. 1 at 4.  The organization represents the Individual Plaintiffs.  *Id.*  It has over 3,100 members.  *Id.*

The Individual Plaintiffs come together from various counties around Iowa.  Charmaine Alexander is the parent of an eleven-year-old child attending the Johnston Community School District in Polk County, Iowa.  ECF No. 1 at 23.  Her child struggles with moderate to severe asthma.  *Id.*  Jonathan Craig is the parent of a five-year-old and an eleven-year-old who attend the Waterloo Public School District in Black Hawk County, Iowa.  ECF No. 1 at 25.  His younger child has Down Syndrome, chronic seizures, and chronic respiratory problems.  ECF No. 3-3 ¶ 2.  His older child suffers from sickle cell anemia, functional asplenia, and has a compromised immune system.  ECF No. 3-3 ¶ 3.  Michelle Croft's nine-year-old child attends the Iowa City Community School District in Johnson County, Iowa.  ECF No. 1 at 29.  Her child has been diagnosed with asthma, Attention Deficit/Hyperactivity Disorder (ADHD), and other disabilities.  ECF No. 3-9 ¶ 3.  Amanda Devereaux is the parent of a five-year-old attending the Ankeny Community School District in Polk County, Iowa.  ECF No. 1 at 26.  Her child was born with a brain malformation caused by congenital infection; the child suffers from symptomatic congenital cytomegalovirus, polymicrogyria, epilepsy, feeding delay, expressive and language delay, nonverbal, hearing loss, gross/fine motor skill delays, and uses a feeding tube.  ECF No. 3-10 ¶ 3.  Carrisa Froyum Roise is the parent of a ten-year-old child who attends the Denver Community School District in Bremer County, Iowa.  ECF No. 1 at 28.  Her child has been diagnosed with congenital central hypoventilation syndrome.  ECF No. 3-5 ¶ 3.  Lidija Geest is

**Exhibit - A**

the parent of a six-year-old attending the Davenport Community School District in Scott County, Iowa. ECF No. 1 at 23–24. Her child struggles with asthma. ECF No. 3-12 ¶ 4. Melissa Hadden's three-year-old child attends the Council Bluffs Community School District in Pottawattamie County, Iowa. ECF No. 1 at 28–29. Her child has been diagnosed with heart disease, periventricular leukomalacia, autism, cerebral palsy, cortical digital impairments, and optic nerve hypoplasia. ECF No. 3-4 ¶ 2. Heather Lynn Preston is the parent of two eleven-year-olds who attend Des Moines Public School District in Polk County, Iowa. ECF No. 1 at 21–22. One child has been diagnosed with an extremely rare condition called Heterotaxy Syndrome, which causes significant heart defects and lung conditions. ECF No. 3-11 ¶¶ 4, 5. Her other child has been diagnosed with hypertension, kidney disease, seizures, and a range of other disabilities including ADHD. ECF No. 3-11 ¶ 8. Lisa Hardisty Sithonnorath's five-year-old child attends the Des Moines Public School District in Polk County, Iowa. ECF No. 1 at 22–23. Her child has Down Syndrome, hypothyroidism, and a previous history of viral-induced asthma. ECF No. 3-7 ¶ 6. Rebekah Stewart is the parent of a ten-year-old child attending the Linn-Mar Community School District in Linn County, Iowa. ECF No. 1 at 30. Her child has Williams Syndrome, which causes slow growth, heart problems, gastrointestinal issues, and learning disabilities. ECF No. 3-8 ¶ 3. Erin Vercande is the parent of a ten-year-old who attends the Decorah Community School District in Winneshiek County, Iowa. ECF No. 1 at 24–25. Her child suffers from a brain injury, cerebral palsy, and a history of strokes and epilepsy. ECF No. 3-6 ¶ 8.

