**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:21-cv-22863-KMM

JUDITY ANNE HAYES, individually and
on behalf of W.H., a minor, *et al.*,

      Plaintiffs,

v.

GOVERNOR RONALD DION DESANTIS,
in his official Capacity as Governor of the
State of Florida, *et al.*,

      Defendants.

_____/

**ORDER DENYING PRELIMINARY INJUNCTION**

THIS CAUSE came before the Court upon Plaintiff Judith Anne Hayes, individually and

on behalf of W.H., a minor, Plaintiffs Robyn and John McCarthy, individually and on behalf of

L.M., a minor, Plaintiff Amanda Banek, individually and on behalf of D.B. and B.B., minor

children, Plaintiff Kas Arone-Miller, individually and on behalf of R.M. and L.M., minor children,

Plaintiff Alisha Todd, individually and on behalf of R.M and L.M., minor children, Plaintiff Jamie

Kinder, individually and on behalf of R.K., a minor, Plaintiff Chris Rodriguez, individually and

on behalf of J.D.-F., a minor, Plaintiff Jack Koch, individually and on behalf of R.K., B.K., and

A.K., minor children, Plaintiff Kristen Thompson, individually and on behalf of P.R., a minor,

Plaintiff Eren Dooley, individually and on behalf of G.D., a minor, and Plaintiff Tom Collins,

individually and on behalf of Q.C., a minor's (collectively, "Plaintiffs") Amended Motion for

Preliminary Injunction.  ("Mot.") (ECF No. 17).  Therein, Plaintiffs request the Court to issue a

preliminary injunction requiring Defendant Governor Ronald D. Desantis ("Governor DeSantis"),

Defendant Commissioner Richard Corcoran ("Corcoran"), Defendant Florida Department of

Education, Defendant Broward County School Board ("Broward"), Defendant Palm Beach County School Board ("Palm Beach"), Defendant Orange County School Board, Defendant Miami-Dade County School Board, Defendant Hillsborough County School Board, Defendant Pasco County School Board, Defendant Alachua County School Board, and Defendant Volusia County School Board (collectively, "Defendants"), to refrain from enforcing the Office of the Governor Executive Order 21-175. *See generally* Mot. Defendant Governor DeSantis, Defendant Corcoran, and Defendant Florida Department of Education (collectively, "the State Defendants") filed a joint response in opposition. ("Resp.") (ECF No. 51).[1] Plaintiffs filed a reply. ("Reply") (ECF No. 63). The Motion is now ripe for review.

## I.    BACKGROUND

On July 30, 2021, Florida Governor Ron DeSantis issued Executive Order 21-175 ("Exec. Order 21-175"), entitled "Ensuring Parents' Freedom to Choose – Masks in School." *See* Exec. Order 21-175 (July 30, 2021), https://www.flgov.com/wp-content/uploads/2021 /07/Executive-Order-21-175.pdf. Therein, Governor DeSantis directed the Florida Department of Health and the Florida Department of Education to "execute rules" and "take any additional agency action

---

[1]    Defendant Orange County School Board, Defendant Broward, Defendant Palm Beach, Defendant Miami-Dade County School Board, Defendant Hillsborough County School Board, Defendant Pasco County School Board, Defendant Alachua County School Board, and Defendant Colusia County School Board (collectively, "the School District Defendants") also filed responses to Plaintiffs' Motion for Preliminary Injunction. (ECF Nos. 41, 42, 43, 46, 49, 50, 55, 57). These responses generally raise concerns regarding: (1) whether Plaintiffs have standing to assert these claims against the School District Defendants, as opposed to the State Defendants, or (2) whether venue is appropriate in the Southern District of Florida. *See generally id*. Defendant Broward County notes that it has defied Executive Order 21-175 and has imposed a universal mask mandate. (ECF No. 44) at 4. Like State Defendants, Defendant Palm Beach raises arguments with respect to administrative exhaustion. (ECF No. 49) at 2. The Court finds that these arguments are unrelated to the core issues relevant to Plaintiffs' Motion, or merely track the arguments raised by State Defendants. To the extent these arguments are not before the Court in State Defendants' Response, the Court will address these issues when it adjudicates the School District Defendants' pending Motions to Dismiss.

necessary" to ensure that safety protocols for controlling the spread of COVID-19: (1) "[d]o not violate Floridians' constitutional freedoms," (2) "[d]o not violate parents' rights under Florida law to make health care decisions for their minor children," and (3) "[p]rotect children with disabilities or health conditions who would be harmed by certain protocols such as face masking requirements." *Id.* at 3–4. Further, Executive Order 21-175 requires that any actions taken pursuant to the foregoing "shall at a minimum be in accordance with Florida's 'Parents' Bill of Rights' and protect parents' right to make decisions regarding masking of their children in relation to COVID-19." *Id.* at 4. Executive Order 21-175 also requires the Florida Commissioner of Education to "pursue all legal means available to ensure school districts adhere to Florida law, including but not limited to withholding state funds from noncompliant school boards[.]" *Id.*

Following the issuance of Executive Order 21-175, on August 6, 2021, the Florida Department of Health and the Florida Department of Education each issued rules governing COVID-19-related health protocols in schools. The Florida Department of Health issued a single emergency rule ("the FDH Rule") which requires, as relevant to the issue of mask-wearing in schools, that "[s]tudents may wear masks or facial coverings as a mitigation measure; however, the school must allow for a parent or legal guardian of the student to opt-out the student from wearing a face covering or mask." Emergency Rule 64DER21-12(1)(d), Fla. Admin. Reg., Vol. 47/153 (Aug. 9, 2021), https://www.flrules.org/gateway/ruleNo.asp?id=64DER21-12. The FDH Rule also requires that students who have been opted out of masking requirements "shall not be subject to any harassment or discriminatory treatment." 64DER21-12(6). The Florida Department of Education also promulgated a rule ("the FDE Rule") entitled "Hope Scholarship Transfer Procedures" which provides:

> The Hope Scholarship Program provides funding for a K-12 public school student to transfer to a private school or to another district in the state if the student has

been subjected to harassment or other qualifying adverse, intimidating treatment at school.  Applying the Hope Scholarship Program to instances where a child has been subjected to COVID-19 harassment will provide parents another means to protect the health and education of their child by moving their child to another school.

Emergency R. 6AER21-02(1), Fla. Admin. Reg. Vol. 47/153 (Aug. 9, 2021), https://www.flrules.org/gateway/ruleNo.asp?id=6AER21-02.

Plaintiffs are 11 parents of 16 students that are enrolled in eight public school districts throughout Florida.  *See generally* Compl.  Each student presents unique health-related concerns that they allege makes attending school without a "universal mask mandate"[2] difficult or impossible.  The Court will give a brief background on each student here:

First, Plaintiff Hayes's son, W.H. is ten (10) years old and is not eligible for the vaccine. Second Declaration of Judith Anne Garabo Hayes ("Hayes Aff.") (ECF No. 80-1) ¶ 1.  W.H. has down syndrome and is currently not attending Orange County Public Schools in person, although he has in the past.  *Id*. ¶¶ 4, 8.  Plaintiff Hayes requested an accommodation which would "allow for W.H. to appear in his classroom virtually, until it [becomes] safe for him to return to school once vaccinated, with a universal mask mandate, and with the school following the CDC guidelines related to social distancing, contact tracing and the like."  *Id*. ¶ 10.  However, this request was denied and, instead, the school's plan was to place W.H. in an "overcrowded classroom . . . without any assurance that other students and adults would be wearing masks."  *Id*. ¶ 11.  For these reasons, Plaintiff Hayes opted to keep "W.H. home and not send him to school,