All of these parents have vulnerable children under the age of twelve who face an increased risk of severe illness or death if they contract COVID-19. None of these children have been authorized by the FDA to receive a vaccine. Many children are currently treated by

**Exhibit - A**

pediatricians at the best hospitals in Iowa, including Blank Children's Hospital and the University of Iowa Stead Family Children's Hospital. *See* ECF No. 11 at 7, 10, 13, 16, 19, 25, 41, 43. Several pediatricians agree that the prevention of a mask mandate in Iowa schools means that remote learning is the *only* safe option for immune-suppressed children. ECF No. 11 at 7, 10, 13, 16, 19, 29, 41. But Plaintiffs report unsuccessful experiences with virtual or remote learning over the past year. *See, e.g.*, ECF Nos. 3-3 ¶ 10 ("My child struggled to get the academic help he needed [with the 100% remote option last year] and suffered in terms of his emotional and mental health. He also fell behind"); 3-7 ¶ 12 ("I witnessed serious negative consequences to the point that I had to hire an assistant"); 3-8 ¶ 8 ("[My child] was unable to keep focused, struggled with lack of socialization with peers, and had an increase in behavior problems. My child remained at baseline and did not make gains in her learning."). Some schools do not even offer virtual learning options. ECF Nos. 3-13 ¶ 9; 3-4 ¶ 6; 3-5 ¶ 13. In addition, some Plaintiffs report an inability to assist their disabled children with remote-learning instruction because they work full time. ECF Nos. 3-8 ¶ 11; 3-10 ¶ 10.

In-person learning is essential for many children. Defendant Lebo remarked in January 2021 that a return to in-person learning is *necessary* as "students engaged in remote learning are falling behind academically." ECF No. 1 at 13 (citing David Pitt, *Iowa Gov. Reynolds pushing for In-Person Learning*, AP (Jan. 4, 2021), https://apnews.com/article/des-moines-coronavirus-pandemic-kim-reynolds-iowa-school-boards-76f11e689a2fd5496ecacd987a3b9fff); *see also COVID-19 Guidance for Safe Schools*, Am. Acad. Pediatrics (July 18, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools. Plaintiffs' pediatricians similarly report it is essential for all children with underlying health conditions in

**Exhibit - A**

particular to be in-person if possible because it keeps them "engaged in learning and allow[s] for socialization with peers." ECF No. 11 at 19. The children involved in this case are creative, caring, and truly love the challenge of school according to their individualized learning plan staff. ECF No. 11 at 36. Their strengths include "[m]ath facts, division and multiplication [and] participation in class." *Id.* But Plaintiffs allege the children risk their lives if they go to school in person because Iowa schools are banned from requiring protective masks to prevent the spread of COVID-19. These students also risk their "physical[,] psychological, emotional, and developmental well-being" by going to school in a maskless environment. ECF No. 3-1 ¶ 7. And yet, Plaintiffs' Expert Dr. Waddell sees the grave harm COVID-19 can cause children and families with his own eyes. He states that "[s]everal of these parents have looked me in the eyes while crying and asked, 'could we have done something to prevent this from happening?'" ECF No. 3-1 at 20.

Plaintiffs thus lament the choice of having to either send their children to school in person with the rest of the kids their age without a mask mandate or swallow the lesser option that is not always available to them—remote learning. *See* ECF Nos. 1, 3, 17. As one pediatrician states, "Children with these kinds of risks and challenges should not be forced to stay home and be deprived of learning . . . children should have the freedom to attend school." ECF No. 11 at 23.

Iowa's mask mandate ban makes it not only dangerous for disabled or immunocompromised children to attend school, but several pediatricians opine it is also dangerous for healthy siblings to attend school in person because they risk carrying the virus back to their disabled or immunocompromised siblings. *See* ECF Nos. 11 at 10, 13; 3-1 ¶¶ 7, 32. Iowa Code section 280.31 has impacted Plaintiffs' families and communities by effectively

**Exhibit - A**

denying local public school boards the discretion to require masks in their schools for the safety of the immune-suppressed or disabled children who attend them.  Importantly, the CDC specifically states that there are no known adverse effects from mask use.  ECF No. 3-2 ¶ 32; *Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.  Expert Dr. Waddell opines, "Masking is also critical for the health of those who, for reasons of disability, cannot mask" including children "who struggle to take a mask off and on, whether because of motor skills or cognitive issues; people with sensory processing disorders; and people with facial deformities incompatible with a mask, among others."  ECF No. 3-1 ¶ 27.  As one pediatrician states, "[t]here's no evidence that wearing a mask has any negative impact whatsoever on that child's physical, social or mental well-being."  ECF No. 11 at 23.