---

[2]  The Court will use the term "universal mask mandate" to refer to masking policies that do not provide for parental opt-outs pursuant to Executive Order 21-175, the FDH Rule, and the FDE Rule.  Universal mask mandates may provide for medical opt-outs from mask requirements, but not for parental opt-outs.  The Court will use the term "parental opt-out mask mandate" to refer to masking policies that are compliant with Executive Order 21-175, the FDH Rule, and the FDE Rule.

because his health and safety are of paramount concern." *Id.* ¶ 16.  However, Plaintiff Hayes states in her affidavit that even after a universal mask mandate "was put into place, it was still too dangerous for W.H. to return to school because of the number of students how [sic] have been able to opt-out of the mandate." *Id.* ¶ 17.  For example, Plaintiff Hayes states that some students got letters from chiropractors in order to medically opt-out of the universal mask mandate. *Id.*  Plaintiff Hayes is concerned that the class that "W.H. is slated to return to has students who are not required to wear a mask because they have been able to [opt-out]." *Id.*

Second, Plaintiff Dooley's daughter, G.D., is a ten (10) year-old who has asthma and an emotional behavioral disability.  Second Declaration of Erin Dooley ("Dooley Aff.") (ECF No. 80-2) ¶¶ 4, 8–9.  G.D. is currently attending school in person in Hillsborough County public schools now that "the school board put into place a 30-day mask mandate." *Id.* ¶ 6.  Despite the mask-mandate being in place in Hillsborough County, Plaintiff Dooley raises various concerns with masking in the cafeteria during lunchtime and is concerned that G.D.'s counseling sessions at school have not aligned with her Individualized Education Program ("IEP"). *Id.* ¶¶ 11–12, 16. Plaintiff Dooley states that "[i]f the mask mandate is not extended, or an accommodation, related to mask wearing and distancing at [lunchtime], is not provided[,] then I will be forced to home school G.D. thereby losing the IEP and any of the supports or services contained therein." *Id.* ¶ 18.

Third, Plaintiff Todd's son, J.T., is a 10-year-old who attends Palm Beach School for Autism in Palm Beach County.  Second Declaration of Alisha Todd ("Todd Aff.") (ECF No. 80-3) ¶ 3.  J.T. had brain surgery for "Chiari malformation" in June of 2021 and his medical team determined that it would be high risk for him to attend school in person if the students are not wearing masks. *Id.* ¶ 7.  J.T. is currently not attending school in person and is considering enrolling in Palm Beach County's hospital homebound educational program. *Id.* ¶¶ 12, 13.  Plaintiff Todd

"heard on Facebook" that Palm Beach County had "altered their order and mandated masks" but her son "is still unable to attend as there are students in his room who were granted medical opt-outs and are therefore unmasked." *Id*. ¶ 18. Plaintiff Todd is concerned that if J.T. leaves the public school system, he will waive his rights to an IEP. *Id*. ¶ 22.

Fourth, Plaintiff Banek has three (3) children with disabilities who are enrolled in Palm Beach Public Schools. Second Declaration of Amanda Banek ("Banek Aff.") (ECF No. 80-4) ¶ 3. Plaintiff Banek is concerned that the school has not responded to her request for an accommodation that would allow her child, D.B., who has asthma, to eat lunch and snack in a "safe space and away from other unmasked students." *Id*. ¶¶ 5–6. Plaintiff Banek also informs the Court that her offer to purchase plastic dividers for the classroom was ignored. *Id*. ¶ 7. Plaintiff Banek plans to send her children to school while the mask mandate is in place but is not sure what she will do if the mask mandate is lifted. *Id*. ¶ 8.

Fifth, Plaintiff McCarthy has a six (6) year-old son, L.M, who goes to a "choice program within a [Miami-Dade] County public school." Second Declaration of Robyn McCarthy ("McCarthy Aff.") (ECF No. 80-5) ¶¶ 3–4. Plaintiff McCarthy states that L.M. has a disability but does not state exactly what disability he has. *Id*. ¶ 5. L.M. currently attends school in person because Plaintiff McCarthy was told that if he did not, L.M. would lose his seat in the choice program. *Id*. ¶ 7. Plaintiff McCarthy checks L.M. out for lunch so he can eat in a space away from unmasked students. *Id*. ¶ 9. Plaintiff McCarthy asserts that if the mask mandate is lifted, it will not be safe for L.M. to remain in school. *Id*. ¶ 12.

Sixth, Plaintiff Koch has three children in Pasco County schools. Second Declaration of Jack Koch ("Koch Aff.") (ECF No. 80-6) ¶¶ 3–4. Two of Plaintiff Koch's children are vaccinated and are attending school in person and Plaintiff's Koch's third child is attending virtual school.

*Id*. ¶ 15.  At the hearing held on September 8, 2021, it was undisputed that Pasco County has a parental opt-out mask mandate, rather than a universal mask mandate.  Preliminary Injunction Hearing Transcript ("Hr'g Tr.") at 13:1–16.

Seventh, Plaintiff Collins has a ten (10) year-old son, Q.C., who is attending school in-person in West Palm Beach County, where a "universal mask mandate" is in place.  Second Declaration of Tom Collins ("Collins Aff.") (ECF No. 80-7) ¶¶ 3–4, 8.  However, Q.C. was also attending school in-person before the "universal mask mandate" was in place.  *Id*. ¶ 7.  Plaintiff Collins states that Q.C. has a disability but does not say specifically what that disability is.  *Id*. ¶ 4.  However, Plaintiff Collins informs the Court that Q.C.'s brother has asthma, and there is a concern that Q.C. could catch COVID-19 at school and infect his brother.  *Id*. ¶ 14.  Plaintiff Collins also has raised concerns over mask wearing during lunchtime.  *Id*. ¶ 10.

Eighth, Plaintiff Kinder has a nine (9) year-old daughter, R.K., who is immunocompromised due to gastrointestinal issues.  Second Declaration of Jamie Kinder ("Kinder Aff.") (ECF No. 80-8) ¶¶ 3–4.  Plaintiff Kinder informs the Court that despite a temporary mask mandate, that provides a medical opt-out, R.K was "was removed from public school on the advice of her doctor."  *Id*. ¶ 9.  Plaintiff Kinder also states that R.K's "doctor is not permitting her to return back to school, even during the time the temporary mandate is in place because of the number of parents who have already exercised their right to [opt-out] of the mandate."  *Id*.  In Plaintiff Kinder's view, "with such a large number of children still remaining unmasked, even with the mandate in place, the mandate becomes illusory."  *Id*.  Plaintiff Kinder also states that "R.K.'s grade level is separated in portable classrooms.  If the district honored [her] request to ensure that everyone in her classroom is wearing masks, R.K. could return to school with her peers."  *Id*. ¶ 16.