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 gives courts authority to enter TROs.  In the Eighth Circuit, courts apply the same standards to a motion for a TRO as to a motion for a preliminary injunction.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).  A TRO "is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Id.* (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in

**Exhibit - A**

employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

In determining whether to issue a TRO, the Court evaluates four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)). "[W]hen the [g]overnment is the opposing party," the balance of the equities and the public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of establishing the propriety of a TRO by a preponderance of the evidence. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

IV.  ANALYSIS

Plaintiffs ask the Court to issue a TRO enjoining enforcement of Iowa Code section 280.31 by Defendants Reynolds and Lebo because irreparable harms exist, they are likely to succeed on the merits of their claims, and the balance of the equities and the public interest weigh in favor of an emergency injunction.

In their resistance to the TRO Motion, Defendants Reynolds and Lebo argue the Court should deny Plaintiffs' request for a TRO because it is unnecessary and inappropriate. First, they argue a TRO is unnecessary because section 280.31 permits local school districts to comply with

**Exhibit - A**

federal by way of a "savings" clause. Section 280.31 does not prohibit a school district from requiring masks if it determines it "is necessary for a specific extracurricular or instructional purpose, or is required by . . . any other provision of law." Iowa Code § 280.31. Defendants Reynolds and Lebo thus contend that school districts have the power to determine whether federal law requires masks to be worn in schools,[2] and therefore, a TRO is unnecessary.[3] Next, Defendants Reynolds and Lebo argue Plaintiffs lack standing because a temporary injunction will not redress their alleged injuries. They contend Plaintiffs seek only to enjoin the enforcement of the mask mandate ban, which will not ensure that local public school districts will institute universal mask mandates to keep them safe. Finally, Defendants Reynolds and Lebo argue that issuing a TRO will risk upsetting "the status quo" and cause "unnecessary confusion and conflict." They complain section 280.31 has been in effect for over four months and Plaintiffs have known about the more-dangerous Delta variant since early July, yet Plaintiffs only recently filed their Complaint and request for injunctive relief. At the hearing, counsel for Defendants Reynolds and Lebo additionally argued that Plaintiffs have an administrative remedy through the Individual Education Plan process.

Defendant Iowa City Community School District does not resist the issuance of a TRO enjoining enforcement of Iowa Code section 280.31. ECF No. 28-1. The other Defendant school districts declined to take a position at the hearing on the TRO Motion.

---

[2] Plaintiffs filed the affidavits of two school board members entered in a similar state-court case stating that, pursuant to Iowa Code section 280.31, they are not able to issue a mask mandate in their school districts. ECF Nos. 28-5; 28-6. Both school board members stated they believe local school boards "would be in a better position to enact appropriate mask measures to protect [their] students than the . . . state law blocking a mask mandate." ECF Nos. 28-5; 28-6.

[3] At the hearing, counsel for Defendants Reynolds and Lebo acknowledged that the CDC issued an Order on February 1, 2021, that requires masks to be worn by all drivers and students on school buses. Counsel recognized that Iowa Code section 280.31 does not prohibit local school districts from complying with this federal mandate.

**Exhibit - A**

*A.  Standing*

Article III of the Constitution limits federal courts' jurisdiction to cases or controversies. In other words, a plaintiff must have standing for this Court to have jurisdiction over this case. There are three constitutional standing requirements identified by the Supreme Court: injury in fact, causation, and redressability.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Defendants Reynolds and Lebo challenge whether the injuries alleged by Plaintiffs are redressable.  At the hearing on the TRO Motion, Defendants Reynolds and Lebo argued that, if there is truly a "Hobson's choice," as Plaintiffs contend, the harm alleged creates redressability problems because ultimately the public school districts will have discretion whether to implement mask mandates and may choose not to adopt universal masking policies.  Defendants Reynolds and Lebo asserted the remedy is to work with staff assigned to the individual students, or alternative administrative remedies, rather than issue a TRO enjoining the enforcement of Iowa Code section 280.31.