Ninth, Plaintiff Rodriguez has a five (5) year-old son, J.D.-F., who has chronic kidney disease, hypertension, rental tubular acidosis, and asthma.  Second Declaration of Chris Rodriguez ("Rodriguez Aff.") (ECF No. 80-9) ¶¶ 5–6.  J.D.-F.'s "treating doctors and specialists have informed his parents, that it is too dangerous to return to [brick-and-mortar] school without such precautions as following the recommended CDC guidelines of mandatory masking and regular testing in schools of unmasked people." *Id.* ¶ 8.  J.D.-F's doctors have advised his parents that "if he catches the Covid-19 virus it could be fatal." *Id.*  Plaintiff Rodriguez did not send J.D.-F. to school, even while Broward County had a universal mask mandate in place. *Id.* ¶¶ 10–11. Plaintiff Rodriguez is concerned that the universal mask mandate in Broward County is only temporary. *Id.* ¶ 10.  Plaintiff Rodriguez also states, that in addition to a universal mask mandate, J.D.-F.'s school would also have to commit to (1) following "other CDC guidelines such as social distancing," (2) requiring "masks at recess," and (3) allowing students "to be able to eat lunch safely since the students will necessarily need to be unmasked." *Id.* ¶ 11.  Plaintiff Rodriguez further states that "[i]n Broward there is no vaccine mandate for the teachers or staff working in and near the students, and no requirement for those who [opt-out] of the mask mandate to be tested on a regular basis, thus the risk to J.D.-F. remains too high." *Id.*

Tenth, Plaintiff Thompson has a seven (7) year-old daughter, P.T., who is registered in the hospital homebound program in the Alchua County school district.  Second Declaration of Kristen Thompson ("Thompson Aff.") (ECF No. 80-10) ¶¶ 3–4.  P.T. has two conditions: (1) Trisomy-18, which is a chromosomal abnormality, and (2) a tracheostomy, which is "an opening created at the front of the neck so a tube can be inserted into the windpipe (trachea) to help you breathe." *Id.* ¶¶ 4–5.  Plaintiff Thompson is currently keeping P.T. home from school because, even with a mask mandate in place, "one person in P.T.'s class contracted Covid-19 and passed it to another student

in the classroom." *Id*. ¶ 8.  Plaintiff Thompson states that "[w]ithout a mask mandate and other accommodations like staff and students wearing a mask in P.T.'s classroom, being provided with a safe lunch place, and having regular testing for those who are unmasked, I cannot safely return P.T. to school." *Id*. ¶ 13.

On September 8, 2021, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction that was attended by counsel for Plaintiffs and State Defendants.  (ECF No. 90).  As of the date of the hearing, all of the school districts in which Plaintiffs' children are attending school—except Pasco County—had a universal mask mandate in place, in violation of the polices set forth in Executive Order 21-175 and related regulations.  Hr'g Tr. at 13:1–16.  Between August 9, 2021 to September 1, 2021, Defendant Corcoran, in his capacity as Commissioner of Education, sent several letters informing the non-compliant school districts that the FDH Rule "explicitly requires that any mandated mask policy imposed by a district or school 'must allow for a parent or legal guardian of the student to opt-out the student from wearing a face covering or mask.'" (ECF Nos. 80-12–80-20).  These letters also informed the non-compliant school districts that: (1) an investigation is being opened as to their efforts to comply with the FDH Rule, and (2) funding may be withheld from the school districts in an amount equal to the salaries of the Superintendent and all members of the School Board.  *Id*.  At the hearing, it was not disputed that "one-twelfth of the salaries of the School Board" has already been withheld from Broward and Alachua School Districts.  Hr'g Tr. at 24:24–25:2.

Disputes surrounding mask protocols in public schools have been proceeding through the Florida's state courts and the circumstances of those proceedings are rapidly changing.  On September 2, 2021, Judge John C. Cooper, of the Second Judicial Circuit in and for Leon County, Florida, enjoined the enforcement of the "Executive Order and the policies it caused to be

generated." (ECF No. 80-21) at 25. Then, on September 10, 2021, the injunction imposed by Judge Cooper was stayed pending appeal by Florida's District Court of Appeal, First District. (ECF No. 89) at 1.

On August 6, 2021, Plaintiffs filed the Complaint, which brings three separate claims: (1) a violation of the Americans with Disabilities Act ("ADA") ("Count I"), (2) a violation of Section 504 of the Rehabilitation Act ("Count II"), and (3) a violation of the Florida Equity Act ("Count III"). *See generally* Compl.

Now, in Plaintiffs' instant Motion for a Preliminary Injunction, Plaintiffs seek ask the Court to "immediately enjoin enforcement of Defendant Governor DeSantis'[s] Executive Order 21-175 and allow the school districts to implement these children's IEP and 504 plans to ensure that each child receives a free and appropriate education in the least restrictive and most integrated environment – without jeopardizing their lives or safety." Mot. at 21 (emphasis removed).

## II.   LEGAL STANDARD

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). Thus, to secure a preliminary injunction, the moving party must show: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without a preliminary injunction; (3) that the threatened injury to the party outweighs any harm that might result to the defendants; and (4) that an injunction is not adverse to the public interest." *Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1224 (11th Cir. 2021) (citing *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The plaintiff bears the 'burden of

persuasion' on each of these four factors." *Id.* (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "Indeed, the grant of a preliminary injunction is 'the exception rather than the rule.'" *Brown*, 4 F.4th at 1224 (citation omitted).

## III. DISCUSSION

For the reasons discussed below, the Court finds that Plaintiffs have not made an adequate showing under the four-part framework governing injunctive relief.

### A. Plaintiffs Are Not Likely to Succeed on the Merits Because They Have Failed to Exhaust Their Claims, as Required under the Individuals with Disabilities Education Act ("IDEA").

Plaintiffs argue that they have a strong likelihood of success on the merits because Executive Order 21-175 denies disabled children an equal opportunity to participate in or benefit from any aid, benefit, or service to others. Mot. at 11 (citing 28 C.F.R §§ 35.130(b)(1), (g)). Specifically, Plaintiffs contend that Defendants' actions violate four separate regulations promulgated pursuant to the ADA:

> (1) failing to make a reasonable modification under circumstances where it is required (28 C.F.R. § 35.130(b)(7)); (2) excluding Plaintiffs from the participation in public education (42 U.S.C. § 12132; 28 C.F.R. § 35.130); (3) failing to make its services, programs, and activities "readily accessible" to disabled individuals (28 C.F.R. § 35.150); and (4) administering a policy that has the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability (28 C.F.R. § 35.130(b)(3)).

*Id.* at 13. Plaintiffs argue that the scholarship amounts to a policy of "separate but equal" that is not permitted under the ADA, IDEA, or 14th Amendment. *Id.* at 16.

State Defendants argue in response that Plaintiffs are not likely to succeed on the merits because they have failed to exhaust administrative remedies under the IDEA.  Resp. at 9.  State Defendants contend that Plaintiffs need to have exhausted their claims because they are ultimately based upon a denial of free access to public education ("FAPE") and Plaintiffs have not shown that exhaustion would be futile.  *Id*. at 9–13.  State Defendants also argue that Plaintiffs are not likely to succeed in on the merits because they are without standing in this case.  *Id*. at 13.

In reply, Plaintiffs argue that their claims do not require exhaustion because they could be asserted against a different public facility and an adult in the school could press the same claims.  Reply at 11.   Additionally, Plaintiffs argue that exhaustion would be futile because an administrative law judge ("ALJ") would not have the authority to enjoin Executive Order 21-175.  *Id*. at 16.  With respect to standing, Plaintiffs also argue that harms posed by parental opt-out mask mandates are traceable to Executive Order 21-175.  *Id*. at 9.

### 1. Plaintiffs Have Failed to Exhaust Their Administrative Remedies, as Required.

Plaintiffs argue that exhaustion under the IDEA is not required because: (1) this claim could be asserted against a different public facility, and (2) any adult could press this claim.  Reply at 12–16.  State Defendants contend that exhaustion under the IDEA is required for Plaintiffs' claims because the Complaint and Motion for Preliminary Injunction request relief that is related to the alleged denial of FAPE.  Resp. at 12 –14.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Thus, "[t]o state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or . . . denied

the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'"  *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132).  "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases" and claims under the Rehabilitation Act and the ADA are therefore often discussed together.  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

Where claims arising under the ADA and Rehabilitation Act are asserted in the context of public education, the question of whether administrative exhaustion requirement under the IDEA is implicated.  20 U.S.C. § 1401(3)(A)(i).  "The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities."  *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. § 1401(3)(A)(i)).  "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction."  *Id*. at 748–749 (citing 20 U.S.C. §§ 1401(9), (26), (29); *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203 (1982)).  "Under the IDEA, an 'individualized education program,' called an IEP for short, serves as the 'primary vehicle' for providing each child with the promised FAPE."  *Id*. at 749 (citing *Honig v. Doe*, 484 U.S. 305, 311 (1988); § 1414(d)).  "Crafted by a child's 'IEP Team'—a group of school officials, teachers, and parents—the IEP spells out a personalized plan to meet all of the child's 'educational needs.'"  *Id*. (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B)).