The U.S. Supreme Court has made clear that the redressability standing requirement must be satisfied prior to entering federal court.  *See, e.g.*, *Allen v. Wright*, 468 U.S. 737 (1984).  The standard is not whether the proposed remedy is an absolute solution, but rather, whether it will "be 'likely,' as opposed to merely 'speculative,'" to redress plaintiff's injury.  *Lujan*, 504 U.S. at 561; *see Uzuegunam v. Preczewski*, 592 U.S. ___, ___, 141 S. Ct. 792, 797 (2021) (emphasizing that the ability to effectuate a partial remedy satisfies the redressability requirement).  Here, Plaintiffs have standing to challenge section 280.31 in federal court because they allege a concrete and particularized injury that is redressable.  During the 2020–2021 school year, numerous school districts around the state adopted, implemented, and enforced mask mandates

**Exhibit - A**

for students, staff, and teachers.[4]  If section 280.31 is not enforced, then those public school

districts and others in Iowa will have discretion to implement a mandatory mask policy on school

grounds without violating Iowa law and risking the loss of funding or accreditation.[5]  Therefore,

it is not "merely speculative" that enjoining enforcement of section 280.31 will redress Plaintiffs'

alleged injuries.  Accordingly, Plaintiffs have standing to bring this action before this Court.

### B.  Administrative Exhaustion

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*,

ensures that physically or intellectually disabled students receive necessary special education

services by requiring states to provide a free appropriate public education (FAPE).  "Under the

IDEA, an 'individualized education program,' called an IEP for short, serves as the 'primary

vehicle' for providing each child with the promised FAPE."  *Fry v. Napoleon Cmty. Schs.*, 580

U.S. ___, ___, 137 S. Ct. 743, 749 (2017).  Congress expressly permits a plaintiff to bring claims

for the denial of a FAPE under the IDEA as well as Title II of the ADA and section 504 of the

Rehabilitation Act so long as the plaintiff first exhausts his or her administrative remedies under

the IDEA.  20 U.S.C. § 1415(*l*).  But when "the remedy sought is not for the denial of a FAPE,

then exhaustion of the IDEA's procedures is not required.  *Id.* at 754.  Courts must look to the

"gravamen" of the plaintiff's complaint in determining whether the relief sought falls under the

IDEA, and therefore requires administrative exhaustion.  *Id.* at 755.  In making this

determination, courts must ask first whether "the plaintiff [could] have brought essentially the

same claim if the alleged conduct had occurred at a public facility that was *not* a school."  *Id.* at

756.  Second, courts must ask "could an *adult* at the school . . . have pressed essentially the same

---

[4] At the TRO hearing, Plaintiffs' counsel stated that every named school district Defendant had a universal masking requirement for the 2020–2021 school year.

[5] On September 10, 2021, Defendant Iowa City Community School District communicated that, if a TRO issues, it intends to "meet as soon as possible to consider a mask requirement."  ECF No. 28-1.

**Exhibit - A**

grievance?" *Id.* When the answer is "yes" to both questions, then the claim is not one for the denial of a FAPE under the IDEA and there is no exhaustion requirement. *Id.*

Here, Plaintiffs could bring their claims for the alleged discriminatory conduct occurring at another public facility, like a library. An adult, such as a teacher or a staff member at a public school, could also bring the claims alleged by Plaintiffs. Thus, the gravamen of Plaintiffs' Complaint is not for the denial of a FAPE, and the IDEA's exhaustion requirement is therefore not applicable here.

### C. Threat of Irreparable Harm

To be entitled to injunctive relief, a movant must show "that irreparable injury is *likely*," not merely possible, "in the absence of an injunction." *Winter*, 555 U.S. at 22. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The Court may "find a likelihood of irreparable harm based on general principles." *Id.* at 320.

Plaintiffs argue they can demonstrate three types of irreparable harms that are a direct result of Defendants' enforcement of Iowa Code section 280.31. First, Plaintiffs contend that because of section 280.31, they face a heightened risk of exposure to the virus that causes COVID-19, which could be fatal if contracted. Second, Plaintiffs contend they face an irreparable loss of educational opportunities if section 280.31 is enforced. Third, Plaintiffs contend section 280.31 causes irreparable harm in that it violates their rights under Title II of the ADA and section 504 of the Rehabilitation Act.