13

"Because parents and school representatives sometimes cannot agree on such issues, the IDEA establishes formal procedures for resolving disputes." *Id*. Supreme Court Justice Elena Kagan's description of these procedures for resolving disputes bears repeating here at length:

> To begin, a dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides). *See* § 1415(b)(6). That pleading generally triggers a "[p]reliminary meeting" involving the contending parties, § 1415(f)(1)(B)(i); at their option, the parties may instead (or also) pursue a full-fledged mediation process, *see* § 1415(e). Assuming their impasse continues, the matter proceeds to a "due process hearing" before an impartial hearing officer. § 1415(f)(1)(A); *see* § 1415(f)(3)(A)(i). Any decision of the officer granting substantive relief must be "based on a determination of whether the child received a [FAPE]." § 1415(f)(3)(E)(i). If the hearing is initially conducted at the local level, the ruling is appealable to the state agency. *See* § 1415(g). Finally, a parent unhappy with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court. *See* § 1415(i)(2)(A).

*Id*. at 749–50. "[A] plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances—that is, when 'seeking relief that is also available under' the IDEA—first exhaust the IDEA's administrative procedures." *Id*. at 750.

In *Fry*, the Supreme Court offered guidance on whether exhaustion under the IDEA is required for ADA or Rehabilitation Act suits brought in the context of children's access to public schools:

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. **<u>First</u>**, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And **<u>second</u>**, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward.

*Id*. at 756 (emphasis added).

The Eleventh Circuit has held that "any student who wants 'relief that is available under' the IDEA must use the IDEA's administrative system, even if he invokes a different statute." *M.T.V. v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153, 1158 (11th Cir. 2006) (quoting *Babicz v. Sch. Bd. of Broward County*, 135 F.3d 1420, 1422 n.10 (11th Cir. 1998)). "[C]laims asserted under Section 504 and/or the ADA are subject to Section 1415(f)'s requirement that litigants exhaust the IDEA's administrative procedures to obtain relief that is available under the IDEA before bringing suit under Section 504 and/or the ADA." *Id.* (quoting *Babicz*, 135 F.3d at 1422 n.10).

Here, the Court finds Plaintiffs' attempt to characterize this case as one that involves a denial of access, and not a denial of FAPE, to be wholly untethered to the allegations in the Complaint, the request for relief in the Motion, and Plaintiffs' affidavits. The Complaint is replete with explicit references to alleged denials of FAPE. Compl. ¶ 56 ("The Governor's most recent executive order preventing school districts from putting protections in place for students . . . has tied the hands of school districts from acting and made it impossible for school districts to provide students with disabilities a **free appropriate public education in** the least restrictive environment." (emphasis added)); *see also id.* ¶¶ 61, 80–81, 84–85, 87, 89, 100, 114, 121, 127, 142, 148, 154, 162, 178, 185, 187.

Additionally, in the instant Motion, Plaintiffs seek an injunction against Executive Order 21-175 in order to "to ensure that each child receives a **free and appropriate education** in the least restrictive and most integrated environment[.]" Mot. at 21 (emphasis added).

Moreover, in Plaintiffs' affidavits, each parent expresses individualized concerns relating to their children's education. For example, Plaintiff Hayes has requested an accommodation that would allow W.H., who is currently not attending school in-person even while a universal mask mandate is in place, to appear in his classroom virtually "until it [becomes] safe for him to return

to school once vaccinated, with a universal mask mandate, and with the school following the CDC guidelines related to social distancing, contact tracing and the like."  Hayes Aff. ¶¶ 10, 16–17. Additionally, Plaintiff Dooley's child, G.D., is currently attending school while a mask mandate is in place and raises various concerns regarding: (1) masking in the cafeteria during lunchtime, and (2) the alignment of counseling sessions available at school with G.D.'s IEP.  Dooley Aff. ¶¶ 6, 11–12, 16.  These two examples, both arising in circumstances where a universal mask mandate is already in place, underscore that Plaintiffs' claims are inextricably linked to FAPE, rather than a denial of access resulting from a parental opt-out mask mandate.

For these reasons, the Court finds that the gravamen of Plaintiffs' claims concerns the denial of FAPE.  Plaintiffs cannot simply state that their claim does not concern FAPE, despite the foregoing, and have the Court avert its eyes to the obvious nature of this case.  *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182, 1190 (11th Cir. 2018) ("[I]f the complaint essentially alleges the denial of a FAPE, then the plaintiff must exhaust his administrative remedies.").  Thus, the answer to the first question in *Fry*, which asks, "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library?" is no.  *Fry*, 137 S. Ct. at 756.

With respect to the second question in *Fry*, which asks, "could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?"—the answer is also no. *Fry*, 137 S. Ct. at 756.  The Complaint states:

> Plaintiffs are seeking safe ways to return to brick-and-mortar schools including, but not limited to, rescinding Executive Order 21-175 to allow school districts to provide FAPE in the LRE including offering virtual options that are comparable to those offered to nondisabled students.  The Plaintiffs are seeking a reinstatement of a "full panoply of services" including live synchronous and asynchronous instruction with the same curriculum as in person instruction and the ability to interact with a student's teacher and peers.

16

Compl. ¶ 162.  It strains credulity for Plaintiffs to insist that an adult could bring a Complaint that includes that above-quoted text.   Further, it bears mentioning, again, that in the instant Motion, Plaintiffs seek an injunction against Executive Order 21-175 in order to "to ensure that each child receives a **free and appropriate education** in the least restrictive and most integrated environment[.]" Mot. at 21.  Simply put, an adult at the school, who is not enrolled therein, cannot press claims that are premised upon a denial of FAPE, to which they are not entitled.[3,4]

Lastly, it bears mentioning that given the unique circumstances of each child, as detailed above, each of Plaintiffs' children would benefit from the individualized process afforded by the IDEA's administrative remedies.  For example, Plaintiffs raise concerns including, but not limited to: (1) mask-wearing during lunchtime (despite universal mask mandates being in place), (2) loose standards for medical exemptions from universal mask requirements, (3) availability of

---

[3]  In *G.S. v. Governor Bill Lee*, a court in the Western District of Tennessee found that a student did not need to exhaust administrative remedies in order to challenge a similar executive order that was issued by Governor Bill Lee of Tennessee.  Case No. 2:21-cv-02552-SHL, ECF No. 34, at 12–13 (W.D.T.N. Sept 3, 2021).  That case is distinguishable from the case at bar because, here, the Complaint, Motion, and evidentiary record are replete with references to FAPE and concerns that are unique to children's education.  Whereas, in *G.S.*, the Complaint and Motion for Temporary Restraining Order and Preliminary Injunction do not contain even a single reference to "free appropriate public education" or "FAPE."  *See generally* Complaint, *G.S. v. Governor Bill Lee*, Case No. 2:21-cv-02552-SHL, ECF No. 1 (W.D.T.N. Sept 3, 2021); *see also* Motion for Temporary Restraining Order and Preliminary Injunction, *G.S. v. Governor Bill Lee*, Case No. 2:21-cv-02552-SHL, ECF No. 2-1 (W.D.T.N. Sept 3, 2021).