**Exhibit - A**

1. Severe Illness or Death

The Court agrees with Plaintiffs that Iowa Code section 280.31 substantially increases Plaintiffs' children's risk of contracting SARS-CoV-2 by prohibiting school districts from instituting mask mandates for students, staff, teachers, and visitors, which in turn substantially increases Plaintiffs' children's risk of severe illness or death. The Court has looked at the data concerning the effectiveness of masking to reduce the transmission of COVID-19 and it overwhelmingly supports the CDC and AAP's recommendations. *See* ECF No. 3-1 ¶¶ 25 (relating a study that found "there is very limited within-school transmission of COVID-19 in schools" that "provided full, in-person instruction, masking, and minimal physical distancing"), 26 ("[N]onmedical masks have been effective in reducing transmission of respiratory viruses; and places and time periods where mask usage is required or widespread have shown substantially lower community transmission."); *Science Brief: Transmission of SARS-CoV-2 in K-12 Schools and Early Care and Education Programs-Updated*, Ctrs. for Disease Control & Prevention (July 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html ("Breaches in mask use likely explained the few instances of in-school spread of SARS-CoV-2.").

The data further shows it is important for *all* students, staff, and teachers to wear masks to reduce the spread, not merely those who are most vulnerable to severe illness and death. ECF No. 3-2 ¶ 31 (relating a study involving elementary children that showed a fifty-percent infection rate in the children when everyone in the classroom was wearing a mask except for when the infected teacher removed her mask for short periods of time); *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, *supra* ("Masks are primarily intended to reduce the emission of virus-laden droplets . . . , which is especially relevant for asymptomatic or

**Exhibit - A**

presymptomatic infected wearers who feel well and may be unaware of their infectiousness to others, and who are estimated to account for more than 50% of transmissions.  Masks also help reduce inhalation of these droplets by the wearer . . . .").  Further data shows "that mask wearing has no significant adverse health effects for wearers."  *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, *supra*; ECF No. 3-2 ¶ 32.  Finally, some medically vulnerable and disabled children are unable to wear masks.  *See Guidance for Covid-19 Prevention in K-12 Schools*, *supra*.  Universal masking is therefore especially critical in protecting these children.  ECF No. 3-1 ¶ 27.  Thus, it is essential that to reduce the transmission of the virus causing COVID-19 in schools, all adults and children, whether vaccinated or not, wear masks when indoors.  *Guidance for Covid-19 Prevention in K-12 Schools*, *supra* ("When teachers, staff, and students consistently and correctly wear a mask, they protect others as well as themselves."); ECF No. 3-2 ¶ 24 (noting a CDC-funded study has shown that, without universal masking in schools, likely ninety-one percent of students will be infected in the first three months of school).  Doing so will better protect children with disabilities who are more vulnerable to severe illness or death caused by COVID-19.  ECF No. 3-1 ¶ 28.

Because Plaintiffs have shown that Iowa Code section 280.31's ban on mask mandates in schools substantially increases their risk of contracting the virus that causes COVID-19 and that due to their various medical conditions they are at an increased risk of severe illness or death, Plaintiffs have demonstrated that an irreparable harm exists.  *See Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993); *see also Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) ("[T]he danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury."); *Coreas v. Bounds*, 451 F. Supp. 3d 407, 428–29 (D. Md. 2020) (holding that because detainees "would face a significant risk of death or serious illness [from

**Exhibit - A**

COVID-19], the Court would find likely irreparable harm"); *Thakker v. Doll*, 451 F. Supp. 3d 358, 365 (M.D. Pa. 2020) (concluding "[t]here can be no injury more irreparable" than "a very real risk of serious, lasting illness or death").

    2. Loss of Educational Opportunities

    Plaintiffs contend Iowa Code section 280.31's ban on local school districts' mask mandates effectively forces medically vulnerable children to lose out on much-needed educational opportunities. Because of Plaintiffs' children's increased risks of severe illness and death due to COVID-19, some parents have chosen to temporarily remove their children from school to protect them. This, however, is not a long-term solution. Not attending school with their peers risks these children's "physical[,] psychological, emotional, and developmental well-being." ECF No. 3-1 ¶ 7; *see* ECF No. 3-2 ¶¶ 9, 28. Children with disabilities "need . . . in-person instruction." ECF No. 3-2 ¶ 28. "[I]n many school districts, even nominally equivalent educational services are not available through remote learning." *Id.* Some schools are not offering a virtual learning option. ECF Nos. 3-13 ¶ 9; ECF No. 3-4 ¶ 6; ECF No. 3-5 ¶ 13. Other schools offer a virtual learning option consisting of prerecorded videos that do not allow for interaction between the students and their teachers. ECF No. 3-10 ¶ 8; ECF No. 3-12 ¶ 7; ECF No. 3-11 ¶ 15; ECF No. 3-7 ¶ 15; ECF No. 3-8 ¶ 8.