[4]  Additionally, in *ARC of Iowa v. Reynolds*, a court in the Southern District of Iowa found that students did not need to exhaust their administrative remedies in order to challenge an executive order that "bann[ed] local school districts from implementing universal mask policies on school property." No. 4:21-CV-00264, 2021 WL 4166728, at *3, 8 (S.D. Iowa Sept. 13, 2021).  *Reynolds* is distinguishable from this case for two reasons.  First, in *Reynolds*, the Court concluded that the "gravamen of Plaintiffs' Complaint is not for the denial of a FAPE."  *Id*. at *8.  Whereas, here, the Complaint clearly alleges a denial of FAPE for the reasons stated above.  Second, the executive order in *Reynolds* banned mask mandates in public schools generally.  *Id*. at *3.  Whereas, in this case, Executive Order 21-175 is limited solely to children, and does not extend to adults such as teachers or school staff.

counseling, (4) the quality of virtual education alternatives, and (5) vaccine mandates.  Hayes Aff. ¶¶ 10, 17; Rodriguez Aff. ¶ 11; Todd Aff. ¶ 18; Dooley Aff. ¶¶ 11–12, 16; Banek Aff. ¶¶ 5–6; McCarthy Aff. ¶ 9; Thompson Aff. ¶ 13.  Even if the Court granted Plaintiffs' request for an injunction, none of these concerns would be remedied.  Thus, these highly individualized circumstances are all better served by individualized attention through the administrative remedies available to Plaintiffs.  Indeed, that is the purpose of the IDEA.

On September 7, 2021, Defendant Corcoran and Defendant Department of Education filed an affidavit by Melisa Ramsey, the Vice Chancellor of Strategic Development.  Declaration of Melissa Ramsey ("Ramsey Dec.") (ECF No. 86-1) ¶ 1.  Therein, Vice Chancellor Ramsey stated:

> This morning, September 7, 2021, FDOE conducted a search of the Division of Administrative Hearings docket and FDOE's state complaint system to determine whether the named Plaintiff Parents sought resolution of their FAPE-related complaints using either the due process procedures or the state complaint procedures; however, there is no record that any of the parents have initiated either administrative remedy."

*Id*. ¶ 2.  At the hearing, Plaintiffs' counsel informed the Court that Plaintiffs "have not filed a formal 504 -- due process claim under the IDEA."  Hr'g Tr. at 24:8–13.  Accordingly, the Court finds that Plaintiffs have not attempted to exhaust their administrative remedies.

For these reasons, Plaintiffs are required to exhaust their claims under the IDEA before proceeding in federal court.  Their failure to do so weighs heavily against finding that Plaintiffs' claims are likely to succeed on the merits.[5]

---

[5]  Plaintiffs argue that the scholarship amounts to a policy of "separate but equal."  Mot. at 16.  To the extent Plaintiffs seek an injunction based upon the Fourteenth Amendment, they have not adequately alleged a claim under the Fourteenth Amendment and courts have consistently found that such claims are appropriately considered under the ADA.  *See Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 368 (2001) ("If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause."); *see also Rodriguez v. Procter & Gamble Co*., 465 F. Supp. 3d 1301, 1327 (S.D. Fla.), *mot. to cert. app. denie*d, 499 F. Supp. 3d 1202 (S.D. Fla. 2020) ("While disabled individuals are not a 'suspect

**2.   Exhaustion of Administrative Remedies Would Not Be Futile in This Case.**

Plaintiffs argue that even if administrative exhaustion was required, the requirements of the IDEA should be set aside because exhaustion, in this case, would be "futile and/or inadequate." Reply at 16; *see also* Compl. ¶ 164.   Specifically, Plaintiffs argue that administrative exhaustion would be futile because "there is no jurisdiction or authority for the administrative law judge to order districts to impose or not impose a mask mandate."  Reply at 17.  Relatedly, Plaintiffs argue that "exhaustion would be futile and inadequate as the administrative court does not have jurisdiction over the Governor, the Commissioner of Education, or the Department of Education." *Id*. (citing *P.J.S.  v.  School Bd.  Of Citrus Cty.*, 951 So. 2d 53 (Fla. Dist. Ct. App. 2007) (noting that only school boards and parents are proper parties to a due process hearing)).

In response, State Defendants argue that "Plaintiffs' conclusory assertion that 'exhaustion would be futile' does not excuse their failure to pursue administrative remedies."  Resp. at 14 (internal citation omitted).   State Defendants contend administrative remedies are not futile because Plaintiffs cannot know if adequate relief is available without going through the process. *Id*.

The Eleventh Circuit has held that "[t]he exhaustion of . . . administrative remedies is not required where resort to administrative remedies would be 1) futile or 2) inadequate." *M.T.V.*, 446 F.3d at 1159 (quoting *N.B. by D.G. v. Alachua Cty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996)). "The burden of demonstrating futility is on the party seeking exemption from the exhaustion requirement."  *Id*. (citing *Honig v. Doe*, 484 U.S. 305, 327 (1988)).  Speculative allegations of futility and inadequacy fail to sustain this burden.  *Id*.  In *N.B. by D.G.*, the Eleventh Circuit

---

class' under the Equal Protection Clause, they are entitled to the protections of the ADA." (citing *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 (3rd Cir. 2007)).

expressed concern that "litigants could avoid the exhaustion requirement simply by asking for relief that administrative authorities could not grant." 84 F.3d at 1379. "A procedure that may result in any substantial relief is not futile." *Id.* (quoting *Waterman v. Marquette–Alger Intermediate Sch. Dist.*, 739 F. Supp. 361, 368 (W.D. Mich. 1990)).

Here, the Court finds that administrative exhaustion of Plaintiffs' claims would not be futile or inadequate. In Plaintiffs' view, anything short of an injunction against Executive Order 21-175 would be futile or inadequate. However, that perspective ignores the specific grievances set forth in Plaintiffs' affidavits that have been submitted to the Court and the concerns raised in the Complaint.

For example, Plaintiff Kinder informed the Court in her affidavit that "R.K.'s grade level is separated in portable classrooms" and "[i]f the district honored [her] request to ensure that everyone in her classroom is wearing masks, R.K. could return to school with her peers." Kinder Aff. ¶ 16. There is nothing in Executive Order 21-175 that would prevent a school from implementing mask requirements in specific classrooms. Thus, this is an example of accommodation that does not require enjoining Executive Order 21-175 and which would provide a substantial benefit to R.K.

As a second example, Plaintiff Hayes has informed the Court in her affidavit that "[a]fter a mask mandate was put into place, it was still too dangerous for W.H. to return to school because of the number of students how [sic] have been able to opt-out of the mandate. The ability to obtain a letter from even a chiropractor has made the mandate illusory." Hayes Aff. ¶ 17. Plaintiff Hayes requested an accommodation which would "allow for W.H. to appear in his classroom virtually, until it [becomes] safe for him to return to school once vaccinated, with a universal mask mandate, and with the school following the CDC guidelines related to social distancing, contact tracing and

20

the like." *Id.* ¶ 10.  An injunction of Executive Order 21-175 would not permit W.H. to obtain improved virtual education.  Moreover, Plaintiff Hayes was not even sending W.H. to school while a mask-mandate was in effect because the medical-opt-out policies were too loose.  *Id.* ¶ 17.  Thus, an injunction of Executive Order 21-175 would have no effect on W.H.—who is not attending school even while a universal mandate is in place.  This underscores the special attention that W.H. requires and that Plaintiffs' requested relief would not be an adequate remedy.

Third, many Plaintiffs raised concerns over masking at lunchtime.  Dooley Aff. ¶¶ 11–12, 16; Banek Aff. ¶¶ 5–6; McCarthy Aff. ¶ 9; Collins Aff. ¶ 10; Rodriguez Aff. ¶ 11; Thompson Aff. ¶ 13.  An injunction of Executive Order 21-175 would have no impact on the wearing of masks in cafeterias, where students necessarily take their masks off to eat.  However, it is entirely possible that, through administrative procedures under the IDEA, Plaintiffs could reach an accommodation for eating safely at school.