    Depriving these children of their education when a safe in-person learning option is available, i.e., in-person learning with universal masking, most certainly constitutes an irreparable harm. *See Plyler*, 457 U.S. at 221 (noting the "lasting impact of [education's] deprivation on the life of the child"); *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) ("[E]ven a 'few months' in an unsound program can make 'a world of difference in harm' to a child's educational development" (quoting *Nieves-Marquez v. Puerto Rico*, 53 F.3d 108,

**Exhibit - A**

121–22 (1st Cir. 2003))); *Alejandro v. Palm Beach State Coll.*, 843 F. Supp. 2d 1263, 1270–71 (S.D. Fla. 2011) (concluding that a disabled child's inability to attend classes without an accommodation constitutes irreparable harm and granting temporary injunctive relief). In Iowa, "education is not just an important interest. . . . It goes . . . to the essence of the enjoyment of life itself[] and to the core of human dignity." *King v. State*, 818 N.W.2d 1, 61 (Iowa 2012) (Appel, J., dissenting) (emphasizing the importance of education in Iowa's history). Thus, the Court concludes Plaintiffs have demonstrated that an irreparable harm exists for this reason as well.

3. Violation of Federal Disability Laws

Courts presume that a violation of a civil rights statute is an irreparable harm. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("[W]here a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes."). As discussed more fully below, enforcement of Iowa Code section 280.31 violates Title II of the ADA and section 504 of the Rehabilitation Act. Thus, Plaintiffs have shown an irreparable harm caused by Defendants' violation of federal civil rights laws.

For these reasons, the Court concludes Plaintiffs have met their burden of showing that irreparable harm is likely unless the Court issues a temporary order enjoining Defendants' enforcement of Iowa Code section 280.31.

*B. Likelihood of Success on the Merits*

Typically, a party seeking a TRO must demonstrate a "fair chance of prevailing" on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724,

**Exhibit - A**

732 (8th Cir. 2008). However, when a TRO "is sought to enjoin the implementation of a duly enacted state statute, . . . district courts [must] make a threshold finding that a party is *likely* to prevail on the merits." *Id.* (emphasis added) (footnote omitted). This "more rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" *Id.* (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam)). The likelihood-of-success factor is considered the "most significant" in determining whether a motion for a TRO should be granted. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (quoting *S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992)).

The Supremacy Clause of the U.S. Constitution ensures that federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Thus, the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cnty. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824)). "Under the Supremacy Clause, federal law may supersede state law in several different ways." *Id.* One of which is when "state law is nullified to the extent that it actually conflicts with federal law." *Id.* "Such a conflict arises . . . when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Plaintiffs contend such a conflict is present between Iowa Code section 280.31 and Title II of the ADA, section 504 of the Rehabilitation Act, and the ARPA. Title II of the ADA states, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities

23

**Exhibit - A**

of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

Similarly, section 504 of the Rehabilitation Act provides: "No otherwise qualified individual

with a disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). "Enforcement remedies,

procedures and rights under Title II are the same as under section 504." *Pottgen v. Mo. State*

*High Sch. Activities Ass'n*, 40 F.3d 926, 930 (8th Cir. 1994) (citing 42 U.S.C. § 12133).

Together, these laws require public schools to afford disabled students an equal

opportunity to participate in or benefit from the aids, benefits, or services that are provided to

others.[6] 28 C.F.R § 35.130(b)(1), 34 C.F.R. §104.4(b)(ii). "Further, an implementing regulation

referred to as the 'integration mandate' states: 'A public entity shall administer services,

programs, and activities in the most integrated setting appropriate to the needs of qualified

individuals with disabilities.'" *Murphy ex rel. Murphy v. Minn. Dep't of Hum. Servs.*, 260 F.