These examples, taken together, demonstrate that there are unique problems facing Plaintiffs, which require unique solutions.  The Court finds all Plaintiffs would be substantially benefited by pursuing administrative remedies that can provide tailored solutions to each child's individual needs.  By focusing on an A.L.J.'s lack of authority to enjoin Executive Order 21-175, rather than on the specific issues that are facing each of Plaintiffs' children, Plaintiffs' arguments have raised an inference that Plaintiffs have sought to bypass the exhaustion requirement "by asking for relief that administrative authorities could not grant."  *N.B. by D.G*, 84 F.3d at 1379.

Moreover, it is not even clear that Plaintiffs' requested relief would alleviate many of the concerns raised by Plaintiffs in their affidavits.  As discussed above, Plaintiffs raise highly individualized concerns including, but not limited to: (1) mask-wearing during lunchtime (despite universal mask mandates being in place), (2) loose standards for medical exemptions from mask

requirements (despite universal mask mandates being in place), (3) availability of counseling, (4) the quality of virtual education alternatives, and (5) the absence of vaccine mandates.  Hayes Aff. ¶ 10, 17; Rodriguez Aff. ¶ 11; Todd Aff. ¶ 18; Dooley Aff. ¶¶ 11–12, 16; Banek Aff. ¶¶ 5–6; McCarthy Aff. ¶ 9; Thompson Aff. ¶ 13; Compl. ¶ 162 ("The Plaintiffs are seeking a reinstatement of a 'full panoply of services' including live synchronous and asynchronous instruction with the same curriculum as in person instruction and the ability to interact with a student's teacher and peers.").

These various individualized circumstances beg the question: How would an injunction against Executive Order 21-175 solve these problems?  Plaintiffs have not offered an adequate answer.  *See generally* Resp.  The IDEA does, however, offer an administrative solution that Plaintiffs would be well-advised to avail themselves of.

Plaintiffs would also have the Court ignore the Complaint's repeated concerns with the viability of virtual educational opportunities, which: (1) would not require an injunction of Executive Order 21-175 to improve, and (2) likely could be improved through the pursuit administrative remedies.  Compl. ¶¶ 86, 114, 124.

Plaintiffs also ignore the significance of the fact that the FDE Rule provides for a "Hope Scholarship" which "provide[s] parents another means to protect the health and education of their child by moving their child to another school."  *See* FDE Rule.  The Court does not have a great deal of information as to whether this option would be well-suited for Plaintiffs, in part, due to Plaintiffs' failure to exhaust their administrative remedies.

In addition to the foregoing, there are strong policy reasons belying the exhaustion requirement.  In *N.B. by D.G*, the Eleventh Circuit discussed some of these reasons:

Key reasons for requiring the exhaustion of administrative remedies are as follows:
1) to permit the exercise of agency discretion and expertise on issues requiring these

characteristics; 2) to allow the full development of technical issues and a factual record prior to court review; 3) to prevent deliberate disregard and circumvention of agency procedures established by Congress; and 4) to avoid unnecessary judicial decisions by giving the agency the first opportunity to correct any error.

84 F.3d at 1379. Additionally, in *Batchelor v. Rose Tree Media Sch. Dist.*, the Third Circuit discussed the following policy-based rationales for the IDEA's exhaustion requirement: (1) "[e]xhaustion serves the purpose of developing the record for review on appeal," (2) "encouraging parents and the local school district to work together to formulate an IEP for a child's education," and (3) "allowing the education agencies to apply their expertise and correct their own errors." 759 F.3d 266, 275 (3d Cir. 2014) (internal citations omitted). These policy concerns are applicable in this case as well. Here, too, the Court's review would be greatly benefitted by an administrative record, including relevant facts and potential accommodations, that would be developed during the administrative process. The IDEA's existence is a recognition that it would be ill-advised for a federal court to wade into the waters of localized education without at least affording state or local officials an opportunity to: (1) first attempt to remedy the problem, and (2) develop a record for a federal court's subsequent review. *See, e.g.*, *N.B. by D.G*, 84 F.3d at 1379. The Court appreciates Plaintiffs' submitting affidavits describing their specific concerns for their children's wellbeing. However, there can be no doubt that if Plaintiffs had exhausted their administrative remedies, this Court, and any other court, would be in a much better position to evaluate whether an individual student is experiencing an unlawful denial of FAPE. Perhaps in some cases, a court would have no use for such an administrative record. In this case, however, the Court finds that the value which would have been provided by an administrative record weighs against finding that exhaustion would be futile.

For the foregoing reasons, the Court finds that Plaintiffs' assertion that exhaustion would be futile is without merit. *M.T.V.*, 446 F.3d at 1159. Thus, because the IDEA's exhaustion

requirement applies to Plaintiffs' claims and the process of exhaustion would not be futile or inadequate, the Court finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits.

### 3. The Court Will Address Plaintiffs' Article III Standing in Ruling on the Pending Motions to Dismiss in This Case.

The Court finds that the Parties' arguments with respect to standing would be better addressed at a later stage in this litigation because further briefing will be required on these issues. However, the Court notes that State Defendants' have raised legitimate concerns with respect to Plaintiffs' standing in this case. For instance, it is particularly perplexing that Plaintiffs have failed to join the Florida Department of Health to this action. Plaintiffs' failure to do so calls into question whether an injunction against Executive Order 21-175, alone, would have any impact on the FDH Rule, which provides in relevant part that schools "must allow for a parent or legal guardian of the student to opt-out the student from wearing a face covering or mask." *See* FDH Rule. Thus, it is unclear whether the relief sought by Plaintiffs would actually provide redress to any of Plaintiffs' alleged injuries. Relatedly, in Plaintiffs' Motion, they request that this court "issue a preliminary injunction requiring [Defendants] to refrain from enforcing Office of the Governor Executive Order 21-175." Mot. at 2. This underscores that Plaintiffs' requested relief does not encompass the FDH Rule. However, at this time, the Court does not conclude one way or another as to whether standing has any bearing on Plaintiffs' likelihood of success on the merits.

Additionally, many Plaintiffs' children are located in districts that currently have a universal mask mandate but are either: (1) not going to school, or (2) going to school and are raising concerns about other aspects of the masking requirements, such as masking during lunchtime or medical opt-out provisions. *See* Hayes Aff. ¶ 17; Banek Aff. ¶¶ 5–6; Hr'g Tr. at 15:9–10 ("In those schools, the mask policy is not preventing them from going to school.").

24

Notably, one of Plaintiffs' children, R.K., is not going to school even with a universal mask mandate on the advice of her doctor.  Kinder Aff. ¶ 9.  Thus, the Court has concerns as to whether an injunction of Executive Order 21-175 (and the related regulations) would provide redress to Plaintiffs' alleged injuries.  The Court is hesitant to find no standing on this basis at this time, however, because the mask protocols have undergone changes, even during the short time that this suit has been pending in federal court.  The Court finds it would be worthwhile, as this case proceeds, to more carefully probe the redress that the requested relief would have on each Plaintiff's specific injuries.  Again, this underscores the benefit an administrative record would have had in this case if Plaintiffs had exhausted their administrative remedies.  It appears that at least some of Plaintiffs' children's concerns are wholly unrelated to Executive Order 21-175 and could be adequately addressed through that process.

The Court has every intention of fulfilling its obligation to inquire into subject matter jurisdiction as this case proceeds.  *See Univ. of S. Ala. v. Am. Tobacco Co*., 168 F.3d 405, 410 (11th Cir. 1999) (citations omitted).