Supp. 3d 1084, 1114 (D. Minn. 2018) (quoting 28 C.F.R. § 35.130(d)). "[T]he most integrated

setting" is described as "a setting that enables individuals with disabilities to interact with

nondisabled persons to the fullest extent possible." *Id.* (quoting 28 C.F.R. pt. 35, app. B, subp.

B., § 35.130). Additionally, a public entity must "make reasonable modifications in policies,

practices, or procedures when the modifications are necessary to avoid discrimination on the

basis of disability, unless [it] can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

To establish a violation of the ADA and the Rehabilitation Act, a plaintiff must

demonstrate (1) he or she "is a qualified individual with a disability;" (2) he or she "was

---

[6] Public schools are public entities within the meaning of the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 12131(1)(B); 29 U.S.C. § 794(b)(2)(B).

**Exhibit - A**

excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and (3) that such exclusion, denial of benefits, or other discrimination, was by reason of his [or her] disability." *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998).

The minor children involved in this case each have a "disability" as defined by the ADA. *See* 42 U.S.C. § 12102(1)(A) (defining "disability" as "a physical or mental impairment that substantially limits one or more major life activities"). These children are also students at public schools and are thus entitled to participate in the programs, services, and activities of their schools. Thus, the question is whether Plaintiffs will likely prevail on their claims that these children have been discriminated against by their schools or have been excluded from participation in or denied the benefits of their school's services, programs, or activities because of their disabilities.

Plaintiffs have identified several ways in which they have been excluded from participating in or denied the benefits of their public school's programs, services, and activities. Defendants appear to be failing to make school programs, services, and activities "readily accessible" to disabled students, in violation of 28 C.F.R. § 35.150,[7] by making in-person learning at schools available only under conditions that are dangerous to children with disabilities. Under the ADA and the Rehabilitation Act, schools are required "to 'start by considering how [their educational programs] are used by non-disabled [students] and then take reasonable steps to provide [disabled students] with a like experience." *Argenyi v. Creighton Univ.*, 703 F.3d 441, 451 (8th Cir. 2013) (quoting *Baughman v. Walt Disney World Co.*, 685

---

[7] This regulation provides: "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150.

**Exhibit - A**

F.3d 1131, 1135 (9th Cir. 2012)). Plaintiffs have demonstrated that school programs, services, and activities are not "readily accessible" to the disabled minor children involved here because these children cannot attend in-person learning at their schools without the very real threat to their lives because of their medical vulnerabilities. Permitting schools to institute universal mask mandates would allow disabled children who are at an increased risk of severe illness or death from COVID-19 to participate in their school's programs, services, and activities "with a like experience" to their nondisabled peers. *Id.*

Additionally, by enforcing the ban, Defendants appear to be violating the ADA's requirement that schools must provide "reasonable modifications" to disabled students in order to provide them with equal access to school programs, services, and activities. *See DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1105 (8th Cir. 1997) ("Title II regulations require a public entity to 'make reasonable modifications in policies . . . when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service.'" (quoting 28 C.F.R. § 35.130(b)(7))). A universal masking requirement instituted by a school is a reasonable modification that would enable disabled students to have equal access to the necessary in-person school programs, services, and activities. Allowing schools to make the reasonable modification of universal masking to protect disabled children also would not fundamentally alter the nature of the services that public schools provide.

Finally, Defendants appear to be failing to permit schools from administering programs, services, and activities in the "most integrated setting" appropriate to the needs of qualified disabled students. When Defendant Reynolds suggested that children who feel unsafe in Iowa's schools because of the mask mandate ban could instead engage in "some online learning," ECF

**Exhibit - A**

No. 1 at 16, that effectively leaves disabled children with not only an inferior service but unnecessarily segregated from their peers. All children need to return to in-person learning to ensure their "physical[,] psychological, emotional, and developmental well-being." ECF No. 3-1 ¶ 7; *see* ECF No. 3-2 ¶¶ 9, 28. Children with disabilities in particular "need . . . in-person instruction." ECF No. 3-2 ¶ 28. Federal law requires schools to enable disabled students to interact with their nondisabled peers "to the fullest extent possible." 28 C.F.R. pt. 35, app. B, subp. B., § 35.130; 28 C.F.R. § 35.130(d)). Failing to provide disabled children with the "most integrated setting" possible violates their rights under the ADA and the Rehabilitation Act. *See Olmstead v. L.C.*, 527 U.S. 581, 592 (1999).