**B.     Plaintiffs Have Not Shown Irreparable Injury Arising from Executive Order 21-175 and Related Regulations.**

Plaintiffs argue that their children will suffer irreparable injuries because absence from school has been recognized by courts as irreparable harm. Mot. at 18–19 (citing *Sullivan v. Vallejo City Unified Sch. Dist.*, 31 F. Supp. 947, 961 (E.D. Cal. 1990); *Alejandro v. Palm Beach State College*, 843 F. Supp. 2d 1263, 1270-71 (S.D. Fla. 2011) (concluding that missing school classes constitutes irreparable harm and granting the temporary injunctive relief); *Borough of Palmyra Bd. of Educ. v. F.C.*, 2 F. Supp. 2d 637, 645 (D.N.J. 1998) (holding that the loss of an appropriate education is an irreparable harm under preliminary injunction analysis)).  Plaintiffs argue that "[t]he loss of educational opportunities is a paradigmatic example of irreparable harm, as it is both

intangible and deeply damaging." *Id*. at 18.  Plaintiffs contend that Executive Order 21-175 is "forcing parents with children with disabilities to choose between their child's health or their child's education." *Id*. at 19.  Plaintiffs argue that the "[t]o the extent that any relief may violate the 'Parent's Bill of Rights' such acts would readily fall by the U.S. Constitution's Supremacy Clause." *Id*.

In response, State Defendants argues that Plaintiffs have overlooked Eleventh Circuit precedent on this issue, which states that the "loss of educational opportunities" is not sufficient to be considered an irreparable injury when a school has not denied educational services to a student altogether but rather has denied authorization for him or her to receive those services at the school of his or her choice.  Resp. at 20 (citing *C.B. v. Bd. of Sch. Comm'rs of Mobile Co., AL*, 261 F. App'x 192, 194 (11th Cir. 2008)).  State Defendants also argue that the cases cited by Plaintiffs are distinguishable because (1) *Sullivan* and *Alejandro* concerned service dogs, and (2) *Borough of Palmyra* involved an injunction to comply with an ALJ's orders—"a far cry from this case, in which Plaintiffs have decided not to pursue their administrative remedies at all."  *Id*. at 20–21.

The Eleventh Circuit's precedent is clear on the issue of irreparable harm in the context of preliminary injunctions involving alleged denials of FAPE.  The Eleventh Circuit's holding in *C.B. v. Bd. of Sch. Comm'rs* warrants quoting at length:

> In this case, the district court did not abuse its discretion by denying C.B.'s motion for a preliminary injunction because he failed to establish that he would suffer immediate and irreparable harm if such relief were not granted.  C.B. does not provide any evidence that the district court's decision to maintain the status quo in the present case constitutes irreparable harm.  **To the contrary, the evidence in the record indicates that the School Board has not denied educational services to C.B. altogether, but has denied authorization for him to receive those services at the school of his choice.**  Moreover, the record also indicates that he can continue to receive educational services at his neighborhood school while the underlying case is pending in the district court.  Although C.B. asserts that other

courts have granted injunctive relief in favor of students who were denied school benefits, and further asserts that the denial of such benefits constitutes irreparable harm *per se,* the cases he cites in support of this claim are factually distinguishable as they address situations where students were at risk of being excluded from school attendance or participation in school activities for an entire year.

261 F. App'x at 194 (internal citation omitted) (emphasis added).

Here, for the reasons discussed below, the Court finds that Plaintiffs have failed to establish irreparable harm because they have not been denied educational services all together.

As in many other aspects of this case, the Court's analysis is frustrated by the fact that there are numerous Plaintiffs that each face their own unique challenges.  As has been discussed above, some of Plaintiffs are currently in school with universal mask mandates, some are in school without universal mask mandates, some are at home despite universal mask mandates being in place, and one is at home in circumstances where a universal mask mandate is not in place.  These unique circumstances notwithstanding, there has been no allegation that any of Plaintiffs' schools have denied Plaintiffs educational opportunities altogether.  Plaintiffs allege that Florida Virtual School and other virtual learning options are not well-suited for students with cognitive disabilities and that they do not provide FAPE.  Compl. ¶ 85.   In their affidavits, several Plaintiffs note that their children are enrolled in online educational programs, such as Florida Virtual School, or are attempting to strengthen the functionality of their children's online options.  Hayes Aff. ¶ 10; Koch Aff. ¶¶ 6, 15; Kinder Aff. ¶ 34.  The Court is sensitive to the difficulties that disabled children would have partaking in virtual education.  However, the Court finds that these difficulties do not amount to a denial of educational services altogether and Plaintiffs' concerns with respect to virtual learning, therefore, do not amount to irreparable harm.  *C.B.,* 261 F. App'x at 194 ("[T]the evidence in the record indicates that the School Board has not denied educational services to C.B.

altogether, but has denied authorization for him to receive those services at the school of his choice.").[6]

Further, the FDE Rule explicitly provides for a Hope Scholarship which "provide[s] parents another means to protect the health and education of their child by moving their child to another school." *See* FDE Rule. Plaintiffs allege in the Complaint that a "voucher" for private school is "not a viable alternative" because parents need to find a school willing to accept their children with disabilities and transportation can be expensive. Compl. ¶ 87. The Court finds these concerns speculative. To the extent Plaintiffs believe the Hope Scholarship would be insufficient, those concerns should be raised after Plaintiffs have at least attempted to avail themselves of the benefits of the Hope Scholarship. Additionally, in the instant Motion, Plaintiffs raise a number of speculative concerns regarding the Hope Scholarship, such as: (1) it would require a waiver to the children's right to FAPE, (2) the teachers might be less qualified, (3) private schools do not follow IEPs, (4) children have less rights to procedural safeguards when there is a disagreement, (5) the school district is not required to provide transportation to private schools, and (6) many families cannot afford private school. Mot. at 17. However, these concerns are all hypothetical because no Plaintiff has even explored what the scholarship would actually entail. Plaintiffs' unsubstantiated concerns with the Hope Scholarship notwithstanding, the fact that the FDE Rule explicitly provides for alternative educational opportunities is another factor that weighs against finding a complete denial of educational services to Plaintiffs altogether. *C.B.*, 261 F. App'x at

---

[6]  Multiple times in the Complaint, Plaintiffs claim that Florida Virtual School or other online programs do not provide FAPE because they do not provide "an Access Point Curriculum or the necessary supports, services and accommodations, including direct instruction from a special education teacher." Compl. ¶¶ 86, 114, 124. However, the difficulties that Plaintiffs' children are enduring with virtual education provide an additional reason why Plaintiffs should have exhausted their administrative remedies before bringing this suit.

194 ("[T]the evidence in the record indicates that the School Board has not denied educational services to C.B. altogether, but has denied authorization for him to receive those services at the school of his choice.").[7]

Thus, as in *C.B.*, the evidence in the record indicates that Plaintiffs have not been denied educational services to Plaintiffs altogether. Rather Plaintiffs have been deprived of the opportunity to receive those services in the school of their choice, or in a virtual learning environment of their choice. *C.B.*, 261 F. App'x at 194.

Lastly, the Court agrees with State Defendants' arguments distinguishing the cases cited by Plaintiffs from the case at bar because here: (1) there has been no denial of education altogether, and (2) there has been no attempt to exhaust administrative remedies. Resp. at 17. The service animal cases are distinguishable because, in those cases, the policies prohibiting animals effectively cut off each plaintiff's access to education. *Sullivan*, 731 F. Supp. at 961 (separation from a service animal caused the service animal's "usefulness" was diminished, thereby undermining plaintiff's ability to function as an independent person); *Alejandro*, 843 F. Supp. 2d at 1270–71 (finding irreparable harm when school banned service animal and student could not attend class without it). In *Borough of Palmyra Bd. of Educ.*, the Court found irreparable harm because a school district failed to provide education in a manner consistent with an A.L.J.'s decision. 2 F. Supp. 2d at 645. This circumstance is a highly distinguishable from the facts of this case, in which Plaintiffs have not even exhausted their administrative remedies. More importantly, in any event, the Eleventh Circuit precedent established in *C.B.* is controlling on the issues in this

---

[7] Plaintiffs' argument that they have been irreparably harmed, without even exploring what the Hope Scholarship would entail or taking any steps to exhaust their administrative remedies, leads the Court to attribute a degree of the alleged harms to Plaintiffs, rather than Defendants.

case with respect to irreparable harm. Thus, Court finds that Plaintiffs have failed to show irreparable harm because Defendants have "not denied educational services to [Plaintiffs] altogether but has denied authorization for [them] to receive those services at the school of [their] choice." *C.B.*, 261 F. App'x at 194.