The Court concludes Iowa Code section 280.31 seems to conflict with the ADA and section 504 of the Rehabilitation Act because it excludes disabled children from participating in and denies them the benefits of public schools' programs, services, and activities to which they are entitled. Thus, section 280.31 appears to "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. Defendants are "duty bound not to enforce a statutory provision if doing so would either cause or perpetuate unlawful discrimination." *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 69 (1st Cir. 2010). The Court therefore concludes Plaintiffs have met their burden of demonstrating that they are likely to succeed on the merits of their claims.[8]

---

[8] Because the Court concludes that Plaintiffs are likely to succeed on the merits of their claims under the ADA and the Rehabilitation Act, the Court need not consider at this time whether Plaintiffs are likely to succeed on the merits of their claim under the ARPA. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) ("The plaintiff 'need only establish a likelihood of succeeding on the merits of any one of [its] claims.'" (quoting *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 250 (D.D.C. 2003))).

**Exhibit - A**

### C. Balancing the Weight of the Injuries and Public Interest

In this case, the Court must balance the injuries the parties may suffer in granting or denying the requested injunctive relief. "[Courts] are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers." *Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1047 (N.D. Iowa 2011) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996)). But when Congress passes antidiscrimination laws like "the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to [e]nsure that the mandate of federal law is achieved." *Id.* (quoting *Crowder*, 81 F.3d at 1485); *see also Heather K. by Anita K. v. City of Mallard*, 887 F. Supp. 1249, 1266 (N.D. Iowa 1995) ("The public interest in eliminating [discrimination on the basis of disability] gave rise to the ADA."). In other words, the national public interest in enforcing the ADA wins out over the state's interest in enforcing Iowa Code section 280.31 in this case.

It is also in the public's interest to inhibit the spread of COVID-19 and the devastation it is wreaking in Iowa, both among school-aged children and their families, particularly for the safety of disabled children. Moreover, there is little harm to Defendants in enjoining section 280.31 and permitting the individual public school districts to return to the way in which they were operating prior to its passage by leaving a universal mask mandate to their discretion. It is no great burden for individual school boards to make these types of decisions for the children within their districts. *See* ECF Nos. 28-5; 28-6.

Accordingly, in balancing the weight of the equities in this case and considering the public interest, the Court concludes these combined factors weigh in favor of granting a TRO "to preserve the status quo until the merits are determined. *Dataphase Sys., Inc.*, 640 F.2d at 113.

**Exhibit - A**

## V.  CONCLUSION

The Court concludes that all of the relevant *Dataphase* factors weigh in favor of issuing a TRO against the enforcement of Iowa Code section 280.31.  The Court recognizes issuing a TRO is an extreme remedy, however, if the drastic increase in the number of pediatric COVID-19 cases since the start of the school year in Iowa is any indication of what is to come, such an extreme remedy is necessary to ensure that the children involved in this case are not irreparably harmed.

IT IS THEREFORE ORDERED THAT:

1.  Defendants Governor Reynolds, Director Lebo, and the school districts are ENJOINED from enforcing Iowa Code section 280.31 banning local public school districts from utilizing their discretion to mandate masks for students, staff, teachers, and visitors.

2.  Notwithstanding the provisions of Rule 65(c), the Court finds this Temporary Restraining Order shall issue immediately, without bond or security, in light of the nature of the conduct temporarily enjoined and the fact that Defendants will not suffer any costs or damages in the event the Court determines that Defendants were wrongfully restrained.

3.  This Temporary Restraining Order shall remain in full force and effect until the Court enters an Order on Plaintiffs' request for a preliminary injunction.  If the parties desire to have an additional hearing on the matter after briefing the request for a preliminary injunction, counsel shall confer and contact Chambers with a proposed hearing date.

4.  The Court is entering this Order to prevent further injury, damage, and loss to Plaintiffs.

IT IS SO ORDERED.

Dated this 13th day of September, 2021.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT

29

**Exhibit - A**