     **C.**     **Weighing Harms and the Public Interest.**

Given that Plaintiffs have failed to demonstrate a likelihood of success on the merits and irreparable injury, the Court need not address the final two prongs of the preliminary injunction framework at great length. *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) ("Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits."). However, the Court briefly addresses the remaining issues below.

To begin, with respect to whether threatened injury to Plaintiffs outweighs damage to Defendants, the Court recognizes that as a general matter, immunocompromised individuals would be benefitted by settings in which those surrounding them are wearing masks. However, the Court will not oblige Plaintiffs' attempt to place a false choice before the Court. Plaintiffs would frame this case in a manner allowing for two rigid courses of action: (1) a path in which universal mask-wearing protects immunocompromised children in schools, or (2) a path where insufficient mask-wearing protocols needlessly put students at risk. *See generally* Mot. Yet, the facts before the Court make clear that these two paths are illusory and do not reflect the circumstances detailed in the record. For example, many Plaintiffs have raised concerns about medical opt-outs from universal mask mandates and lunchtime procedures. Dooley Aff. ¶¶ 11–12, 16; Banek Aff. ¶¶ 5–6; McCarthy Aff. ¶ 9; Collins Aff. ¶ 10; Rodriguez Aff. ¶ 11; Thompson Aff. ¶ 13; Hayes Aff. ¶ 17; Todd Aff. ¶ 18. Some Plaintiffs are not sending their children to school despite that their

children's school districts currently have a universal mask mandate in place.  Todd Aff. ¶ 18; Hayes Aff. ¶ 17; Kinder Aff. ¶ 9; Hr'g Tr. at 15:12–13 ("They may have other issues, but the mask policy itself is not preventing them from going to school.").  Thus, Plaintiffs' contention that an injunction of Executive Order 21-175 would remedy the harms posed to Plaintiffs' children is, in large part, not borne out in the record.

Plaintiffs' affidavits make clear that each child would benefit from individualized attention to remedy the various headwinds imposed on their education by the COVID-19 pandemic.  Thus, the Court finds that Plaintiffs would benefit more from the exhaustion of their administrative remedies to reach individualized accommodations than the enjoining of Executive Order 21-175 (assuming an injunction would even have Plaintiffs' desired effect, which is anything but guaranteed).

A specific example makes this point clear.  One of Plaintiffs' children, J.T., underwent brain surgery in June.  Todd Aff. ¶ 7.  J.T.'s parents have opted to keep him home from school, despite his school district's universal mask mandate, because students in his class were granted medical opt-outs.  *Id*. ¶ 18.  In this circumstance, there is no harm to weigh one way or another. The only path forward is for J.T. to seek an administrative solution that will provide him with the best education possible under the circumstances.  The Court can envision a solution for J.T. to return to public schools, in person, under specialized circumstances that would promote his maximum well-being.  For example, J.T. could attend school in an environment that includes the following: (1) specific classrooms with universal mask mandates, (2) outdoor lunchtime for immunocompromised students, (3) specific classrooms with only vaccinated students—to the extent they are available, (4) classrooms in which students partake in regularized COVID-19 testing, and (5) classrooms where there are no students with medical opt-outs from masking

policies. If a single classroom in J.T.'s school were to employ these provisions, it would allow him, and other immunocompromised children, to substantially mitigate the risks posed by COVID-19 and restore a semblance of normalcy to education. Enjoining Executive Order 21-175 will simply have no impact at all, in J.T.'s case, because he cannot attend his school which currently has universal mask mandate in place.

During the hearing, Plaintiffs' counsel alluded to these sorts of remedies being akin to segregation or otherwise unlawful discrimination. Plaintiffs' attempt to characterize instituting specialized health protocols to benefit children as segregation is unpersuasive, to say the least. Hr'g Tr. at 53:19–25.[8] To the contrary, the statutes on which Plaintiffs rely specifically envision individualized treatment for children with disabilities, that often requires special attention. *Fry*, 137 S. Ct. at 749 ("As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." (citing 20 U.S.C. §§ 1401(9), (26), (29) (other citations omitted)). Moreover, Plaintiffs' counsel would be advised to read the affidavit submitted by Plaintiff Kinder in which she specifically states that "[i]f the district honored [her] request to ensure that everyone in [R.K.'s] classroom is wearing masks, R.K. could return to school with her peers." Kinder Aff. ¶ 16. In any event, the Court is not presented with the legality of these proposed measures because Plaintiffs have not exhausted their administrative remedies and these sorts of accommodations have not been explored through that process. The Court would note, however, that if a child is truly so immunocompromised that COVID-19 has a high

---

[8] The Court sees no reason to believe that separating immunocompromised individuals to ensure that their surroundings support their maximum wellbeing is akin to unlawful segregation any more than providing children with peanut allergies their own table to eat at during lunchtime would be. However, if Plaintiffs truly believe that such accommodations would be unlawful, they may challenge those accommodations after exhausting their administrative remedies.

probability of causing severe illness or death, such as is the case with J.T., these measures just might save that child's life.  In the Court's view, that is where the interest of these children lies. For these reasons, although a universal mask mandate might be of some benefit to Plaintiffs' children, the Court finds that the balance of harms weighs in favor of Plaintiffs exhausting their administrative remedies in order to better address the specific harms posed to each child.

Lastly, with respect to the public interest.  On one hand, the Center for Disease Control's guidance on wearing masks informs the Court that, in general, public health would be benefitted by universal mask wearing.  On the other hand, Governor DeSantis and the Florida Legislature, through Executive Order 21-175 and the Parents' Bill of Rights respectively, have expressed on behalf of those who elected them that returning to a sense of "normal" is in the public interest as well.  Here, given the unique concerns raised by each parent, the Court finds that the public's interest is most adequately served by ensuring that these children receive their necessary accommodations in a manner that complies with the statutory framework governing claims alleging a denial of FAPE.  The IDEA's exhaustion requirement is "not merely a pleading hurdle." *Fry*, 137 S. Ct. at 755.  Rather, as discussed above, it serves several important purposes, including: (1) "developing the record for review on appeal," (2) "encouraging parents and the local school district to work together to formulate an IEP for a child's education," and (3) "allowing the education agencies to apply their expertise and correct their own errors."  *Batchelor*, 759 F.3d at 275; *see also N.B. by D.G*, 84 F.3d at 1379.  If the Court were to enjoin Executive Order 21-175 without first requiring exhaustion, it would run contrary to these important policies underlying the IDEA's exhaustion requirement.  Moreover, as discussed above, a case-by-case review of each Plaintiff's concerns would likely yield more effective solutions for each individual child than would a blanket injunction of Executive Order 21-175.  Indeed, for the students who are currently

at home despite a universal mask mandate being in place in their district, an injunction of Executive Order 21-175 would have no effect at all.  Thus, the Court finds that under the circumstances presented in this case, Plaintiffs' failure to exhaust their administrative remedies renders their requested relief to be out of line with the public interest.  Only after Plaintiffs have availed themselves of their administrative remedies would their requested relief be, potentially, in line with the public interest.

## IV.    CONCLUSION

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiffs' Amended Motion for Preliminary Injunction (ECF No. 17) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this *15th* day of September, 2021.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record